1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


UNITED STATES OF AMERICA,      *     Criminal Action
                          *     No. 24-105
    Plaintiff,           *
                          *     Section "D"
       v.             *
                          *     New Orleans, Louisiana
JOVANNA R. GARDNER,       *     May 8, 2024
                          *
    Defendant.           *
* * * * * * * * * * * * * * *

DETENTION HEARING,
BEFORE THE HONORABLE KAREN WELLS ROBY,
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For the Government:        U.S. Attorney's Office
                        By:  MATTHEW R. PAYNE, ESQ.
                        By:  BRIAN KLEBBA, ESQ.
                        By:  RYAN McLAREN, ESQ.
                        By:  BENJAMIN MYERS, ESQ.
                        650 Poydras Street, Suite 1600
                        New Orleans, Louisiana 70130

For the Defendant:         Law Office of Graham Bosworth
                        By:  GRAHAM L. BOSWORTH, ESQ.
                          CJA Attorney
                        700 Camp Street, Suite 112
                        New Orleans, Louisiana 70130

Court Audio Operator:     (Magistrate Clerical)

Transcriptionist:         Sherryl Robinson
                        c/o U.S. District Court
                        500 Poydras Street, Room B275
                        New Orleans, Louisiana 70130
                        (504) 589-7724


Proceedings recorded by electronic sound recording,

transcript produced by transcription service.

**I N D E X**

| WITNESSES: | | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|---|
| Amanda Eby | | 5 | 25 | 37 | -- |
| Amy Lapointe | | 40 | 41 | -- | -- |
|    By the Court | 42 | | | | |
| Renay Gardner | | 45 | 48 | -- | -- |
|    By the Court | 53 | | | | |
| Amy Lapointe | | | | | |
|    By the Court | 57 | | | | |

| GOVERNMENT EXHIBITS: | Marked | Received |
|---|---|---|
| #A   Twelve pages of demonstrative items<br>**(ADMITTED UNDER SEAL AND ATTACHED)** | 39 | 39 |

<u>P R O C E E D I N G S</u>

(Wednesday, May 8, 2024)

(Court is in Session)

\*   \*   \*   \*   \*

**DETENTION HEARING**

\*   \*   \*   \*   \*

1         THE COURT:  All right.  Call the next matter,
please.

         THE CLERK:  Criminal Action 24-105, *United States of America v. Jovanna R. Gardner*.  It's set for a detention hearing on an indictment.

         MR. PAYNE:  Your Honor, good afternoon.  On behalf of the United States, Matthew Payne joined by Brian Klebba, Ryan McLaren and Benjamin Myers.

         MR. BOSWORTH:  Good afternoon Your Honor, Graham Bosworth on behalf of Ms. Gardner who is present and in Court.

         THE COURT:  All right.  I believe it's the Government's request to detain.  Ms. Gardner, is that correct?

         MR. PAYNE:  That's correct, Your Honor.

         THE COURT:  What's your legal basis, sir?

         MR. PAYNE:  Your Honor, flight risk and danger to the community.

         THE COURT:  Mr. Bosworth, your response?

         MR. BOSWORTH:  Your Honor, we disagree with the

1    Government and are asking for a detention hearing.

2            MR. PAYNE:  Your Honor, we note that the Pretrial

3    Services report, Officer Silvette Ennis represented here by

4    Officer Amy Lapointe has recommended detention.  And we are

5    happy to -- we will call these people --

6            THE COURT:  Are you going to talk into that mike so I

7    can hear you?

8            MR. PAYNE:  I'll try.

9            THE COURT:  Because you sound like you're mumbling to

10   me.

11           MR. PAYNE:  I'm getting myself set up.

12           THE COURT:  All right.

13           MR. PAYNE:  Your Honor, in sum, Your Honor, this is a

14   very serious offense, and we will present evidence.

15   Ms. Gardner contributed the coordinated hit of a federal

16   witness in order to retaliate against him and also to silence

17   him from future cooperation.

18           We're going to point out, Your Honor, Ms. Gardner was

19   not the trigger person here, but what she did was assist a man

20   with whom she had a relationship and that seems to be a

21   historical precedent in her life.

22           And Your Honor, at this time we will cover -- we'll

23   cover Special Agent, FBI Special Agent Amanda Eby at this

24   time.

25           THE COURT:  Agent?

1          THE CLERK:  Please raise your right hand.

2                    *    *    *    *    *

3          **AMANDA EBY, GOVERNMENT'S WITNESS, SWORN**

4                    *    *    *    *    *

5          THE CLERK:  Please be seated and state your name and

6    spell it for the record.

7          THE WITNESS:  Amanda Eby, A-M-A-N-D-A, E-B-Y.

8          THE CLERK:  Thank you.

9          MR. PAYNE:  And if I could, the case manager just put

10   up that monitor, please.

11         THE COURT:  Your monitor is right there.  You can use

12   that if you wish.

13         THE WITNESS:  Yes, Your Honor.

14         MR. PAYNE:  Thank you Your Honor.

15      (Pause.)

16         MR. PAYNE:  Thank you.

17                    *    *    *    *    *

18                      DIRECT EXAMINATION

19   BY MR. PAYNE:

20   Q.   Special Agent, good afternoon.

21   A.   Good afternoon.

22   Q.   What is your current position?

23   A.   Special Agent with the FBI.

24   Q.   What field office do you work for?

25   A.   New Orleans Headquarters.

1  Q.    What squad are you assigned to?

2  A.    Violent Crime.

3  Q.    How long have you been a Special Agent?

4  A.    A year and a half.

5  Q.    What is your prior law enforcement experience?

6  A.    I have eight years of total enforcement experience between

7  that and police officer.

8  Q.    Have you been involved, excuse me, in the investigation of

9  fraudulently staged car collisions in the Greater New Orleans

10 area?

11 A.    Yes.

12 Q.    And that's been referenced as Operation Sideswipe?

13 A.    Yes.

14 Q.    Also in the course of this investigation have you also

15 participated in the investigation of the murder of Cornelius

16 Garrison, a cooperating witness in the Sideswipe investigation?

17 A.    Yes.

18 Q.    And who have you identified as among the perpetrators of

19 this murder?

20 A.    Ryan Harris and Jovanna Gardner.

21 Q.    So I'd like to start by just giving the Judge a little

22 background on this Operation Sideswipe.  About when did it

23 begin?

24 A.    Early 2019.

25 Q.    And what did this federal investigation concern?  What was

1    the scope?

2    A.    Fraudulent collisions between vehicles and semi-trailers.

3    Q.    How did this fraud work?

4    A.    Basically, you would have a vehicle that was known as the

5    slammer vehicle.  The slammer vehicle would intentionally

6    sideswipe a tractor-trailer.  They would then pull over and a

7    spotter vehicle would pull up behind them.  The driver or the

8    slammer of the slammer vehicle would then get out, they would

9    get into the spotter vehicle.  That vehicle would drive away

10   and a passenger would then get into the driver's seat of the

11   slammer vehicle and then they would flag down the semi-truck to

12   let them know that they've been in an accident.

13   Q.    So, and after that accident, you know, after they've seen

14   the passengers flag down this tractor-trailer, what would

15   happen then?

16   A.    They would then file a police report, sometimes

17   fraudulently police report, but not every time.  And they

18   usually did this because they held a high dollar amount of

19   insurance.

20   Q.    That's why the tractor-trailers were targeted?

21   A.    Yes.

22   Q.    And then after that, were there any insurance claims?

23   A.    Yes.

24   Q.    So, were passengers involved in this scheme?

25   A.    They were.

```
 1   Q.    In fact, how did passengers get involved in this scheme?

 2   A.    They're recruited by the slammers.

 3   Q.    Among those slammers, did that include Ryan Harris?

 4   A.    Yes.

 5   Q.    And Ms. Gardner, Jovanna Gardner; was she ever involved in

 6   a staged accident?

 7   A.    She was.

 8   Q.    Now, what was Mr. Harris' role in this scheme?

 9   A.    He was a slammer.

10   Q.    I'd like to talk to you about (inaudible), that's

11   Garrison; is Mr. Garrison there?

12   A.    It is.

13   Q.    And he had two nicknames, is that right?

14   A.    Yes, Slim and Pooty.

15   Q.    So, was Mr. Garrison caught by federal agents in October

16   2019?

17   A.    He was.

18   Q.    Did Mr. Garrison agree to cooperate with law enforcement?

19   A.    Yes.

20   Q.    And was this covert cooperation extended through September

21   of 2020 or thereabouts?

22   A.    Yes.

23   Q.    Did that cooperation include providing useful information

24   to federal agents?

25   A.    Yes.
```

1  Q.    And during this covert period of his cooperation, in fact

2  was he also assigned counsel?

3  A.    He was, Mr. Claude Kelly.

4  Q.    Did Mr. Garrison provide information specifically about

5  Ryan Harris?

6  A.    Yes, he did.

7  Q.    I want to be clear.  Did he also -- did he ever provide

8  information about Jovanna Gardner though?

9  A.    No.

10  Q.    Mr. Harris, just to talk about him:  What information did

11  Mr. Garrison provide about Mr. Harris in summary?

12  A.    He stated that he was a slammer.  He was involved in other

13  fraudulent actions with vehicles, and that they had set up two

14  or three fraudulent collisions together, and that they

15  ultimately had a falling out over money.

16  Q.    Also, did Mr. Garrison explain that Mr. Harris would stay

17  back since he's on his own?

18  A.    Yes.

19  Q.    And how would Mr. Harris do that?

20  A.    He would buy vehicles at salvage.  He would falsify

21  information that he fixed them up, insure them for more money

22  and then stage collisions between his own two vehicles to

23  collect the insurance.

24  Q.    Okay.  Now, I'd like to talk about September 18th, 2020,

25  an indictment that came down.  As Mr. Garrison's covert

1  cooperation ended, was he indicted for staging collisions?

2  A.   Yes.

3  Q.   Now, was it expected that Mr. Garrison would continue

4  cooperating?

5  A.   Yes.

6  Q.   In fact, after that he would be a cooperating witness?

7  A.   Correct.

8  Q.   Did this indictment include some information provided by

9  Mr. Garrison?

10  A.   Yes.

11  Q.   Was that indictment publicly available?

12  A.   Yes.

13  Q.   Also, was there a press release issued by the U.S.

14  Attorney's Office about this?

15  A.   There was.

16  Q.   To be clear, there were some co-Defendants in this

17  indictment, is that right?

18  A.   Correct.

19  Q.   Were any of them Mr. Harris?

20  A.   No.

21  Q.   Were any of them Ms. Gardner?

22  A.   No.

23  Q.   However, again, this indictment, you could specifically --

24        MR. BOSWORTH:  Objection, Your Honor, leading.

25        THE COURT:  Overruled.  Go ahead.

1  BY MR. PAYNE:

2  Q.    Information in this indictment could be attributed to

3  Mr. Garrison?

4  A.    Yes.

5  Q.    So now I'd like to turn your attention to September 22nd,

6  2020, four days after this indictment.   What happened that day?

7  A.    Mr. Garrison was murdered.

8  Q.    Where did Mr. Garrison live at that time?

9  A.    1533 Foy Street, it's his mother's house.

10 Q.    Did his mother live at the same residence?

11 A.    Yes.

12 Q.    Was Mr. Garrison married?

13 A.    Not to my knowledge.

14 Q.    Did he have children?

15 A.    He did.

16 Q.    However, did they live with him at the time?

17 A.    No.

18 Q.    About what time did this murder occur?

19 A.    Approximately 8:38 p.m.

20 Q.    And is that approximately when 911 calls came in?

21 A.    Yes.

22 Q.    When NOPD officers arrived what did they find?

23 A.    They found Mr. Garrison face down in living room.   There

24 was blood collected around his head and there was shell casings

25 found both outside and inside of his residence.   I believe he

1    was shot ten times and they found ten casings.

2    Q.    Based on the information from Mr. Garrison's mother, what

3    did she say happened?

4    A.    Between her interview and the 911 call she said that

5    Mr. Garrison had a phone call.  The doorbell rang, he went to

6    answer it.  He yelled, "Get down," and then she heard the

7    shots, however she didn't see the perpetrator.

8    Q.    I'd like to show you some photographs.  I'm going to show

9    you some photographs; have you reviewed these photographs,

10   Special Agent Eby?

11   A.    (Witness examines photographs.)

12         Yes.

13   Q.    And what are these photographs of?

14   A.    This is the New Orleans Police Department crime scene

15   photos from that night.

16   Q.    This photograph is an external photograph of what

17   location?

18   A.    (Witness examines photograph.)

19         Mr. Garrison's home.

20   Q.    What is that photograph of, Special Agent?

21   A.    (Witness examines photograph.)

22         The entry way and also Mr. Garrison's body.

23   Q.    Okay.  This is the second photograph in the series?

24         So Special Agent, this is an external photograph as well,

25   isn't that right?

1   A.   (Witness examines photograph.)

2        Yes.

3   Q.   Some of these are marking some items.   What are those

4   items?

5   A.   To my knowledge, 1 and 2 are the casings.

6   Q.   Uh-huh.

7   A.   And I believe that's marker number 3 is his shoe.

8   Q.   I'm showing you the next photograph in the series.   What

9   is this photograph of?

10  A.   (Witness examines photograph.)

11       Mr. Garrison.

12  Q.   There are also some evidence markers in this photograph,

13  is that right?

14  A.   Yes.

15  Q.   One of them I see, number 14; what is that marking?

16  A.   (Witness examines photograph.)

17       That was determined to be Mr. Garrison's phone.

18  Q.   The other markers there; some of them are marking what

19  else?

20  A.   (Witness examines photograph.)

21       Casings.

22  Q.   I'm showing you the next photograph in the series.   What

23  is this a photograph of?

24  A.   (Witness examines photograph.)

25       Casings that were located.

1  Q.    Is it the interior of the residence as well?

2  A.    Yes.

3  Q.    Okay.  And specifically, I think a coffee table?

4  A.    It appears to be that.

5  Q.    Special Agent, just based on your training and experience,

6  the fact that Mr. Garrison had been shot ten times; what is

7  your inference based on that?

8          MR. BOSWORTH:  Objection, Your Honor.  It calls for

9  speculation.

10         MR. PAYNE:  Okay.

11         THE COURT:  Overruled.

12         MR. PAYNE:  Thank you.

13         THE WITNESS:  That the shooting occurred in close

14  proximity.

15  BY MR. PAYNE:

16  Q.    All right.  So Special Agent, next, in the course of this

17  investigation did the FBI search the contents of Mr. Garrison's

18  cell phone that was found near his body?

19  A.    Yes.

20  Q.    What did they find in that cell phone?

21  A.    Suspicious texts from a contact that was labeled "Kim".

22  Q.    Why did Special Agents believe these were suspicious

23  contacts?

24  A.    They were flirtatious in nature and then also they

25  indicated a meeting that was to happen prior -- minutes prior

1  to his death.

2  Q.   Okay.  I'm showing you another photograph here, a snip,

3  excuse me, what's the -- what is it?

4  A.   (Witness examines photograph.)

5       The suspicious text messages.

6  Q.   These are from Mr. Garrison's phone?

7  A.   Yes.

8  Q.   All right.  Just to identify these, there are some that

9  are labeled bold.  Those that are bold; who are those by?

10 A.   (Witness examines photograph.)

11      Kim.

12 Q.   And just for the record for clarity, over what time period

13 were these texts between Mr. Gardner (sic) and the person known

14 as Kim?

15 A.   Can you repeat the question?

16 Q.   Over what time period, how many days?

17 A.   The phone was purchased and activated the day before

18 Mr. Garrison's murder.

19 Q.   Two days?

20 A.   Yes.

21 Q.   Okay.  So we are focusing here -- so while there are texts

22 on September 21st, the day before, this is September 22nd?

23 A.   Yes.

24 Q.   And this is the day of the homicide?

25 A.   Correct.

16

```
1   Q.   So the text messages in bold and along with Mr. Garrison's
2   response, I just want to point out some here, if it please the
3   Court, and I'll just read this out if that's acceptable.
4              THE COURT:  Any objection from defense counsel?
5              MR. BOSWORTH:  None, Your Honor.
6              THE COURT:  All right, go ahead.
7   BY MR. PAYNE:
8   Q.   There is a text here from Mr. Garrison saying, "Just
9   come."
10      To which this Kim says, "The same spot, project?"
11      Mr. Garrison replies, "Yeah."
12      And then Kim says, "What time?  How mom's doing?"
13      And he says, "Oh, when you want to.  She is good."
14      And then Kim replies, "I'mma text you later."
15      And Mr. Garrison says, "Okay."
16      I'm going to pause there.  Based on your training and
17  especially your experience in this case, what information is
18  being conveyed here?
19  A.   Confirming --
20             MR. BOSWORTH:  Again Your Honor, I would object at
21  this point to speculation and best evidence.  It speaks for
22  itself.
23             THE COURT:  Overruled.
24             THE WITNESS:  Confirming location and potentially who
25  he's living with.
```

```
 1            MR. PAYNE:  Okay.

 2  BY MR. PAYNE:

 3  Q.   Finally, there's a text here.  Those texts are around 4:30

 4  p.m. and 4:45 p.m. local time, is that correct?

 5  A.   Yes.

 6  Q.   Now I'm going to jump to this next text that is at 7:26

 7  p.m. local time; what does Kim say?

 8  A.   "I'mma come around 8:30.  I'mma text you when I'm

 9  outside."

10  Q.   To which Mr. Garrison replies what?

11  A.   "Okay."

12  Q.   What time was the homicide?

13  A.   Approximately 8:38 p.m.

14  Q.   After these texts at 7:30 p.m., were there any phone

15  calls?

16  A.   There were.

17  Q.   The next slide I'm showing you here; what are these?  What

18  is this?

19  A.   (Witness examines photograph.)

20       Phone calls located on Mr. Garrison's phone.

21  Q.   There's certain ones that have been highlighted here for

22  reference; who are those phone calls with?

23  A.   The contact labeled "Kim."

24  Q.   Again, all of these phone contacts show local time, New

25  Orleans?
```

1  A.   Yes.

2  Q.   Just to highlight them, there is a contact there that is

3  at 1932, that's 7:32 p.m. local time?

4  A.   Yes.

5  Q.   And then a couple of other contacts with other individuals

6  around 7:34 and 7:44, and then at 2034, which is 8:34 p.m.,

7  there's a contact with the Kim phone?

8  A.   Yes.

9  Q.   And then an outgoing call to the Kim phone at 2036?

10  A.   Yes.

11  Q.   That would be 8:36 p.m.?

12  A.   Yes.

13  Q.   And again, what time did the 911 calls come in?

14  A.   8:38 p.m.

15  Q.   And what did Mr. Garrison's mother say?

16  A.   That he received a phone call or that he was on the phone

17  and then there was -- the doorbell rang.

18  Q.   Did Special Agents after recovering this evidence try to

19  determine where and who was using that phone?

20  A.   They did.

21       MR. BOSWORTH:  I'm going to object, Your Honor.  This

22  calls for a factual conclusion that hasn't been supported by

23  evidence.

24       THE COURT:  Overruled.

25       MR. PAYNE:  We're going to get there.

1   BY MR. PAYNE:

2   Q.   So Special Agent, this phone; did the agents learn how

3   long it had been in use?

4   A.   Yes.

5   Q.   How long?

6   A.   Two days.

7   Q.   After this phone had these contacts with Mr. Garrison; how

8   much longer was that phone in use?

9   A.   It wasn't.

10  Q.   It went dead?

11  A.   Yes.

12  Q.   Was this phone in contact with any other phones other than

13  Mr. Garrison's?

14  A.   One other phone.

15  Q.   Did you all try to track down that phone?

16  A.   We did.

17  Q.   Where were those two phones purchased?

18  A.   The Family Dollar.

19  Q.   Is that the same Family Dollar store?

20  A.   Yes.

21  Q.   And did you determine who purchased them?

22  A.   We did.

23  Q.   Who was it?

24  A.   Ryan Harris.

25  Q.   And did you obtain surveillance from Family Dollar?

20

1   A.   We did.

2   Q.   And what do these photographs show here?

3   A.   (Witness examines photographs.)

4       It's surveillance video from the Family Dollar during the

5   time of the purchases of the phones.

6   Q.   In the course of this investigation, have agents referred

7   to -- well, which phone is referred to as Burner Phone 1, just

8   so the Court knows what this slide represents?

9   A.   Burner Phone 1 was determined to be the phone that the

10   contact Kim was using.  It's labeled Burner Phone 1 because

11   that was the first phone agents located.

12   Q.   And then Burner Phone 2, what's that?

13   A.   Burner Phone 2 was the phone number that the agents were

14   able to determine because it was the only other phone that the

15   Burner Phone 1 was in contact with besides Mr. Garrison.

16   Q.   After Burner Phone 1 was activated, after it was purchased

17   on September 21, 2020 the day before the murder; did agents

18   trace its location?

19   A.   Yes.

20   Q.   Where did it go?

21   A.   After it was activated it moved from the area to

22   Chalmette.

23   Q.   And specifically for this interview of where?

24   A.   Ms. Gardner's home.

25   Q.   And were the agents able to learn the location of

21

1    Ms. Gardner's real phone, her normally used phone?

2            THE COURT:  I've got a question.

3            MR. PAYNE:  Sure.

4            THE COURT:  Were you responding to Burner Phone 1 or

5    Burner Phone 2?

6            THE WITNESS:  I'm sorry, ma'am, it's confusing.

7    Burner Phone 1 was activated on September 21st.

8            THE COURT:  Uh-huh.

9            THE WITNESS:  And once it was activated, it moved to

10   Chalmette.

11           THE COURT:  Ah, okay, that was my question.

12           THE WITNESS:  And it was --

13           THE COURT:  Okay.

14           THE WITNESS:  Yes, ma'am.

15           THE COURT:  Thank you.

16   BY MR. PAYNE:

17   Q.   Incidentally, also Burner Phone 2 that was previously

18   purchased; was that also -- did that also move towards

19   Chalmette, as well?

20   A.   Yes.

21   Q.   Who lives in Chalmette?

22   A.   Ms. Gardner.

23   Q.   And I had asked you if agents had learned the location of

24   Ms. Gardner's normal actual phone, the regular one she uses?

25   A.   Yes.

1  Q.   Was that also in the same location at the time that phone

2  was delivered?

3  A.   Yes.

4  Q.   And I use the term "delivered" here only because after a

5  meeting there, and excuse me -- were there also texts between

6  Mr. Harris and Ms. Gardner prior to that meeting occurring?

7  A.   Yes, they had a text message string that was consistent

8  with a meet-up.

9  Q.   Okay.  Then after that phone went to Chalmette, where did

10 Burner Phone 1 go?

11 A.   Burner Phone 1 stayed in the vicinity of Chalmette.

12 Q.   Where did Burner Phone 2 go?

13 A.   It moved back towards I believe the East.

14 Q.   Over the course of the use of Burner Phone 1 and the

15 corresponding use of Ms. Gardner's phone; what locations were

16 they in?

17 A.   Trained agents in Southside Analysis were able to

18 determine that both phones stayed in the same vicinity when

19 they were in use.

20 Q.   And over the course of Burner Phone 2 and Mr. Harris'

21 actual phone; where were these phones located?

22 A.   Again, the agents that are trained in Southside Analysis

23 were able to determine that the phones were consistent with

24 being in the same vicinity.

25 Q.   The night of the homicide, September 22nd, 2022 (sic);

1   where was Burner Phone 1?

2   A.   Burner Phone 1 was consistent with being in the vicinity

3   of New Orleans East.

4   Q.   And where was Ms. Gardner's phone?

5   A.   Also in the same location.

6   Q.   Burner Phone 2; where was Burner Phone 2 located at the

7   time of the homicide?

8   A.   It was consistent with being in the vicinity of 1533 Foy

9   Street.

10   Q.   Did agents also on November 19th, 2020 execute a state

11   arrest warrant for Mr. Harris?

12   A.   We did.

13   Q.   In summary, did they recover some -- excuse me.   Was

14   Mr. Harris wearing a sweatshirt the day he was arrested?

15   A.   He was.

16   Q.   What kind of sweatshirt was that?

17   A.   The one that's portrayed there (indicating) with the

18   unique emblem that's also seen in the surveillance video of the

19   Family Dollar.

20   Q.   Okay.   I'd like to talk to you about Ms. Gardner's ongoing

21   contacts with Mr. Harris --

22        And this is going to wrap up, Your Honor.

23        For the record, are we touching on every single aspect of

24   this investigation?

25   A.   No.

1  Q.   And Your Honor, we're trying to limit this on certain

2  items as the nature of the charges, however -- excuse me.  Has

3  the Government obtained the toll records from Ms. Gardner's

4  phone?

5  A.   Yes.

6  Q.   And excuse me.  These show phone numbers called by

7  Ms. Gardner since April 4, 2024?

8  A.   Yes.

9  Q.   And to be clear, what is Ms. Gardner's and Mr. Harris'

10 relationship?

11 A.   They share a child.

12 Q.   On or about April 18th, 2024 around 9:00 a.m. did the

13 representatives of the Government and FBI meet with

14 Ms. Gardner's attorney?

15 A.   They did.

16 Q.   Did they provide some information about this case?

17 A.   Yes.

18 Q.   Now, between April 4th and April 18th, that's about twelve

19 days; approximately how many times did Ms. Gardner and

20 Mr. Harris have contacts?

21 A.   Approximately six times.

22 Q.   And from April 19th beginning at around 1:00 p.m. that day

23 until April 22nd, three days later; how many contacts were

24 there between Ms. Gardner and Mr. Harris?

25 A.   Approximately 22.

1    Q.    Okay.

2            MR. PAYNE:   Thank you very much.

3            Pass the witness, Your Honor.

4                    *    *    *    *    *

5                    CROSS-EXAMINATION

6    BY MR. BOSWORTH:

7    Q.    Good afternoon Agent -- Edy?

8    A.    "Eby."

9    Q.    E-D-Y?

10   A.    E-B-Y.

11   Q.    E-B-Y, I apologize, Eby.

12        I think we've met briefly before.  My name is Graham

13   Bosworth, I'm Ms. Gardner's attorney.  Just some questions

14   initially, to kind of go over the narrative of the

15   investigation to make sure that I have this clear.

16        Your testimony today is in 2019 you started a federal

17   investigation into fraudulent collisions, correct?

18   A.    Agents did.

19   Q.    The agents did.  There was a larger investigation that you

20   were a part of?

21   A.    There is Operation Sideswipe in which the fraud agents

22   work.  I became a part of this investigation for the violent

23   crime aspect of it, which was the murder of Mr. Garrison, and

24   that case I became part of as soon as I arrived at the office.

25   Q.    All right.  So you didn't actually get involved in the

1  case until towards the end of 2020?

2  A.   April of 2023.

3  Q.   Or April of 2023.

4       So your testimony about anything up until that point is

5  what you learned from other agents?

6  A.   That's correct.

7  Q.   Okay.  So based on what you've learned from other agents,

8  there was allegedly an enterprise wherein people were staging

9  accidents with 18-wheelers?

10 A.   That's my understanding, yes.

11 Q.   All right.  And in this investigation, the allegation is

12 that Ryan Harris and Cornelius Garrison worked in conjunction

13 with each other?

14 A.   Yes.

15 Q.   All right.  And again, I think it was your testimony that

16 there was no evidence that Mr. Garrison, who had become a

17 cooperating witness, had any information as it relates to

18 Ms. Gardner, correct?

19 A.   That's correct.

20 Q.   All right.  And your indication was that Cornelius

21 Garrison and Ryan Harris had a falling out, correct?

22 A.   Yes.

23 Q.   All right.  There's no information that there was any sort

24 of personal falling outs between Cornelius Garrison and

25 Ms. Gardner, correct?

1    A.    That's correct.

2    Q.    And your testimony is that an indictment was filed on

3    September 18th of 2020, correct?

4    A.    Yes.

5    Q.    And that was against Cornelius Garrison?

6    A.    Yes, and other co-conspirators.

7    Q.    And other co-conspirators.   And that four days later

8    Cornelius Garrison was shot and killed at his mother's house?

9    A.    That's correct.

10   Q.    And that that testimony -- or excuse me -- that that

11   shooting happened at roughly 8:30 p.m. on September 22nd, 2020?

12   A.    8:38 p.m.

13   Q.    8:38?

14   A.    Approximately.

15   Q.    Got it.   Thank you very much.

16        All right.   And just so that we are clear, there is zero

17   evidence that Jovanna Gardner was ever at (inaudible) in

18   custody, correct?

19   A.    That's correct.

20   Q.    All right.   There is zero evidence Jovanna Gardner was

21   ever in possession of any firearm at any point that you're

22   aware of, correct?

23   A.    That I'm aware of, correct.

24   Q.    Your investigation led you to believe that Cornelius

25   Garrison was the individual who fired that firearm, correct?

1  A.    Cornelius was the victim.

2  Q.    Excuse me, I'm sorry.  Ryan Harris is the person who fired

3  the firearm shooting Cornelius Garrison?

4  A.    My and along with the other agents' investigation.

5  Q.    All right.  And your testimony was that Ryan Harris is the

6  biological father of one of Ms. Gardner's children, correct?

7  A.    That's my understanding, yes.

8  Q.    And you're aware that child is four years old today?

9  A.    I wasn't sure of the age, but I knew she was a young

10 child.

11 Q.    All right.  And this shooting happened approximately three

12 and a half years ago, correct?

13 A.    Approximately.

14 Q.    So, when that child would have been a relatively newborn,

15 correct?

16 A.    That's correct.

17 Q.    All right.  So it's not surprising that Ryan Harris and

18 Jovanna Gardner would have been in communication, seeing as

19 they shared a newborn child at the time, correct?

20 A.    That's correct.

21 Q.    All right.  Now, your testimony is that on September, I

22 guess 22nd, based on the screen shots we saw; an individual

23 that you said identified themselves as Kim was texting

24 Cornelius Garrison, correct?

25 A.    Yes.

1  Q.   All right.  And you have no direct evidence whatsoever as

2  to who the person on the other end of the phone saying they

3  were Kim actually was, correct?

4  A.   No, not correct.

5       THE COURT:  She said not correct, counsel.

6  BY MR. BOSWORTH:

7  Q.   You have direct evidence?

8  A.   We have indirect evidence.

9  Q.   All right.  My question was:  You have no direct evidence

10 establishing who that was, correct?

11 A.   Correct.

12 Q.   Thank you.  What you were able to establish was that those

13 text messages came from what you referred to as Burner Phone 1,

14 correct?

15 A.   Yes.

16 Q.   All right.  And you, through your investigation,

17 determined that Burner Phone 1 had been purchased at a Family

18 Dollar a few days before, correct?

19 A.   The day before.

20 Q.   "The day before."

21      And your investigation led to -- we've lost the photos

22 here.

23      (Pause.)

24      MR. BOSWORTH:  I apologize, Your Honor.  I have to

25 rely on the Government.

1          (Laughter.)

2              THE COURT:  Is your cable in your device firmly,

3    because that happens sometimes.

4              UNKNOWN SPEAKER:  We might have to mirror the

5    display.

6          (Pause; fixing the computer screen.)

7              MR. BOSWORTH:  Your Honor, if it's okay I can just

8    use the print I think the Government has just given me.

9              THE COURT:  That's fine with me if it's fine with

10   you.

11             MR. BOSWORTH:  Fair enough, all right.

12   BY MR. BOSWORTH:

13   Q.   So we're clear, based on your investigation you determined

14   that Burner Phone 1 was purchased on September 21st, 2020?

15   A.   Yes.

16   Q.   And at a time when an individual with that picture right

17   there (indicating) was making a purchase, correct?

18   A.   Correct.

19   Q.   All right.  And your investigation has led you to believe

20   that that was Ryan Harris, correct?

21   A.   Yes.

22   Q.   To be clear, that's not Jovanna Gardner, correct?

23   A.   That's correct.

24   Q.   There's no evidence Jovanna Gardner was anywhere near the

25   Family Dollar at that point, correct?

1    A.    Correct.

2    Q.    All right.  You however apparently got the data relative

3    to Burner Phone 1 and determined when that phone had been

4    turned on, correct?

5    A.    Yes, the agents did.

6    Q.    All right.  And in your investigation you determined that

7    it had been turned on in Chalmette?

8    A.    No.  The phone had been turned on -- I can't remember

9    exactly where exactly it was turned on, but it was activated.

10   It was purchased and activated in a relatively short manner.

11   And then, I believe the agents saw the phone move from the East

12   to Chalmette.

13   Q.    "To Chalmette."

14        Now, when you say it moved from the East to Chalmette, you

15   are actually using what I think you've testified to as cell

16   phone data?

17   A.    Cell site data.

18   Q.    All right.  And cell site data means that on a cell site

19   there are three cones that come out and you can determine which

20   cone a phone is bouncing a signal off of, correct, roughly

21   speaking?

22   A.    Very roughly speaking.

23   Q.    All right.

24   A.    I can't speak to -- I'm referring back to the cell site

25   trained agents on that.

```
 1   Q.    Okay.  Unfortunately, I only have you to cross-examine.

 2   A.    That's fine.

 3         (Laughter.)

 4   Q.    But generally speaking, you're talking about a cone --

 5   A.    Roughly, generally.

 6   Q.    Okay.  Now it doesn't identify a particular address,

 7   correct?

 8   A.    That's correct.

 9   Q.    It doesn't particularly identify a particular block even,

10   correct?

11   A.    It depends on the tower.  According to what I've heard

12   from other agents, but in the vicinity of the Chalmette it was

13   not a block --

14   Q.    Right.

15   A.    -- if that's what you're getting to.

16   Q.    So basically, you can say that a cone of data spreading

17   out from the tower, at some point in that cone, covering

18   multiple blocks somewhere in Chalmette, you indicated that that

19   phone was operating?

20   A.    Yes.

21   Q.    Correct?

22   A.    Yes.

23   Q.    All right.  And your testimony is that that cone of

24   digital coverage also you believe contained Ms. Gardner's home,

25   correct?
```

1  A.   Yes.  So agents have -- also that are trained in cell site

2  data -- were able to determine a particular tower that she uses

3  with her known phone number and that burner phone was also

4  consistent with using that tower.

5  Q.   Okay.  But again, some line of questions:  You have no

6  idea specifically where her phone was, correct?

7  A.   As far as like a block, no.

8  Q.   All right.  It's somewhere in that same digital coverage

9  zone, covering a huge chunk of Chalmette, correct?

10  A.   I wouldn't say huge, but a particular area of Chalmette,

11  yes.

12  Q.   You can't get us to eat like generals?

13  A.   I don't have the miles or anything like that.

14  Q.   All right.  But in light of any other information you

15  can't specifically say those two phones were ever at the exact

16  same location.

17  A.   Down to the block?  No.

18  Q.   I mean, down to multiple blocks?

19  A.   It was in the vicinity of each other.  That's all I can

20  say about it.

21  Q.   But you can't even say how big the vicinity is?

22       MR. PAYNE:  Asked and answered.

23       MR. BOSWORTH:  I apologize, I'm just trying to get

24  some clarifications.

25       THE COURT:  Sustained.

1        MR. BOSWORTH:  Understood.  All right.

2   BY MR. BOSWORTH:

3   Q.   Now you also testified that prior to that phone moving to

4   the general area in Chalmette, there was text communication

5   between Mr. Harris and Ms. Gardner, I guess on their personal

6   Cell phones.

7   A.   Yes.

8   Q.   All right.  So for clarification, you got their personal

9   cell phone to check with?

10  A.   No, it's off of iCloud data, I believe.

11  Q.   All right.

12  A.   That's where they got that from.

13  Q.   Now again, that isn't necessarily surprising because they

14  shared a newborn child at the time, correct?

15  A.   That's correct.

16        THE COURT:  Let me ask this:  So the data shows the

17  connection between the two phones but not the substance of the

18  communications, correct?

19        THE WITNESS:  For the Burner Phones, no.

20        THE COURT:  For their personal phones?

21        THE WITNESS:  So for their known phone numbers there

22  was a conversation that indicated that they were going to meet

23  up shortly after the Burner Phone 1 was purchased.  And then

24  Burner Phone 1 is also seen in Chalmette.

25        THE COURT:  Okay.

1          THE WITNESS:  Along with Burner Phone 2.

2          THE COURT:  Okay.

3   BY MR. BOSWORTH:

4   Q.   So to be clear then, when you have the text communication

5   between their personal phones, you actually know the substance

6   of that communication?

7   A.   We knew -- we know some text messages, yes.

8   Q.   All right.  And there was nothing in a text message

9   saying:  I'm coming to bring you a burner phone?

10  A.   No.

11  Q.   It just said --

12  A.   Not the burner phone part.

13  Q.   -- I'm coming over?

14  A.   I can't remember the exact verbiage.  I know that we have

15  it.  It said something to the fact of W-Y-A, which I determine

16  is slang for where you at?  I think was what it said, something

17  to that effect.

18       And then the reply from Jovanna was inside and I would

19  determine that as being slang for staying inside the house.

20  And then, something to the effect that he was coming over.

21  Q.   Okay.  Now, you also testified that you were looking at

22  the general cell coverage of those two phones going forward?

23  A.   Of which ones?

24  Q.   Of Burner Phone 1 and Jovanna Gardner's personal phone.

25  A.   Yes, it was --

36

1    Q.    Over the course of the next day?

2    A.    I'm not sure how long agents actually were looking at

3    those phones.  I don't know how far after the incident of the

4    murder was, over how long before.

5    Q.    But from the point that it was activated on September 21st

6    to the point of the homicide on September 22nd; your testimony

7    is those two phones were using that same tower regardless of

8    which tower in the Greater New Orleans area that were used?

9    A.    They were consistent with moving, when they were in use,

10   together.

11   Q.    Okay.

12   A.    On those two days.

13   Q.    But again, you have no idea who was actually in possession

14   of Jovanna Gardner's personal phone?

15   A.    To my -- I believe that there is text messages that are

16   consistent with her possessing her personal phone on the day of

17   the murder.

18   Q.    All right.  You believe or you know?

19   A.    I know of one for sure.

20   Q.    And it identifies her as conclusively being the person, or

21   it's something that you're inferring based on the substance?

22   A.    Inferring.

23   Q.    All right.  You have nobody who directly saw her in

24   possession of that phone that day?

25   A.    If you're saying do we have somebody that said I saw

1    Jovanna with her phone on the day of her murder or Jovanna

2    texting somebody:  Hey, I have my phone on the day of my -- not

3    that I have seen.

4    Q.   Okay.  So again, you have no direct evidence of who was

5    actually in possession of Jovanna Gardner's personal phone that

6    day?

7    A.   No direct evidence.

8    Q.   Yes.

9         MR. BOSWORTH:  Just a moment, Your Honor.

10        (Pause.)

11        MR. BOSWORTH:  Your Honor, no further questions at

12   this time.

13        THE COURT:  All right.  Counsel for the Government?

14        MR. PAYNE:  Yes.

15                 *    *    *    *    *

16                    REDIRECT EXAMINATION

17   BY MR. PAYNE:

18   Q.   I'm just clarifying.  You were asked some questions about

19   direct and indirect evidence, kind of a legal term, do you

20   remember?

21   A.   Yes.

22   Q.   You do have text messages?

23   A.   We do have text messages.

24   Q.   There's other evidence we haven't touched on in this

25   matter?

38

1   A.   Yes.

2   Q.   And I know there are some questions here about specific

3   texts, whether or not we knew that Ms. Gardner was in

4   possession of a real phone.  The night of the murder, about an

5   hour afterwards, was there a text between Ryan Harris and

6   Ms. Gardner?

7   A.   Yes.

8   Q.   And what did Mr. Harris ask?

9   A.   "Where ya' at?"

10  Q.   And what did she say?

11  A.   "By Jer."

12  Q.   And what does "Jer" mean?

13  A.   Her sister.

14  Q.   That's Jereny (phonetic) Gardner?

15  A.   Yes.

16  Q.   And where was that -- and where was her phone at the time?

17  A.   In the East.

18  Q.   And where does Ms. Gardner live -- excuse me, Ms. Jereny

19  Gardner live?

20  A.   In the East.

21  Q.   Okay.

22       MR. PAYNE:  Thank you very much.  We would ask to

23  call --

24       THE COURT:  I have a question for you.

25       MR. PAYNE:  Yes.

```
 1              THE COURT:  You have offered these items as
 2    demonstrative evidence?
 3              MR. PAYNE:  Yes.
 4              THE COURT:  And I'm not aware of whether the
 5    Government seeks to admit them as evidence?
 6              MR. PAYNE:  We can, and so we would suggest that they
 7    would likely be under seal, Your Honor, and have the Court --
 8              THE COURT:  All right.  Any objection?
 9              MR. PAYNE:  -- if necessary.
10              MR. BOSWORTH:  If the Government is introducing it I
11    have no objection, but I would request that they remain under
12    seal.
13              THE COURT:  All right.  The Court will admit those
14    items as Government Exhibits -- what?
15              MR. PAYNE:  We can -- this is twelve pages.
16              THE COURT:  Okay, 1 through 12.
17              MR. PAYNE:  Just Government Exhibit A and --
18              THE COURT:  And it shall be under seal.
19              MR. PAYNE:  Thank you Your Honor.
20              THE COURT:  All right.
21              MR. PAYNE:  We'll provide a copy.
22              THE COURT:  Any further need for the agent at this
23    time?
24              MR. PAYNE:  No.  Thank you very much Special Agent
25    Eby.
```

1          THE COURT:  You may step down.

2      (Witness is excused)

3          MR. PAYNE:  Officer Amy Lapointe, please.

4          THE CLERK:  Please raise your right hand.

5                    *   *   *   *   *

6          **AMY LAPOINTE, GOVERNMENT'S WITNESS, SWORN**

7                    *   *   *   *   *

8          THE CLERK:  Please state your name for the record.

9          THE WITNESS:  Amy Lapointe.

10         THE CLERK:  Thank you.

11                   *   *   *   *   *

12                   DIRECT EXAMINATION

13    BY MR. PAYNE:

14    Q.   Officer Lapointe, good afternoon.

15    A.   Good afternoon.

16    Q.   Where do you work?

17    A.   U.S. Probation.

18    Q.   Did you assist on the recommendation for Ms. Gardner's

19    bond?

20    A.   Yes, I reviewed the report submitted by USPO Ennis with a

21    recommendation for detention.

22         MR. PAYNE:  We would offer a stipulation regarding

23    the contents of this report, if that please the Court.

24         THE COURT:  Mr. Bosworth?

25         MR. BOSWORTH:  We'll join in that stipulation.

1          THE COURT:  All right, so noted.

2          MR. PAYNE:  I just want to go over one item here.

3          THE COURT:  Uh-huh.

4    BY MR. PAYNE:

5    Q.   The circumstances of Ms. Gardner's prior felony, which is

6    a misprision of a felony from the U.S. District Court, Southern

7    District of Texas.  Could you please explain that, generally,

8    what you're aware of?

9    A.   In conferring with USPO Ennis, it appears that that charge

10   involves a credit card scheme that the Defendant was involved

11   with, with a dating partner at the time.

12   Q.   Thank you very much.

13          MR. PAYNE:  Nothing further, Your Honor.

14   BY MR. PAYNE:

15   Q.   I believe unless -- is there any other details you have on

16   that?

17   A.   I do not.

18   Q.   Okay.

19          THE COURT:  Mr. Bosworth?

20          MR. BOSWORTH:  This will be also very briefly, just

21   to (inaudible) the point.

22                    *    *    *    *    *

23                    CROSS-EXAMINATION

24   BY MR. BOSWORTH:

25   Q.   In your report you are able to provide a family history

1  for Ms. Gardner, correct?

2  A.   Yes, sir.

3  Q.   And you are able to demonstrate her -- the number of

4  children that she has?

5  A.   Yes, sir.

6  Q.   And you're able to establish that a younger child is four

7  years old?

8  A.   Yes, sir.

9  Q.   Okay.

10        MR. BOSWORTH:  No further questions.  Thank you, Your

11  Honor.

12              *   *   *   *   *

13              EXAMINATION BY THE COURT

14        THE COURT:  So how many children does Ms. Gardner

15  have?

16        THE WITNESS:  Your Honor, I believe it was five.  She

17  has an adult child and then four that she has custody of.  If

18  I'm mistaken on the number, I apologize.

19        MR. BOSWORTH:  For clarification, Your Honor, it's

20  four.

21        THE COURT:  All right, thank you, Mr. Bosworth.

22        THE WITNESS:  So there's one adult child who I

23  believe lives with a girlfriend and then three minor children

24  who reside with the Defendant.

25        THE COURT:  Okay.  Do you know what she does for a

1    living?

2              THE WITNESS:  Yes, Your Honor.  She works at

3    Children's Hospital in I believe janitorial.

4              THE COURT:  And how much does she earn annually, are

5    you aware?

6              THE WITNESS:  Your Honor, I believe it was around 30

7    annually.

8              THE COURT:  Thirty thousand?

9              THE WITNESS:  Thirty thousand.

10             THE COURT:  I see that she has an asset which is a

11   2021 Blazer?

12             THE WITNESS:  Yes, Your Honor.

13             THE COURT:  Do you know if there is a note on that,

14   or is it free and clear?

15             THE WITNESS:  It's my appreciation that it's free and

16   clear, Your Honor.

17             THE COURT:  Given her annual income and the fact that

18   a 2021 Blazer is free and clear, do you have any understanding

19   as to how that could be?

20             THE WITNESS:  No, Your Honor.

21             THE COURT:  With regards to the misprision of the

22   felony, how do you know that it involved a person that she was

23   in a relationship with?

24             THE WITNESS:  Your Honor, that was testimony I

25   received this afternoon from USPO Ennis when I called her about

44

1    the report that she had submitted, to try to get clarification

2    on some items.

3             THE COURT:  And what happened with the charge?

4             THE WITNESS:  She pled guilty in the Southern

5    District of Texas, received a sentence of I believe it was 27

6    months, followed by a term of supervised release.

7             THE COURT:  So the supervised release terminated

8    when?

9             THE WITNESS:  In, I think it was April of 2016, April

10   12th if I'm not mistaken.

11            THE COURT:  And so since 2016 to the present, she has

12   not had any encounters with the law, correct?

13            THE WITNESS:  None that I am aware of, Your Honor.

14            THE COURT:  Okay.  Thank you.

15            You may step down.

16            THE WITNESS:  Thank you Your Honor.

17       (Witness is excused)

18            MR. PAYNE:  Nothing further from the Government, Your

19   Honor.

20            MR. BOSWORTH:  Your Honor, at this time the defense

21   would call Renay Gardner.

22            THE CLERK:  Please raise your right hand.

23                     *   *   *   *   *

24        **RENAY GARDNER, DEFENDANT'S WITNESS, SWORN**

25                     *   *   *   *   *

45

1          THE CLERK:  Please be seated and state your name and
2    spell it for the record.
3          THE WITNESS:  Renay Gardner, R-E-N-A-Y,
4    G-A-R-D-N-E-R.
5          THE CLERK:  Thank you.
6          THE COURT:  Are you okay?
7          THE WITNESS:  No.
8          THE COURT:  You're not okay?
9          THE WITNESS:  No.
10          THE COURT:  Can I get her some water, please?  It's
11    going to be all right.  And a Kleenex, please.  It's going to
12    be all right, Ms. Gardner.
13        (Pause.)
14          THE WITNESS:  I'm sorry.
15          THE COURT:  It's okay, you don't have to apologize.
16          Go ahead, sir.
17                    *    *    *    *    *
18                    DIRECT EXAMINATION
19    BY MR. BOSWORTH:
20    Q.   Ms. Gardner, how do you know Jovanna Gardner?
21    A.   My daughter.
22    Q.   Are you close to your daughter?
23    A.   Yes.
24    Q.   All right.  So you're aware of her kind of current living
25    situation?

1   A.    Yeah.

2   Q.    All right.  Do you know where she's currently residing

3   without necessarily putting it on the record?

4   A.    In the East.

5   Q.    Okay.  And you know who lives with her?

6   A.    My granddaughter, my two grandsons.

7   Q.    Okay.

8   A.    Sometimes my oldest grandson, all of them.

9   Q.    Okay.

10  A.    I think.

11  Q.    And is she currently employed?

12  A.    Huh?

13  Q.    Is she currently employed?

14  A.    Yeah.

15  Q.    All right.  And through her employment, do you know who

16  she provides for?

17  A.    Her children, herself.

18  Q.    Is she the sole provider of her children -- of her

19  children?

20  A.    Yeah.

21  Q.    Ma'am, and are you employed?

22  A.    Yeah.

23  Q.    All right.  Where are you employed?

24  A.    New Orleans (inaudible) Academy.

25  Q.    Okay.  And do you own or rent your home?

```
 1  A.    Rent.

 2           THE COURT:  I'm sorry, I didn't hear you.

 3           THE WITNESS:  Rent.

 4           THE COURT:  Thank you, ma'am.

 5  BY MR. BOSWORTH:

 6  Q.    And if necessitated by the Court, would you be willing to

 7  serve as a third party custodian for your daughter?

 8  A.    Yes.

 9  Q.    All right.  And do you understand that that would mean

10  that if she violated any terms of release that the Court

11  provided, you would be obligated to inform the Court?

12  A.    Yes.

13  Q.    Is that something that you would be willing to do?

14  A.    Yes.

15  Q.    All right, ma'am.  In order for the Court to make a proper

16  determination of whether or not you're valid, I have to go

17  through some personal history.

18       Have you ever been in trouble with the law before?

19  A.    No.

20  Q.    Never once?

21  A.    No.

22  Q.    Have you ever been convicted of any crime?

23  A.    No.

24           MR. BOSWORTH:  I have no further questions at this

25  time.
```

```
 1              THE COURT:  Government?

 2              MR. PAYNE:  Yes, Your Honor.

 3                      *   *   *   *   *

 4                      CROSS-EXAMINATION

 5   BY MR. PAYNE:

 6   Q.   Hi Ms. Gardner.

 7   A.   Hey.

 8   Q.   I'm sorry you're here today, ma'am.  You said that

 9   Ms. Gardner has a -- they have a child together, right?

10   A.   Excuse me?

11              THE COURT:  She didn't say.

12              MR. PAYNE:  All right.

13              THE COURT:  Are you asking her?

14              MR. PAYNE:  Yes.

15              THE COURT:  She was just asked how many who lives

16   with her daughter, and she said her kids.  But she didn't say

17   who the daddies were.

18              MR. PAYNE:  All right.

19   BY MR. PAYNE:

20   Q.   So Ms. Gardner, your daughter; she has a child with

21   Mr. Harris?

22   A.   Yes.

23   Q.   Does he provide any child support?

24   A.   Not to my knowledge.

25   Q.   Does he co-parent at all?
```

49

1  A.   I don't know.

2  Q.   So, she doesn't live with you?

3  A.   No.

4  Q.   Okay.  At any time has she lived with you over the past I

5  want to say ten years?

6  A.   No.

7  Q.   Does -- I'm just going to say Jovanna if you don't mind,

8  because I know you're Ms. Gardner, too, just for the purposes

9  of this.

10      Does Jovanna and Mr. Harris currently have a relationship?

11  A.   I don't know.  I don't think so.

12          THE COURT:  Why is that?  Why you think not?

13          THE WITNESS:  Well, I don't -- I never saw her with

14  him.  I met him once, a couple of times, we never got along.

15  So I really don't know her personal relationship with

16  Mr. Harris, at all.

17          THE COURT:  Why y'all didn't get along?

18          THE WITNESS:  Just didn't rub right with each other.

19          THE COURT:  What you didn't like about him?

20          THE WITNESS:  I mean --

21          THE COURT:  Because you know, look, I'm a mama too,

22  mamas know.  What was your gut?

23          THE WITNESS:  He just wasn't right for her.

24          THE COURT:  Okay.  Go ahead Counsel.

25          MR. PAYNE:  Thank you.

1          Your Honor, if I -- can I have one minute to confer

2   with Mr. Bosworth?

3          THE COURT:  You may.

4          MR. PAYNE:  At a side bar?

5          THE COURT:  You may.

6          MR. PAYNE:  Thank you.

7          THE COURT:  Are y'all side barring by yourselves?

8   Y'all don't need me.

9          MR. PAYNE:  No, it's not -- (inaudible; not speaking

10  near the microphone.)

11         THE COURT:  Okay, not a problem.

12      (At side bar; off the record)

13         MR. PAYNE:  I'm just going to ask you a couple more

14  questions, and this is about meetings that you've attended with

15  your daughter at the U.S. Attorney's Office.

16         THE WITNESS:  Uh-huh.

17         MR. PAYNE:  And that's why I wanted to give a head's

18  up to Mr. Bosworth about it.

19         MR. BOSWORTH:  And Your Honor, I will object for the

20  record that this is outside of the scope of cross and the

21  purpose of this testimony.

22  BY MR. PAYNE:

23  Q.   And it's that, so you were there for meetings?

24  A.   Excuse me?

25  Q.   With the U.S. Attorney's Office.  In fact, this is not the

1    first time that you've been there?

2    A.    No.

3    Q.    Okay.  I'm talking about those meetings.

4    A.    Yeah.

5    Q.    Did you talk to your daughter after those?

6    A.    A little bit.

7    Q.    Did she say anything about this?

8    A.    No.

9    Q.    She didn't talk about this case at all?

10   A.    No.

11   Q.    Okay.

12           MR. PAYNE:  Thank you very much.

13           Thank you Your Honor.

14           THE COURT:  Mr. Bosworth?

15           MR. BOSWORTH:  Just a moment, Your Honor.

16       (Pause.)

17           MR. BOSWORTH:  No further questions -- or no further

18   witnesses, Your Honor.

19           THE COURT:  Are you offering Ms. Gardner as a third

20   party custodian?  It's unclear to me.

21           MR. BOSWORTH:  And Your Honor, that is true.  I will

22   offer --

23           THE COURT:  I take it the answer is no?

24           MR. BOSWORTH:  Well, no.  I will offer her as the

25   third party custodian if the Court deems it necessary.

1           THE COURT:  This is not for the Court to deem

2    necessary.  I'm trying to evaluate the purpose of her testimony

3    or use --

4           MR. BOSWORTH:  Then yes, out of an abundance of

5    caution I am going to offer her as a third party custodian.

6           THE COURT:  And you have no additional questions of

7    her to ask, that would help me evaluate whether she's qualified

8    to be a third party custodian?

9           MR. BOSWORTH:  (No response.)

10           THE COURT:  If not, I will take her testimony as

11    given.

12           MR. BOSWORTH:  I have no further questions at this

13    time.

14           THE COURT:  Does the Government?

15    BY MR. PAYNE:

16    Q.   Ms. Gardner, if you are to be a third party custodian; do

17    you know what that means?

18    A.   Yeah.

19    Q.   Okay.  Can you explain what that means, please?

20    A.   About I'm just over Jovanna while she's home, while this

21    case is trying to see what's going on.  I mean you're innocent

22    until proven guilty.

23    Q.   That's absolutely right.

24    A.   And that's how I feel, like she innocent, she didn't do

25    nothing, so I'm okay.

1  Q.   I understand.  If she does anything, you have to report it

2  to Judge Roby.

3  A.   I don't have a problem with that.

4  Q.   Okay.  And obviously, if we learn of information, we're

5  going to inform the Court, but we're not the only ones to do

6  that.  It's going to be you.

7  A.   Fine.

8  Q.   And if you don't do that, you could face consequences from

9  the Court.  And that would include things like contacting a co-

10  Defendant.

11  A.   Oh.

12  Q.   And that would be Mr. Harris.  Do you understand that?

13  A.   I do.

14  Q.   Okay.

15       MR. PAYNE:  I don't have any questions on that point,

16  Your Honor.

17                    *   *   *   *   *

18                 EXAMINATION BY THE COURT

19       THE COURT:  So, you told me you didn't like him from

20  the get-go, right?  You didn't think he was good for your

21  daughter, right?

22       THE WITNESS:  Right.

23       THE COURT:  So if I were to determine that you could

24  be the third party custodian, do you think in light of the fact

25  that Jovanna knows you don't like her choice, that she would

1  keep that from you?

2           THE WITNESS:  Not now.

3           THE COURT:  Why not?

4           THE WITNESS:  Just look at her, she in jail, she in

5  trouble.  I mean she --

6           THE COURT:  That don't mean going to tell you

7  nothing.

8           THE WITNESS:  I believe she would.

9           THE COURT:  But you said after the meetings with the

10 Government she didn't tell you nothing.  So it seems to me

11 she's keeping stuff to herself.

12          THE WITNESS:  The reason why because I trusted and

13 had faith in her lawyer, and I really didn't discuss it, and

14 this happened so fast, it happened fast, like right after, so I

15 really didn't have a chance --

16          THE COURT:  I got you.

17          THE WITNESS:  -- to talk to her, to see what was

18 going on.

19          THE COURT:  Uh-huh.  Part of the hard parts of being

20 a custodian is that you have to tell somebody like me about

21 somebody that you birthed, that you love, that you believe in,

22 and that's a hard thing to do.

23          THE WITNESS:  I mean it's hard but she grown, and I'm

24 grown.  I have a good life, I'm happy.  And I'm not

25 jeopardizing my life for nobody.

1          THE COURT:  And that includes her?

2          THE WITNESS:  Yeah, that includes her.

3          THE COURT:  What about those grandbabies that she's

4    got?

5          THE WITNESS:  I'mma take care of them.

6          THE COURT:  Whether she's out or in?

7          THE WITNESS:  Whether she's out or in.

8          THE COURT:  Would they be able to come live with you

9    if she were allowed to be released on bond?

10          THE WITNESS:  Of course.

11          THE COURT:  Uh-huh.  How much time ordinarily did you

12   spend with her prior to these circumstances?

13          THE WITNESS:  My daughter?

14          THE COURT:  Yes.

15          THE WITNESS:  A lot of time.

16          THE COURT:  The reason I'm asking, because you say

17   you didn't think that she and Mr. Harris were together.  And

18   usually when people are together they bring people around

19   family, which is normal.  And so I question how much time was

20   really spend because you've have known if she was still hanging

21   with him or not.

22          THE WITNESS:  Well, he never -- I never saw him

23   around family.  I never saw him at the house, and I talk to her

24   every day, and I see why a lot, and my grandson go to school

25   where I work.  He's my student.

56

```
 1              THE COURT:  Uh-huh.

 2              THE WITNESS:  So I bring him home a lot.

 3              THE COURT:  Uh-huh.  You teach?

 4              THE WITNESS:  Yeah.

 5              THE COURT:  What do you teach?

 6              THE WITNESS:  Elementary school, kindergarten to

 7  eighth grade.

 8              THE COURT:  What grade specifically though?

 9              THE WITNESS:  Right now it's kindergarten to like

10  second grade, early childhood education.

11              THE COURT:  Okay, okay.

12              THE WITNESS:  Uh-huh.

13              THE COURT:  All right.  Thank you, ma'am.

14              THE WITNESS:  That's it?

15              THE COURT:  Yes, ma'am.

16              It wasn't so bad now, was it?

17              THE WITNESS:  It was.

18              THE COURT:  It was?  I'm sorry.

19         (Laughter.)

20         (Witness is excused)

21              THE COURT:  Mr. Bosworth?

22              MR. BOSWORTH:  No further witnesses from the defense,

23  Your Honor.

24              MR. PAYNE:  Nothing from the Government.

25              THE COURT:  Argument?
```

1          MR. PAYNE:  Your Honor, it's a very tough case.  This

2     entire case is very difficult and --

3          THE CLERK:  Matthew, can you please get near a

4     microphone?

5          MR. PAYNE:  Yeah.

6          THE COURT:  You are whispering.

7          You know what, I have a question.

8          MR. PAYNE:  Certainly.

9          THE COURT:  Since you all don't have any questions.

10         MR. PAYNE:  Sure.

11         THE COURT:  Ms. Amy?

12         PROBATION OFFICER MS. LAPOINTE:  Yes, Your Honor.

13         THE COURT:  Back to the witness stand.

14         PROBATION OFFICER MS. LAPOINTE:  Am I still under

15    oath?

16         THE COURT:  You're still under oath.

17         PROBATION OFFICER MS. LAPOINTE:  All right.

18                         *    *    *    *    *

19         **AMY LAPOINTE, WITNESS, PREVIOUSLY SWORN**

20                         *    *    *    *    *

21                    EXAMINATION BY THE COURT

22         THE COURT:  So you heard Ms. Gardner's testimony?

23         THE WITNESS:  I did, Your Honor.

24         THE COURT:  In your opinion, how long have you been

25    in Probation -- in Pretrial Services?

1          THE WITNESS:  In Pretrial Services, roughly seven

2    years.

3          THE COURT:  And in your experience as a Pretrial

4    Services officer do you believe she would be a good third party

5    custodian?

6          THE WITNESS:  So my concern is I did have opportunity

7    to run her rap sheet earlier and she has been convicted of two

8    misdemeanors.  There was a violation of a protective order and

9    I believe there was a theft.  And while those were over ten

10   years ago, I'm not concerned about those crimes.

11         THE COURT:  Uh-huh.

12         THE WITNESS:  I believe that she is gainfully

13   employed and seems to be doing very well for herself right now,

14   but it is concerning when people don't report arrests and stuff

15   to the Court, particularly when her counsel did ask several

16   times if there was --

17         THE COURT:  He looked a little perplexed that she

18   didn't say yes.

19         THE WITNESS:  So --

20         THE COURT:  The look on Graham's face was indicative.

21         THE WITNESS:  And those in and of themselves would

22   not be reasons to --

23         THE COURT:  Right.

24         THE WITNESS:  -- remove her as a custodian.  I

25   believe she's extremely well intended, but I do have concerns

59

1    about you know, she's not present during the day.

2              THE COURT:  Uh-huh.

3              THE WITNESS:  Even though she is a teacher, I

4    understand that we are coming up on summer, but there is a good

5    deal of time during the day right now that she is not home,

6    just by virtue of her job.

7              THE COURT:  Uh-huh.

8              THE WITNESS:  And this is a case that even -- I mean

9    the very nature of this alleged involvement involved a

10   telephone, so --

11             THE COURT:  How do I police or how do you police --

12             THE WITNESS:  Right.

13             THE COURT:  -- Ms. Gardner's use of a phone to

14   communicate with Mr. Harris?

15             THE WITNESS:  And by her having three minor children,

16   I don't think it's reasonable to have her home without a phone

17   either.

18             THE COURT:  And given the fact that she has a kid who

19   he fathered, is it reasonable for her not to communicate with

20   him?

21             THE WITNESS:  It would be a very difficult thing to

22   mitigate.  And all of those things were considered when trying

23   to explore bond options for Ms. Jovanna given her fairly

24   minimal criminal history.

25             But I think the implication of danger in this case

1    rises to a gravity that our office still recommended detention.

2         THE COURT:  So what you're saying to me is that there

3    are no circumstances that you can think of that would mitigate

4    the risk of danger to the community, is that correct?

5         THE WITNESS:  Correct, Your Honor.

6         THE COURT:  Thank you.

7       (Witness is excused)

8         MR. PAYNE:  Briefly, I'll emphasize two points here

9    Your Honor relating to the dangerousness.  The flight risk is

10   that this is a substantial offense, Your Honor.  It has a

11   mandatory life sentence.  That can cause someone to flee.  She

12   has some very strong ties, otherwise to the community, and

13   that's true.

14        The dangerousness aspects are:  This is an offense

15   involving the murder of a federal witness.  Ms. Gardner was not

16   the trigger person, but she willfully facilitated this offense.

17   One thing here, we believe at the behest of Ryan Harris, and I

18   noted on her prior conviction, she did the same thing for

19   another person who she was in a relationship with.  She is a

20   very respectfully malleable person who follows instructions

21   from others.

22        I'm not certain how much she will be able to follow

23   that instruction over -- to follow the Court's instruction over

24   those of other people that she's familiar with.

25        And there is a concern here, Your Honor, that the

1    Government is doing an ongoing investigation.  We cannot be

2    certain all of the individuals involved have been identified.

3    She wants -- danger to the community here includes her

4    children, if that is who she's going to be put in a living

5    situation with, Your Honor.  I'm playing this out, it is a very

6    unusual situation here.  This is a crime that is rarely

7    charged, and it raises some issues here that can otherwise --

8    otherwise don't come up in other cases.

9            Your Honor, the danger to the community having

10    corralled either facilitating or some other unfortunate

11    situation that's substantially (inaudible) --

12            THE COURT:  Mr. Bosworth?

13            MR. BOSWORTH:  Thank you Your Honor.

14            I guess before I get into this, a general issue I

15    have with the Government's presentation is it fails to address

16    the fact that these are allegations.  Nothing here has been

17    proven.  And to put someone in jail without proving that they

18    committed a crime is punishment without the conviction.  What

19    needs to be established to the Court --

20            THE COURT:  Well, according to the Bail Reform Act

21    and the requirements that I'm supposed to consider, one of the

22    factors is the weight of the evidence as opposed to the

23    probativeness per se', that's for the next judge.  But the

24    weight of the evidence that the Government currently has,

25    recognizing that they're not showing me their whole case today,

62

1    right?

2              MR. PAYNE:  Uh-huh.

3              THE COURT:  As it relates to the weight of the

4    evidence, what is your position?

5              MR. BOSWORTH:  As it relates to the weight of the

6    evidence, it's not strong.  What you have here is a

7    circumstantial case.  It is a circumstantial case based on

8    using cell phone data to establish that Ryan Harris allegedly

9    was in communication with Jovanna Gardner around the time of

10   the homicide.

11             The Government readily admits she was never in

12   possession of a firearm; the Government admits she had no

13   direct involvement --

14             THE COURT:  The gist of the Government's case was

15   that she used her phone to get the decedent out of his

16   apartment to be killed.

17             MR. BOSWORTH:  That is true.  That is the allegation.

18   But the evidence there is circumstantial at best.  What they

19   have is --

20             THE COURT:  Within two minutes of him being killed,

21   there was a communication, correct?

22             MR. BOSWORTH:  A communication between --

23             THE COURT:  Between her phone and the decedent's

24   phone.

25             MR. BOSWORTH:  There is an allegation that there is a

1   communication afterwards.

2          THE COURT:  There was -- the cell phone stuff don't

3   lie.

4          MR. BOSWORTH:  The cell phone stuff that was

5   introduced --

6          THE COURT:  8:36 and the shooting was 8:38.  That's

7   two minutes from her communication to his death, correct?

8          MR. BOSWORTH:  And we are saying that it is not her

9   communication.  There is a communication from a burner phone

10   identified to someone named Kim, that the Government is

11   alleging was Jovanna Gardner.  But there is no evidence

12   directly leaking --

13          THE COURT:  No direct evidence that it was her.

14          MR. BOSWORTH:  == her to that phone.

15          THE COURT:  Got it.

16          MR. BOSWORTH:  There is circumstantial evidence.

17          THE COURT:  Got it.

18          MR. BOSWORTH:  That is rooted in their belief that

19   Ryan has purchased that phone, and Ryan has communicating with

20   Jovanna Gardner --

21          THE COURT:  Did you say circumstantial evidence that

22   he purchased that phone?

23          MR. BOSWORTH:  No.  There's circumstantial evidence

24   that she was Kim, based on the allegation --

25          THE COURT:  Got it, uh-huh.

1          MR. BOSWORTH:  -- that Ryan has purchased the phone.

2          THE COURT:  Uh-huh.

3          MR. BOSWORTH:  And that Ryan has communicated with

4   Jovanna Gardner after purchasing that phone.  But there's other

5   reasons why he would have been communicating with Jovanna

6   Gardner, they had just had a child together.

7          There's nothing establishing that there's

8   communications between Ryan Harris and Jovanna Gardner around

9   that time, actually had anything to do with the shooting.

10          THE COURT:  But the mama says she didn't think that

11  he was necessarily involved in raising -- and with the baby.

12          MR. BOSWORTH:  Recently.  What the Court --

13          THE COURT:  Or yeah, you should have asked her --

14          MR. BOSWORTH:  -- has to remember is this --

15          THE COURT:  You should have asked her those

16  questions.

17          MR. BOSWORTH:  I apologize, Your Honor.

18          THE COURT:  No, that's okay.

19          MR. BOSWORTH:  But what we're talking about is an

20  event that's three and a half years ago.

21          THE COURT:  Uh-huh.

22          MR. BOSWORTH:  Today at this point are they in

23  ongoing communication?  No.  She's not in a relationship with

24  Mr. Harris.

25          THE COURT:  I don't know that that's a true

1  statement.

2          MR. BOSWORTH:  Well --

3          THE COURT:  I don't know I've heard anything from the

4  witness stand.  I think she said I'm not sure, I don't think

5  they are.

6          MR. BOSWORTH:  Well, she said they --

7          THE COURT:  She's never seen him coming around the

8  family.

9          MR. BOSWORTH:  That is true.

10         THE COURT:  But that doesn't mean they're not still

11  in a relationship, or were.

12         MR. BOSWORTH:  Well, I will say it as an officer of

13  the Court they're not in a relationship.

14         THE COURT:  Okay.

15         MR. BOSWORTH:  I understand that the Court can take

16  that into consideration.

17         THE COURT:  Okay, all right.  You know more than me.

18  That's fair enough.

19         MR. BOSWORTH:  But we're not talking about what's

20  happening now at the time of arrest.

21         THE COURT:  Correct, correct.

22         MR. BOSWORTH:  We're not talking about what happened

23  even a year ago or two years ago, we're talking about three and

24  a half years ago after the birth of the child.

25         THE COURT:  Uh-huh.

1          MR. BOSWORTH:  The child was a newborn at this point.

2    It is not surprising that there's communication between these

3    two as it relates to a newborn child.  There is no evidence

4    establishing that their communication --

5          THE COURT:  There's no evidence that there was

6    communication regarding the newborn child.

7          MR. BOSWORTH:  It's not her burden to establish the

8    newborn child.

9          THE COURT:  Well, you're right about it, but that's

10   your argument.

11         MR. BOSWORTH:  That is my argument.  But the fact of

12   the matter is she's presumed innocent.

13         THE COURT:  Absolutely.

14         MR. BOSWORTH:  And so the presumption here is that

15   it's into the communication.

16         THE COURT:  Okay.

17         MR. BOSWORTH:  The Government has no evidence showing

18   that communication had anything to do with any crime.

19         THE COURT:  Uh-huh.

20         MR. BOSWORTH:  They have no evidence showing that him

21   going over to the house was for any other reason than to see a

22   child.  There is no direct evidence linking her to any crime at

23   all.  The mere fact that that phone was with Ryan Harris and

24   Ryan Harris went to his baby mother's house does not establish

25   her participation in this case, and there's nothing

```
1   conclusively showing that she was the person on the other end

2   of the phone, claiming to be Kim.  It could have been anyone.

3          Their evidence is that phones were in the same area

4   as it relates to cell phone triangulation.  That doesn't

5   establish anything other than phones in the same area.  They

6   can't even establish at the time of the shooting who was in

7   possession of her phone.

8          I'm not saying that there isn't enough for probable

9   cause, obviously an indictment was established.  But if it

10  relates to the weight of the evidence and this Court's decision

11  as it relates to whether or not it's released to bond, this is

12  not an overwhelming case.  The weight of the evidence here is

13  not particularly strong.  And the Court's consideration is

14  rooted in determining whether or not my client will appear for

15  future proceedings as a flight risk and whether or not she

16  represents a risk of safety to the community.

17         And speaking of the Bail Reform Act, the Court is

18  obligated to find the least restrictive means necessary to

19  achieve those two ends.

20         As it relates to appearance, as identified in the

21  report from Pretrial Services, she has strong ties to the

22  community.  The Government has admitted she has strong ties to

23  the community.  She has children who live in the New Orleans

24  area who are dependent upon her.  She has family in New

25  Orleans, she's employed in New Orleans.
```

1              She can be further monitored by --

2              THE COURT:  Here's the problem:  The problem is, the

3       allegation is that she used her phone to facilitate a murder.

4       That is the allegation.  The allegation is also that after the

5       Government met with you, the frequency with which she tried to

6       communicate with Harris was significantly different than what

7       preceded the meeting, which suggests she was trying to get a

8       message to him.

9              MR. BOSWORTH:  And --

10             THE COURT:  I'm telling you the problem is that my

11      probation officer cannot monitor her phone calls.  She cannot

12      police her communications.  She cannot necessarily if she's

13      out, guarantee that she's going to be:  Okay, I'm dealing with

14      a case involving the murder of a federal witness.

15             MR. BOSWORTH:  Understood.

16             THE COURT:  So while you portend that the weight of

17      the evidence is not strong, I would agree with you, it's

18      circumstantial based on what we've heard.  But the

19      circumstances of the communications are not just coincidence.

20      And the circumstances that the Court is presented with is:  Do

21      I release her to the custody of her mother, who I think is a

22      very nice lady, but I am concerned she wasn't 100 percent

23      transparent with me about her past.  So why should I be

24      confident that if she heard, saw or felt that her daughter was

25      violating the terms of the release, that she would communicate

1   that to me.

2          I realize that being a mother of a child facing a

3   charge is a very difficult position to be in, and I've been

4   doing this job for a long time.  And I've had mamas telling me:

5   Yeah, I will.  But you know what, I can tell when they won't.

6   And I'm not sure.  So in this instance the request to release

7   her on bond is denied.

8          MR. BOSWORTH:  All right.  Please note the defense

9   objection, Your Honor.

10          THE COURT:  Objection noted.

11          THE CLERK:  That concludes the docket.

12                    *    *    *    *    *

13                  (Hearing is Concluded)

14

15

16

17

18

19

20

21

22

23

24

25

# **C E R T I F I C A T E**

       I certify that the foregoing is a correct transcript from the electronic sound recording of the proceeding in the above-entitled matter.

**S/Sherryl P. Robinson**                       **_8/12/2024_**
**Sherryl P. Robinson**                          **Date**