```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
 2
     *************************************************************
 3   UNITED STATES OF AMERICA            CRIMINAL ACTION
                                         NO. 24-105
 4   VERSUS                              SECTION "D"(1)
                                         DECEMBER 16, 2024
 5   LEON M. PARKER
     *************************************************************
 6

 7                 TRANSCRIPT OF DETENTION HEARING
            HEARD BEFORE THE HONORABLE JANIS VAN MEERVELD
 8                 UNITED STATES MAGISTRATE JUDGE

 9

10   APPEARANCES:

11   FOR PLAINTIFF:               Matthew R. Payne, Esq.
                                  Brian M. Klebba, Esq.
12                                Mary Katherine Kaufman, Esq.
                                  Jeffrey Ryan McLaren, Esq.
13                                U.S. ATTORNEY'S OFFICE
                                  650 Poydras Street
14                                Suite 1600
                                  New Orleans, LA 70130
15

16
     FOR DEFENDANT:               Stephen J. Haedicke, Esq.
17                                LAW OFFICE OF STEPHEN J. HAEDICKE
                                  1040 St. Ferdinand Street
18                                New Orleans, LA 70117

19

20

21   TRANSCRIBED BY:             Alexis A. Vice, RPR, CRR
                                  500 Poydras Street, HB-275
22                                New Orleans, LA  70130
                                  (504) 589-7777
23                                Alexis_Vice@laed.uscourts.gov

24

25   Proceedings recorded by electronic sound recording.  Transcript
     produced by transcriptionist.

                          OFFICIAL TRANSCRIPT
```

```
 1
 2                        P-R-O-C-E-E-D-I-N-G-S
 3                          (DECEMBER 16, 2024)
 4                          (DETENTION HEARING)
 5
 6          DEPUTY CLERK:  Criminal Action 24-105, United States
 7  of America versus Leon Parker for a detention hearing on a
 8  superseding indictment.
 9          MR. PAYNE:  Your Honor, good afternoon, Matthew Payne,
10  Brian Klebba, Ryan McLaren, and Mary Katherine Kaufman on
11  behalf of the United States.
12          THE COURT:  Thank you.
13          MR. HAEDICKE:  Stephen Haedicke on behalf of Leon
14  Parker.
15          THE COURT:  Thank you.
16          Mr. Parker, if you could just speak into a
17  microphone, may I have your full name, please, sir?
18          THE DEFENDANT:  Leon Mack Parker, ma'am.
19          THE COURT:  All right, thank you, Mr. Parker.  You are
20  here this afternoon for a detention hearing, and it is my
21  understanding we are going to have a hearing.  So if you would
22  like, you could sit at counsel table again while the lawyers do
23  what they're going to do.
24          Before we get started, let me remind you of your
25  right to remain silent.  You do not have to make any statement.
```

OFFICIAL TRANSCRIPT

1    Should you choose to make a statement, it can be used against

2    you.  If you start to make a statement, you can stop at any

3    time.

4              Do you understand your right to remain silent?

5              **THE DEFENDANT:** Yes, ma'am.

6              **THE COURT:** All right, thank you.  Then go ahead and

7    have a seat again.

8              All right, Mr. Payne, what is the basis of your

9    motion for detention?  Please be specific.

10             **MR. PAYNE:** Yes, Your Honor.  The Government moves

11   based on the risk of flight and also risk of obstruction, Your

12   Honor.  As we set forth -- we did submit a filing, Your Honor,

13   that specifically laid out the Government's grounds.  So

14   obviously, we'll be referring to that, Your Honor.

15             We do not believe they will comply with conditions --

16   excuse me, Mr. Parker will comply with conditions of his bond,

17   specifically, again, obstructive conduct and witness tampering

18   and risk of flight.

19             **THE COURT:** Okay.  And Mr. Haedicke, I am correct we

20   have no stipulation; correct?

21             **MR. HAEDICKE:** No stipulation, Judge.  We just note

22   that this is not a presumption case; so it is the Government's

23   burden.

24             **THE COURT:** Okay, and the Government will go first.

25             Do you intend to call any witnesses, Mr. Payne?


                           OFFICIAL TRANSCRIPT

1        **MR. PAYNE:** Yes, Your Honor.  The Government calls
2    Special Agent Michael Heimbach from the United States FBI.
3        **THE COURT:** All right, thank you.
4        **MR. HAEDICKE:** I did intend to call my client's wife
5    who is present in the courtroom.  I don't know if she needs to
6    step out.
7        **MR. PAYNE:** We'll invoke the rule, Your Honor, of
8    sequestration.
9        **THE COURT:** Okay, everybody can stay until such time
10   as they need to leave.
11        But Mr. Haedicke, are you suggesting she needs to go
12   first for some reason?
13        **MR. HAEDICKE:** No, no.  If it would be an issue for
14   her to be present in the courtroom during this testimony and
15   that would cause an issue with her testifying afterwards, then
16   that is -- I do intend to call her as a witness.
17        **THE COURT:** Okay, all right, that's fine.  Thank you.
18        **MR. PAYNE:** I appreciate it, thank you.
19        **MR. HAEDICKE:** So if she needs to step out?
20        **THE COURT:** She can stay in for now; right, Mr. Payne?
21        **MR. PAYNE:** No, the Government invokes the rule of
22   sequestration.
23        **THE COURT:** Oh, I misunderstood.  Thank you.
24                        **MICHAEL HEIMBACH,**
25   after having been duly sworn, did testify as follows:


                        OFFICIAL TRANSCRIPT

1    **DEPUTY CLERK:** Please have a seat.  State your name,
2    and spell it for the record.
3    **THE WITNESS:** Special Agent Michael Heimbach,
4    M-I-C-H-A-E-L, H-E-I-M-B-A-C-H.
5    **MR. PAYNE:** Your Honor, the Government's going to be
6    presenting some documents here by slide.  We have a copy for
7    Your Honor and also one that we submitted for record purposes.
8    I think in an abundance of caution, we ask that this
9    also be filed under seal.
10   **THE COURT:** Any objection, Mr. Haedicke?
11   **MR. HAEDICKE:** No objection.
12   **MR. PAYNE:** It has some sealed information in one part
13   of it, Your Honor.
14   **THE COURT:** Okay.  We'll seal this exhibit.
15                     **DIRECT EXAMINATION**
16   BY MR. PAYNE:
17   Q.   Good afternoon, Special Agent.
18   A.   Good afternoon.
19   Q.   What's your assignment, sir?
20   A.   I'm currently a special agent assigned to the New Orleans
21   Gang Task Force, FBI New Orleans Division.
22   Q.   How long have you been an FBI agent?
23   A.   I've been an FBI agent for six and a half years.
24   Q.   What's some of your experience previous to that?
25   A.   I was an officer in the United States Marine Corps prior

OFFICIAL TRANSCRIPT

1  to joining the FBI.  When I joined the FBI, I worked domestic

2  terrorism matters, mass shootings, death of a federal officer

3  before transferring here to New Orleans.

4  Q.    Have you been involved in the investigation concerning

5  Operation Sideswipe?

6  A.    Yes.

7  Q.    Can you explain that very briefly for the Court and your

8  role in it?

9  A.    My role primarily has been involving the death of

10  Cornelius Garrison who was a witness in that matter.  That case

11  involved hundreds of accidents involving individuals staging

12  automobile accidents with 18-wheelers on the interstate.  Those

13  accidents or fraudulent accidents resulted in lawsuits which

14  subsequently had large settlements.

15       But my primary focus has been the homicide of Cornelius

16  Garrison in September of 2020.

17  Q.    While there's suspicion of many of these, we have actually

18  confirmed that some of these accidents were actually

19  fraudulent?

20  A.    That is correct.

21  Q.    I'd like to turn our attention to Mr. Parker.

22       In the course of this investigation, has it been

23  determined that Mr. Parker was involved in fraudulently staged

24  collisions?

25  A.    Yes.

OFFICIAL TRANSCRIPT

1  Q.    To specifically go over some of those, was there a
2  January 2016 collision?
3  A.    Yes.
4  Q.    Could you explain that one?
5  A.    In January of 2016, Mr. Parker, as well as others, were in
6  a suspicious accident involving an 18-wheeler which we deemed
7  to be fraudulent.  Essentially, in insurance filings,
8  Mr. Parker claimed that he was hit by an 18-wheeler.  We have
9  since determined that was not true, and the result of that
10  particular accident resulted in an $800,000 settlement.
11  Q.    And then a January 2017 collision; is that right?
12  A.    Yes.
13  Q.    Okay.  So I know as this investigation progressed, there's
14  been a lot of focus on collisions between vehicles and
15  18-wheelers; correct?
16  A.    Yes.
17  Q.    Have we determined that's the limit of the scope of these
18  fraudulent accidents?
19  A.    No.
20  Q.    So there's some other -- there's another kind of version?
21  A.    Yes.
22  Q.    Can you explain that, please, for the Court?
23  A.    Of course.  We've determined that these accidents also
24  included two regular vehicles colliding with one another.
25  Oftentimes that collision was conducted by individuals we knew

OFFICIAL TRANSCRIPT

1  to stage accidents with 18-wheelers.  Now they are crashing

2  vehicles into one another in isolated areas of New Orleans, and

3  again, filing fraudulent lawsuits after those collisions.

4  Q.    So to turn the Court's attention to the January 2017

5  collision, was that another one that Mr. Parker was involved

6  in?

7  A.    Yes.

8  Q.    And who was involved in that one?

9  A.    Leon Parker, Jovanna Gardner, I believe Vernika Blunt.

10  And then on body camera, you can see Ryan Harris present for

11  that accident as well.

12  Q.    Was Ryan Harris involved in setting up these accidents?

13  A.    Yes.

14  Q.    The location here is Morrison and Gannon.  Where is that

15  located?

16  A.    In the New Orleans East area of New Orleans.

17  Q.    Is that a populated area?

18  A.    Moderately isolated area of New Orleans.

19  Q.    I understand that involved a salvage vehicle?

20  A.    Yes, that's correct.

21  Q.    Can you explain that?

22  A.    We found that many of these accidents, both with the

23  18-wheelers and the vehicle-on-vehicle accidents, they involved

24  salvage titles.  Vehicles that often can be purchased for low

25  cost that already have damage.  Often do not have any repairs

1    done to them, and if they do, very minimal.  So that during a

2    subsequent accident, they can then claim those damages were

3    part of the accident versus previous damage prior to salvage.

4    Q.    Turning to December 2021, can you explain that one?

5    A.    Yes.  In 2021, Mr. Parker, again, was in an accident.

6    This time in the I-10 Service Road area of New Orleans East.

7    This particular accident involved a salvage title and was

8    subsequently handled by Motta Law following the accident.

9    Q.    The location on I-10 Service Road, again, is that a

10   commonalty with the January 2017 one?

11   A.    Correct.  It's very close to the Morrison/Gannon area of

12   New Orleans East.

13   Q.    Did it involve a salvage vehicle?

14   A.    Yes.

15   Q.    And as far as the information provided by the opposing --

16   for the opposing driver to the insurance company, can you tell

17   us about that?

18   A.    Yes.  The insurance company received very minimal

19   information about the other driver in this alleged head-on

20   collision which we deemed suspicious.

21   Q.    So again, does this have the same kind of hallmarks of a

22   fraudulently staged accident?

23   A.    Yes.

24   Q.    There's also a recent collision that Mr. Parker was in; is

25   that right?

OFFICIAL TRANSCRIPT

1  A.    Yes.

2  Q.    When did that happen?

3  A.    It was November 23rd, 2024.

4  Q.    And what did you learn about this rather recent collision,

5  less than a month ago?

6  A.    This accident involved Leon Parker and his wife Teshana

7  Jones.  We have minimal information, but we do know it took

8  place on Eastbound I-10, also involving a salvage title which

9  again is all the hallmarks of a fraudulent accident.

10  Q.    And when we refer here to NICB, do you know what that

11  stands for?

12  A.    Yes, the National Insurance Crime Bureau.

13  Q.    And roughly describing it, that's a private organization,

14  but collects the information from insurance companies?

15  A.    Correct.

16  Q.    Obviously, to potentially investigate fraud?

17  A.    Yes.

18  Q.    So they're kind of a clearinghouse and provide some quick

19  information; is that right?

20  A.    Yes.

21  Q.    And just to be clear, this is a matter that's still being

22  investigated?

23  A.    That's correct.

24  Q.    But to explain all the other details about it, what

25  else -- what are some other hallmarks of fraud that you found

OFFICIAL TRANSCRIPT

1  here?

2  A.   Again, it involved salvage titles.  There was very minimal

3  information provided that we have access to at this time.

4  Again, indicative of fraud.

5  Q.   Similar to the other accidents that are staged, was an

6  insurance claim filed?

7  A.   Yes.

8  Q.   And I believe we covered it, but the location, is that a

9  similar hallmark?

10 A.   Yes.

11 Q.   Okay.  Did Mr. Parker have an arrest in November 2024?

12 A.   Yes.

13 Q.   Can you please take us through that?

14 A.   Yes.  On November 26th, 2024, Leon Parker was arrested

15 for drug distribution in Jefferson Parish.  That arrest

16 happened following surveillance of Mr. Parker distributing or

17 suspected of distributing marijuana throughout New Orleans and

18 Jefferson Parish on that date.

19 Q.   Now subsequent to that arrest, was there a search warrant

20 done on Mr. Parker's home?

21 A.   Yes.

22 Q.   And that's actually a federal search warrant; is that

23 right?

24 A.   Yes.

25 Q.   So was that on Monday, December the 9th?

OFFICIAL TRANSCRIPT

1  A.    That's correct.

2  Q.    During the search of Mr. Parker's home roughly two weeks

3  after this arrest, what did they even find?

4  A.    We found ledgers indicative of drug dealing, so ledgers

5  with prices for drugs as well as people who owe Mr. Parker

6  money.  We also found five and a half kilos of marijuana,

7  scales, and packaging indicative of drug sales.

8  Q.    Was there any impression from the ledgers as to how long

9  Mr. Parker has been distributing?

10 A.    Yes.  Some of the ledgers go back as far as last year.  So

11 it appears he's been doing this for several years now.

12 Q.    Did agents also inquire about his bond paperwork?

13 A.    Yes.

14 Q.    Now to be clear, the search warrant, where did that occur?

15 A.    In Slidell.

16 Q.    That was a residence in Slidell?

17 A.    Yes, sir.

18 Q.    And was Mr. Parker found at that residence when it was

19 executed?

20 A.    Yes.

21 Q.    As far as the bond paperwork for Mr. Parker's bond in that

22 Jefferson Parish arrest that happened in November, late

23 November 2024, what's the address that was provided there?

24 A.    2713 Dawson Ave in Kenner.

25            **MR. PAYNE:** Your Honor, I provided a copy previously

OFFICIAL TRANSCRIPT

1  to Defense Counsel.  We're going to mark this as Parker 1 for

2  the record, and we'll offer this as well.  It was not actually

3  submitted.  It's a late addition to the Government's brief.

4           **THE COURT:** Any objection, Mr. Haedicke?

5           **MR. HAEDICKE:** No objection.

6           **THE COURT:** Admitted.

7  **BY MR. PAYNE:**

8  Q.  As far as Mr. Parker's address here, what's the address

9  that Mr. Parker gave on his bond paperwork for that pending

10  Jefferson Parish charge?

11  A.  Again, 2713 Dawson Ave in Kenner.

12  Q.  And that's different from the Slidell address; is that

13  right?

14  A.  Yes.

15  Q.  Now, when you did execute that warrant in Slidell in

16  December, this month, did you speak to Mr. Parker's wife?

17  A.  Yes.

18  Q.  And did she inform you anything about how long they had

19  been living there?

20  A.  Yes.

21  Q.  What did she say?

22  A.  She said they'd been living there for several years.

23  Q.  Now, moreover, Mr. Parker, as far as Mr. Parker's address,

24  do you know what his address is on his driver's license?

25  A.  Yes.  Mr. Parker's current driver's license also lists

OFFICIAL TRANSCRIPT

1  this address in Kenner.

2  Q.    And when did Mr. Parker last renew that driver's license?

3  A.    In April 2024.

4  Q.    In April of 2024, was that Kenner address his correct

5  address?

6  A.    No, that was not his correct address.

7  Q.    Now, Special Agent, I'd like to now turn your attention

8  back to the Sideswipe investigation here because I'd like to

9  discuss what's some of the evidence that's provided by

10 Mr. Garrison.

11     Mr. Garrison who, again, you investigated his homicide.

12 Prior to his homicide, was he a cooperating witness for the

13 FBI?

14 A.    Yes.

15 Q.    And in that, his cooperation, did he provide information

16 relating to obstruction and witness tampering?

17 A.    Yes.

18 Q.    Specifically, during his cooperation, obstruction and

19 witness tampering by whom?

20 A.    Sean Alfortish and Vanessa Motta.

21 Q.    For instance, I'd like to turn your attention to a

22 January 9th, 2020 report from Mr. Garrison.

23     On this date, did he report to agents that Mr. Alfortish

24 offered to move Mr. Garrison to the Bahamas?

25 A.    That's correct.

OFFICIAL TRANSCRIPT

1  Q.    And why did Mr. Alfortish offer to move Mr. Garrison to

2  the Bahamas?

3  A.    To keep Mr. Garrison from testifying in pending civil

4  matters as well as criminal investigations.

5  Q.    And did Mr. Alfortish -- we have it here on this slide, a

6  report regarding this information from Mr. Garrison who is

7  referred to as CHS; is that right?

8  A.    Yes.

9  Q.    What does CHS stand for?

10 A.    Confidential Human Source.

11 Q.    Did Mr. Garrison also report that Mr. Alfortish offered to

12 compensate him if Mr. Garrison took the fall for the staged

13 accidents?

14 A.    That's correct.

15 Q.    And how much did Mr. Alfortish offer?

16 A.    He offered $500,000 with $100,000 of it upfront.

17 Q.    Regarding this report, were agents able to corroborate

18 whether or not, indeed, Mr. Alfortish and Ms. Motta actually

19 recently went to the Bahamas?

20 A.    Yes.

21 Q.    According to records from the Customs and Border Patrol,

22 and again, referring back to this January 9th, 2020 trip,

23 when did Mr. Alfortish and Ms. Motta travel to the Bahamas?

24 A.    It would have been January 2020, around that time frame.

25 Q.    And according to these records, it shows that they

OFFICIAL TRANSCRIPT

1  traveled to the Bahamas December 28th, 2019 and returned

2  January 3rd, 2020?

3  A.    Correct.

4  Q.    Now we're hitting some of the points on Mr. Garrison's

5  cooperation; right?

6  A.    Yes.

7  Q.    Are we hitting every single point about your investigation

8  here today?

9  A.    No.

10  Q.    In fact, we're not going to go over every single report by

11  Mr. Garrison; right?

12  A.    That's correct.

13  Q.    So, again, just so it's clear, we're hitting some of the

14  highlights here relevant to Mr. Parker, and what we're going to

15  explain is relevant grounds for his detention later on?

16  A.    Yes.

17  Q.    So let's move on to reports by Mr. Garrison of their

18  suspicion of his cooperation.

19      On February 3rd, 2020, was there a report by

20  Mr. Garrison about suspicion of Mr. Garrison's cooperation?

21  A.    Yes.

22  Q.    And suspicion by who?

23  A.    Sean Alfortish.

24  Q.    February 4th, 2020, what did Mr. Garrison report about

25  Mr. Alfortish and his, Mr. Garrison's, status as a cooperator?

1  A.    Mr. Garrison reported that he believed Sean Alfortish was

2  telling people that he was cooperating with the Government.

3  Q.    Just to give a little bit of context for the Court, around

4  this time, January to early February, what did Ms. Motta and

5  Mr. Alfortish do for Mr. Garrison or attempt to do?

6  A.    Around this time frame, they were attempting to provide

7  him a large amount of money and then also move him to the

8  Bahamas.

9  Q.    Did Mr. Garrison get a subpoena for a deposition?

10  A.    Yes.

11  Q.    In response to that, what did Mr. Alfortish and Ms. Motta

12  do?

13  A.    They arranged for Garrison to have an attorney.

14  Q.    While that attorney did agree briefly to represent

15  Mr. Garrison, subsequently, it became known that Mr. Garrison

16  had already been appointed a lawyer; is that right?

17  A.    Yes.

18  Q.    And appointed a lawyer through an appointment process here

19  in the federal court; correct?

20  A.    Yes.

21  Q.    And that person was who?

22  A.    That was Claude Kelly with the Federal Public Defender's

23  Office.

24  Q.    And it actually was Mr. Kelly himself?

25  A.    Yes.

OFFICIAL TRANSCRIPT

1  Q.  Represented him personally.

2      Okay, and so at this point, Mr. Kelly's representation had

3  become known; is that right?

4  A.  Yes.

5  Q.  Around this time, all right.  So that's February 3rd and

6  February 4th.

7      February 10th, again, did Mr. Garrison make a report

8  about Mr. Alfortish?

9  A.  Yes.

10  Q.  And Mr. Alfortish contacting Mr. Garrison?

11  A.  Yes.

12  Q.  At the very end of that on February 10th, what was the

13  impression by Mr. Garrison of Mr. Alfortish?

14  A.  He stated Sean Alfortish seemed concerned.

15  Q.  And this, again, related to a meeting with this attorney,

16  the new attorney Mr. Kelly?

17  A.  Correct.

18  Q.  By February 16th, 2020, did, again, Mr. Alfortish reach

19  out to Mr. Garrison?

20  A.  Yes.

21  Q.  Did they discuss the deposition coming up for

22  Mr. Garrison?

23  A.  Yes.

24  Q.  Mr. Kelly was going to be at that deposition; is that

25  right?

OFFICIAL TRANSCRIPT

1   A.    Yes.

2   Q.    And what did Mr. Garrison say that he felt like

3   Mr. Alfortish was doing?

4   A.    He felt like something was -- he felt like Alfortish was

5   up to something regarding the deposition.

6   Q.    And then February 17th, did Mr. Garrison make another

7   report about Mr. Alfortish?

8   A.    Yes.

9   Q.    In fact, in this case, Mr. Alfortish and then also

10  Ms. Motta together talked to him; is that right?

11  A.    Yes.

12  Q.    Then Mr. Garrison here who is now represented by

13  Mr. Claude Kelly?

14  A.    Yes.

15  Q.    During this contact, did Ms. Motta provide some advice to

16  Mr. Garrison about his deposition?

17  A.    Yes.  Cornelius reported that he should think about what

18  he said before he said it and that defense counsel would stop

19  harassing the CHS, Mr. Garrison.

20  Q.    And then February 21, 2020, this is after the deposition

21  where Garrison is represented by Claude Kelly.  What did

22  Mr. Garrison report about contact with Mr. Alfortish?

23  A.    Cornelius reported that Sean was not happy with how things

24  went at the deposition and told him that it did not go well.

25  Q.    I'd now like to turn to Mr. Garrison's murder.

OFFICIAL TRANSCRIPT

```
1          Specifically, though, Claude Kelly, the Federal Public
2    Defender, was interviewed by federal agents on
3    September 24th, 2020; is that right?
4    A.    Yes.
5    Q.    And that is two days after the murder?
6    A.    Correct.
7    Q.    Mr. Garrison's murder was certainly known by that point by
8    Mr. Kelly?
9    A.    Yes.
10   Q.    And agents?
11   A.    Yes.
12   Q.    What did Mr. Kelly report regarding Mr. Garrison?
13   A.    Mr. Kelly reported that Garrison had expressed concerns
14   about his safety around that time period or prior to his death.
15   Q.    At this point, was Mr. Garrison speaking with Motta and
16   Alfortish, at least, according to Mr. Garrison?
17         Well, let me be clear.  Mr. Kelly stated that he doubted
18   Mr. Garrison was speaking with Motta or Alfortish at the time?
19   A.    The time leading up to, correct, yes.
20   Q.    So going to some facts on this murder, just to give the
21   Court some background here, we have a photograph here.
22         What's that a photograph of?
23   A.    That's the front of Cornelius Garrison's residence at 1533
24   Foy Street.
25   Q.    We're just showing one photograph here.  This is -- what's
```

OFFICIAL TRANSCRIPT

1  this photograph of the crime scene?

2  A.   Yes, that's a picture of Cornelius Garrison's body at the

3  crime scene the night he was killed.

4  Q.   What we want to do is just to provide some very basic

5  background because I know this has been explained in other

6  settings.

7       However, in order to track down who the suspected

8  murderers were, when Mr. Garrison's body was found initially by

9  NOPD, was there a phone found with him?

10  A.   Yes.

11  Q.   What did officers and soon after special agents start

12  doing to further this investigation?

13  A.   Investigators reviewed the contents of Mr. Garrison's

14  phone and determined he had received text messages from a

15  person who identified themselves as "Kim."  That person had

16  arranged to meet him at roughly 8:30 the night of his death.

17  Q.   The person "Kim," in fact, instructed, told Garrison,

18  "I'll be at your house at 8:30"?

19  A.   Correct.

20  Q.   So did investigators research that phone, the "Kim" phone?

21  A.   Yes.  Investigators determined which phone had been

22  communicating with Cornelius.  That phone had been purchased

23  the day before the murder at a Family Dollar off the I-10

24  Service Road in New Orleans East.

25  Q.   And in your parlance, what do investigators call such

OFFICIAL TRANSCRIPT

1  phones?

2  A.    A burner phone.

3  Q.    So I know this has been labeled previously as Burner Phone

4  1 for the purpose of this investigation; is that right?

5  A.    Yes.

6  Q.    Now, did investigators try to then find out which phone

7  numbers Burner Phone 1 had been in contact with other than

8  Mr. Garrison?

9  A.    Yes.

10  Q.    How many phone numbers?

11  A.    One.

12  Q.    Well, did you investigate that other phone number?

13  A.    Yes.

14  Q.    And did you figure out when that phone had been purchased?

15  A.    Yes.

16  Q.    When did that phone get purchased?

17  A.    It was purchased on August 26, 2020 at the same Family

18  Dollar on the I-10 Service Road in New Orleans East.

19  Q.    And in your investigation, did you then label that phone

20  Burner Phone 2?

21  A.    Yes.

22  Q.    Did you investigate the location of these phones at the

23  time of the murder?

24  A.    Yes.

25  Q.    Where was Burner Phone 1 located?

OFFICIAL TRANSCRIPT

1  A.    In the New Orleans East area of New Orleans.

2  Q.    Not near 1533 Foy?

3  A.    Correct.

4  Q.    Now Burner Phone 2, however, the one that's in contact

5  with Burner Phone 1, where was that one located at the time of

6  Mr. Garrison's murder?

7  A.    Burner Phone 2 utilized a cell site 500 feet from

8  Cornelius Garrison's residence, approximately 500 feet.

9  Q.    And while the communications between Garrison and Burner

10  Phone 1 are occurring, can you describe whether or not there

11  were communications with Burner Phone 2?

12  A.    Yes.  Burner Phone 1 was communicating with Cornelius

13  Garrison and then also with Burner Phone 2 the night of the

14  murder.

15  Q.    And based on your training and experience and what you've

16  learned on this case, what did it look like was happening?

17  A.    It looked like Burner Phone 1 was coordinating and

18  assisting with the homicide.  Burner Phone 2 appeared to be at

19  the location of the homicide the night of the murder.

20  Q.    Did you obtain photographs of the person who purchased

21  both Burner Phone 1 and 2?

22  A.    Yes.

23  Q.    And who did that resemble?

24  A.    Ryan Harris.

25  Q.    Ryan Harris is what -- does he have any involvement in the

OFFICIAL TRANSCRIPT

1    Sideswipe investigation?

2    A.    Yes.  Ryan Harris is a suspect in numerous staged

3    accidents throughout the Sideswipe investigation.

4    Q.    Does Mr. Harris have any connection to Mr. Alfortish?

5    A.    Yes.

6    Q.    What's that?

7    A.    Mr. Harris also received payments from Mr. Alfortish for

8    staging accidents.

9    Q.    Now, again, that's an overview of some of the evidence

10   here regarding Mr. Harris and the homicide; correct?

11   A.    Yes.

12   Q.    I'd like to just turn now to Mr. Parker.

13        What is Mr. Parker's relationship, if any, with Ryan

14   Harris?

15   A.    Mr. Parker described himself in a deposition as Ryan

16   Harris's stepdad.  Essentially, Leon dated Ryan Harris's mother

17   for some time.

18   Q.    Have you investigated Mr. Parker's potential role in this

19   homicide?

20   A.    Yes.

21   Q.    In furtherance of that, was a search warrant executed on

22   Mr. Parker's Google account?

23   A.    Yes.

24   Q.    On September 6, 2020, did Mr. Parker conduct searches on

25   his Google account?

OFFICIAL TRANSCRIPT

1  A.    Yes.

2  Q.    What were they for?

3  A.    For the name Cornelius -- or "Corlinus Garrett,"

4  "CORNELIUS GARRETT," and "Cornelius Garrett."

5  Q.    Roughly different spellings or permutations of Cornelius

6  Garrison?

7  A.    Yes.

8  Q.    Not exact, but it's a possibility?

9  A.    Correct.

10  Q.    And just to be clear, were these sequential searches?

11  A.    Yes.

12  Q.    For the record, when you go into a lot of these records,

13  these Google records, it's labeled as UTC; is that right?

14  A.    Yes.

15  Q.    And that's universal -- go ahead, why not ask you?

16  A.    Universal Central Time.

17  Q.    Coordinated time?

18  A.    Yeah, coordinated time.

19  Q.    In the military, Zulu time?

20  A.    Correct.

21  Q.    All right, let's go with that.

22        Anyway, roughly speaking, though, what does that translate

23  to time in New Orleans?

24  A.    During this period, it would have been five hours behind

25  UTC.


OFFICIAL TRANSCRIPT

```
 1   Q.    It depends whether or not it's Daylight Savings?
 2   A.    Correct.
 3   Q.    We may refer to this as UTC later on just because we'll be
 4   referring to some records.
 5         Okay, six days before the homicide, what happens then?
 6   A.    We see communication between Mr. Harris and Mr. Parker
 7   regarding Harris's attempts to purchase a firearm,
 8   specifically, a Scorpion firearm.  There, you can see a picture
 9   of the firearm sent from Mr. Harris to Mr. Parker.
10   Q.    Correct me if I'm wrong, I'm not sure if the records
11   exactly show whether or not a photo was sent.
12         But at this time, that photo was taken by Mr. Harris?
13   A.    Correct.
14   Q.    And the photo here on the slide, do you recognize that
15   photo -- or excuse me.  Do you recognize what that gun is?
16   A.    Yes.
17   Q.    What is it?
18   A.    A Scorpion.
19   Q.    So that's actually a name of a gun?
20   A.    Correct.
21   Q.    All right.  So after Mr. Harris says, "Scorpion," what
22   does that -- what does Mr. Parker reply with?
23   A.    "Man, that thing nice.  Almost look like mines.  How
24   much?"
25   Q.    What did Mr. Harris respond with?
```

OFFICIAL TRANSCRIPT

1  A.    $1,000.

2  Q.    Continuing on in that conversation, September 16, 2020,

3  six days before the homicide, what does Mr. Harris say?

4  A.    "They going call me in the morning to let me know when to

5  come pick it up.  My background never came back N they was

6  closing."

7  Q.    To which Mr. Parker responded with what?

8  A.    "Let me know when you get your hands on that thing.  I may

9  can get something real nice for it."

10 Q.    And Harris replied with what?

11 A.    "They just called.  Told me to come pick it up on the

12 22nd."

13 Q.    Now, did you agents contact Jefferson Gun Outlet?

14 A.    Yes.

15 Q.    Was Mr. Harris actually able to purchase this weapon?

16 A.    No.

17 Q.    He was denied?

18 A.    Correct.

19 Q.    However, this weapon was -- was this a 9-millimeter?

20 A.    Yes.

21 Q.    And what kind of weapon was used to murder Cornelius

22 Garrison?

23 A.    A 9-millimeter.

24 Q.    Now let's go to September 21, 2020, the day before the

25 homicide.  What did Mr. Parker do with his bank account?

OFFICIAL TRANSCRIPT

1  A.    Mr. Parker withdrew $39,050 from his bank account.

2  Q.    In fact, that was one of his bank accounts.  In total --

3  he made another withdrawal; is that right?

4  A.    Yes.

5  Q.    The total from his two withdrawals from his Regions Bank

6  account, what did that total?

7  A.    $47,287.

8  Q.    And how much did that leave in his account?

9  A.    $2,617.63.

10  Q.    Okay, excuse me, that's both his accounts at Regions Bank;

11  correct?

12  A.    Yes.

13  Q.    Now, again, one day before the homicide, because, going

14  back again, the depletion of the bank account is

15  September 21st, 2020.  So let's talk about meetings.

16        Did Mr. Parker meet with Mr. Harris the day before the

17  homicide?

18  A.    Yes.

19  Q.    At 1:36 p.m., what did Mr. Parker text to Mr. Harris?

20  A.    "I'm here."

21  Q.    And what did Mr. Harris reply with?

22  A.    "Pulling up."

23  Q.    Where did they meet?  Where did they meet, Special Agent?

24  A.    I believe the meeting took place roughly in the area of

25  I-10 Service Road and Crowder Boulevard near the Planet

OFFICIAL TRANSCRIPT

1   Fitness.

2   Q.    This location, right off the I-10?

3   A.    Yes.

4   Q.    And in a parking lot?

5   A.    Correct.

6   Q.    After this occurs, what happens next?

7   A.    The purchase of Burner Phone 1.

8   Q.    So, and we're showing here, what's this a photograph of?

9   A.    This is a photograph of surveillance video from Family

10  Dollar on I-10 Service Road from September 21st, 2020 at

11  3:04 p.m.  It depicts an individual we believe is Ryan Harris.

12  Q.    And only to highlight one detail here, he's wearing a

13  sweatshirt --

14  A.    Yes.

15  Q.    -- with a logo on it.  Have agents found that sweatshirt?

16  A.    Yes, we believe so.

17  Q.    Where was a similar sweatshirt found?

18  A.    It was on Ryan Harris's person during an arrest in 2020.

19  Q.    So after this phone was purchased, what did Mr. Harris,

20  based again on phone data, what happened with that phone?

21  A.    Burner Phone 1, when it's first activated, we see cell

22  site data consistent with moving to the Chalmette area of --

23  well, to Chalmette.

24  Q.    And Chalmette is where who lives?

25  A.    Jovanna Gardner.


OFFICIAL TRANSCRIPT

1   Q.   And based on Ms. Gardner, she's previously been charged in

2   this matter; correct?

3   A.   Yes.

4   Q.   In her factual basis, what did she confirm about the

5   burner phone and Mr. Harris?

6   A.   She confirmed that Mr. Harris gave her the burner phone

7   the day before the murder.

8   Q.   So next, after that burner phone is delivered, what does

9   Mr. Harris do next?

10   A.   Begins texting Mr. Parker again.

11   Q.   What did Mr. Harris text with Mr. Parker at 6:38 p.m.?

12   A.   "I'mma be there around 7:30."

13       Parker responds, "Same spot?"

14       Harris says, "Yeah."

15   Q.   Okay.  So we have a meeting between Mr. Parker and

16   Mr. Harris before the purchase of Burner Phone 1?

17   A.   Yes.

18   Q.   Burner Phone 1 is purchased, and then what happens right

19   afterwards?

20   A.   Mr. Harris travels to Gardner's residence and provides her

21   the phone.

22   Q.   And then after that, what does Mr. Harris do?

23   A.   Meets with Mr. Parker.

24   Q.   For the second time?

25   A.   Correct.

OFFICIAL TRANSCRIPT

1  Q.    Now at this point, Burner Phone 1, which Ms. Gardner has
2  said is with her; correct?
3  A.    Yes.
4  Q.    Begins contacting Mr. Garrison; right?
5  A.    Yes.
6  Q.    But specifically, it starts that contact -- when does it
7  start contacting Mr. Garrison?
8  A.    At approximately 7:34 p.m. on the 21st.
9  Q.    At that point, is Mr. Harris and Mr. Parker together?
10 A.    Yes.
11 Q.    Can you again describe roughly what's the interplay
12 between Burner Phone 2 with Mr. Harris, Burner Phone 1 with
13 Ms. Gardner, and Mr. Garrison's phone?
14 A.    There'd be communications between Burner Phone 1 and
15 Burner Phone 2.  Then a communication between Burner Phone 1
16 and Cornelius Garrison.  Seemingly, Burner Phone 2 was
17 coordinating communication with Cornelius Garrison and Burner
18 Phone 1.
19 Q.    So, again, Burner Phone 1 which the one Ms. Gardner has
20 admitted she's in possession of --
21 A.    Yes.
22 Q.    -- contacts Mr. Garrison and then Burner Phone 2?
23 A.    Correct.
24 Q.    And again, during this period, where are Mr. Harris and
25 Mr. Parker's phones?

OFFICIAL TRANSCRIPT

1    A.    They have activity consistent with being at the same area

2    next to the Planet Fitness off of Crowder and I-10 Service

3    Road.

4    Q.    Same location?

5    A.    Correct.

6    Q.    And just to be clear for the record, let's talk just a

7    brief minute when we're talking about where Mr. Harris is and

8    where Mr. Parker is.

9          Mr. Harris, this information, is this based on cell site

10   data?

11   A.    Correct.

12   Q.    Cell site data can be accurate, or what have you, but

13   we're often talking about the same vicinity; right?

14   A.    Yes.

15   Q.    A vicinity sometimes, not a specific location?

16   A.    Right.

17   Q.    And also, we'll be a little more particular coming forward

18   here on some data, but sometimes we'll talk about Harris's true

19   phone.

20         When you use the term "true phone," what does that mean?

21   A.    The phone with his name and the subscriber data that he

22   used on a daily basis for months prior to and after this

23   incident.

24   Q.    And this, of course, is compared to a burner phone?

25   A.    Correct.

OFFICIAL TRANSCRIPT

1  Q.   When you talk about Mr. Parker, just to be clear, we're

2  talking about the location of Mr. Parker's phone, but that's

3  based on Google data?

4  A.   Correct.

5  Q.   Can you explain that just briefly, what location data you

6  get from Google?

7  A.   Yes.  So Google retains data primarily through Wi-Fi GPS

8  cell site data.  For advertisement purposes, this is data

9  enabled by the user.  It can be disabled by anyone who has a

10 Google account, but it's retained by Google for a number of

11 years and can be requested by law enforcement.

12 Q.   So whenever we're talking about Mr. Parker's location and

13 discussing Google data, we're talking about the location of his

14 phone; is that right?

15 A.   Yes.

16 Q.   Now, of course, you can access his Google account from his

17 home too; right?

18 A.   Yes.

19 Q.   Presumably.  But why is it that you believe that this is

20 being used by his cell phone?

21 A.   The location data was along routes of travel.  So you

22 would see GPS coordinates on roads at movements that are

23 indicative of a car moving along a road, ultimately stopping at

24 locations around the time period Ryan would text him, "I'm

25 here."  So therefore, we believe it was with a physical device

OFFICIAL TRANSCRIPT

1    such as a phone.

2    Q.    Understood, okay.

3          All right, so now we just concluded here the second time

4    they meet together, and this is the second meeting the day

5    before the homicide.

6          Let's go to the day of the homicide.  Did Mr. Harris and

7    Mr. Parker meet the day of the homicide?

8    A.    Yes.

9    Q.    On the day of the homicide -- one important point here is

10   what neighborhood did Mr. Parker live in?

11   A.    At this time, he's living in the Hollygrove area of New

12   Orleans?

13   Q.    At this time, where did Mr. Harris live?

14   A.    Off I-10 Service Road in New Orleans East.

15   Q.    So right here, was there data that Mr. Harris spoke to

16   Mr. Parker?

17   A.    Correct.

18   Q.    Okay.  Now then Mr. Parker's phone travels to New Orleans

19   East; is that right?

20   A.    Yes.

21   Q.    At approximately 7:55 p.m. -- excuse me.

22         It traveled to New Orleans East and then departs New

23   Orleans East around 7:42; is that right?

24   A.    Yes.

25   Q.    Now the murder of Mr. Garrison is at 8:30?

OFFICIAL TRANSCRIPT

```
1    A.    Yes, roughly.
2    Q.    When Mr. Parker's phone leaves New Orleans East and
3    heads -- and leaves the area, it goes back to Hollygrove; is
4    that right?
5    A.    Correct.
6    Q.    And what does it do in Hollygrove?
7    A.    Mr. Parker's phone has a 71-minute phone call at 7:55 p.m.
8    Q.    Now have you reviewed Mr. Parker's phone records for the
9    duration of his calls?
10   A.    Yes.
11   Q.    Would you characterize this as a relatively long call?
12   A.    Yes.
13   Q.    Now Harris's phone, around 10:30 p.m., where did Harris's
14   true phone go after the homicide?
15   A.    That New Orleans East area -- or excuse me.  At 10:30, it
16   travels to the area around Parker's residence.
17   Q.    I should point out, though, before that, was there data
18   showing Mr. Harris's true phone elsewhere before it goes to
19   Hollygrove?
20   A.    Yes.
21   Q.    Where did it go?
22   A.    The New Orleans East area.
23   Q.    Okay.  And then after that, where does Mr. Harris's true
24   phone go at 10:30?
25   A.    To the general area of Mr. Parker's residence in
```

OFFICIAL TRANSCRIPT

1  Hollygrove.

2  Q.    And there are two outgoing calls here to Parker's phone at

3  10:31 and 10:32; correct?

4  A.    Yes.

5  Q.    And then what does Harris's true phone do in New Orleans

6  East?  Sorry.

7        Where does it go at approximately 11:07 p.m.?

8  A.    New Orleans East area.

9  Q.    Okay, so.  Now, again, Mr. Parker's phone does show that

10  it goes back to his residence, the area of his residence in

11  Hollygrove during the time of the murder; correct?

12  A.    Yes.

13  Q.    However, what do you make of that 71-minute call?

14  A.    It looked to me like an alibi call.  It's just pretty

15  lengthy compared to other calls made by Mr. Parker throughout

16  his toll records.

17  Q.    And I think we're going to touch on that a little bit more

18  later on.

19        However, this is not the end of Mr. Parker's activity on

20  September 22nd, 2020, the day of the homicide; is that right?

21  A.    Correct.

22  Q.    In fact, according to the Google data, does Mr. Parker

23  make a late night trip to Kenner?

24  A.    Yes.

25  Q.    And at about what time is that?

1  A.    Approximately 11:20 p.m., Mr. Parker's phone departs the

2  Hollygrove area.  At approximately 11:35, Parker's phone

3  arrives in the vicinity of the Home Depot on Veterans Boulevard

4  in Kenner.

5  Q.    And specifically, was it behind the Home Depot?

6  A.    Yes.

7  Q.    Again, just as far as the rough location, things like

8  Google data, is there a rough range of distance that this is

9  accurate to?

10  A.    Yes.  With each data point, they'll provide a radius where

11  the phone could be at that time.

12  Q.    So did it look like he was inside the Home Depot or

13  Wal-Mart?

14  A.    Most of the data was in the general area behind, closer to

15  a baseball field and a small school.

16  Q.    Now how long did his phone remain there?

17  A.    Ten minutes.

18  Q.    And just to show -- go ahead.

19  A.    Just roughly ten minutes.

20  Q.    And as far as the rough location, there's a map up here,

21  and there's a red dot.  Again, this area is approximate because

22  the phone is just around that area; right?

23  A.    Correct.

24  Q.    So this is really just for a demonstrative, but it's that

25  26th Street area behind both the Home Depot and Wal-Mart;

OFFICIAL TRANSCRIPT

1    right?

2    A.    Yes.

3    Q.    And this is off of Veterans Boulevard?

4    A.    Yes.

5    Q.    In Kenner?

6    A.    Yes.

7    Q.    Where does Mr. Alfortish reside?

8    A.    During this time period, the Kenner area.

9    Q.    And also, had there been previous recorded meetings

10   between Mr. Garrison and Mr. Alfortish?

11   A.    Yes.

12   Q.    Mr. Garrison had recorded these because he was an FBI

13   confidential informant?

14   A.    Yes.

15   Q.    Where did those meetings occur?

16   A.    Various locations off of Veterans Highway or Boulevard.

17   Q.    Now Mr. Parker, that's not the end of the data we have

18   regarding Google; correct?

19   A.    Correct.

20   Q.    Did Mr. Parker use his phone to conduct searches?

21   A.    Yes.

22   Q.    In fact, he did some searches, again, potentially related

23   to Cornelius Garrison about two weeks or so before the

24   homicide?

25   A.    Can you repeat the question?

OFFICIAL TRANSCRIPT

1  Q.   About two weeks or so before the homicide, he had searched
2  for Cornelius Garrison?
3  A.   Yes.
4  Q.   Seven days after the homicide, what did he do?
5  A.   Mr. Parker conducted Google searches for articles related
6  to Sean Alfortish.
7  Q.   And what are we posting here?  Where is this data from
8  here on the screen?
9  A.   This is from Leon Parker's Google search history.
10 Q.   And this is -- first of all, as a general
11 characterization, did you look at Mr. Parker's Google history
12 generally?
13 A.   Yes.
14 Q.   There's some news articles here.  Are there lots of news
15 articles in that news history, I mean, that search history?
16 A.   Occasionally, but not often.
17 Q.   So we have here, again, sequential searches; is that
18 right?
19 A.   Yes.
20 Q.   And another three right here; correct?
21 A.   Yes.
22        **MR. PAYNE:** The first one -- we're going to submit
23 this as Government's Exhibit V as in Victor, and this is not
24 under seal, Your Honor.
25        I'll provide a copy to the Special Agent as well.

OFFICIAL TRANSCRIPT

1  **BY MR. PAYNE:**

2  Q.   So Special Agent, first of all, there is -- this is the

3  first search in Mr. Parker's search history; is that right?

4  A.   In that time period we showed, yes, that's correct.

5  Q.   Okay.  So there's a link here, and we copied it right here

6  on the slide, the slide deck.  The first link in the search

7  history appears to no longer be operable; is that right?

8  A.   Yes.

9  Q.   Did we inquire with the Louisiana Attorney Disciplinary

10 Board regarding this Doc ID 8068?

11 A.   Yes.

12 Q.   And what did they respond with?

13 A.   They responded with the Doc ID being valid; however, the

14 link had expired and provided the document we have here today.

15 Q.   So this one doc, is that document Exhibit V?

16 A.   Yes.

17 Q.   So this search, to be clear, is to the Louisiana Attorney

18 Disciplinary Board?

19 A.   Correct.

20 Q.   Their website?

21 A.   Yes.

22 Q.   For a document that is for Internet purposes on their

23 website is labeled as Doc 8068.  And what does this document

24 concern?

25 A.   It concerns Sean Alfortish's disbarment with the State of

OFFICIAL TRANSCRIPT

1  Louisiana Board or Bar Association.

2  Q.    The document speaks for itself, but it says there

3  Recommendation of the Louisiana Attorney Disciplinary Board for

4  Sean Alfortish?

5  A.    Correct.

6  Q.    All right, that's Mr. Parker's first search on

7  September 29th, 2020.

8        Let's go to the next search.  What did he search for next?

9  A.    The next search was, again, about Alfortish, May 2019,

10  Louisiana Record article, and it discusses the staged accident

11  scheme at that time.

12        **MR. PAYNE:** Again, this document speaks for itself,

13  and we've attached it as an exhibit to our motion, Your Honor.

14  **BY MR. PAYNE:**

15  Q.    Again, on this one, was this document about, for example,

16  Ms. Motta?

17  A.    No.

18  Q.    Who was this about?

19  A.    Sean Alfortish.

20  Q.    Let's go to the next article that Mr. Parker searches for

21  in his Google history on September 29th, 2020.  What's this

22  next document about?

23  A.    This article is about Sean Alfortish's sentencing to

24  46 months in prison related to his previous conviction

25  involving the Horsemen's Benevolent and Protective Association.

1  Q.   This conviction, again, nothing with Ms. Motta; correct?

2  A.   Correct.

3  Q.   Okay.  But this article, however, was from what year?

4  A.   February 2012.

5  Q.   So about eight years earlier?

6  A.   Yes.

7  Q.   Then another article, Special Agent, here, this one is

8  again in sequential order.  What's this article that Mr. Parker

9  searched for?

10 A.   November 2019 article regarding Sean Alfortish and Vanessa

11 Motta's role in the staged accident scheme.

12 Q.   And then -- so this is the search for, as you said,

13 November 2019 WWL article.  This one obviously concerns

14 Ms. Motta as well; correct?

15 A.   Yes.

16 Q.   And then one more article.  Again, this is in sequential

17 order; correct?

18 A.   Yes.

19 Q.   Where is this article from?

20 A.   *NOLA.com*.

21 Q.   What's the date of that article?

22 A.   January 2018.

23 Q.   This article though, specifically, is this about Operation

24 Sideswipe or crashes?

25 A.   No.


OFFICIAL TRANSCRIPT

1  Q.   What's this article about?

2  A.   It's about Alfortish's lawsuit to own thoroughbreds after

3  his conviction in 2012.

4          **MR. PAYNE:** Your Honor, we have some witness

5  information to share under seal.

6          **THE COURT:** All right, then we need to clear the

7  courtroom.  Isabella, you can stay.  All others must leave if

8  you have no official role here.

9              (Proceedings held under seal.)

10         **THE COURT:** We have a couple of exhibits that have

11 been mentioned and not yet admitted too while we're refilling

12 the room.  We had Government Exhibit V which is the LADB

13 report.

14         Any objection, Mr. Haedicke?

15         **MR. HAEDICKE:** No, Judge.

16         **THE COURT:** All right, so that's admitted.

17         And there was another that was attached to your

18 motion or your filing, I believe, but I didn't catch the letter

19 on it.

20         What was it, Angelle?

21         **DEPUTY CLERK:** Parker 1.

22         **MR. PAYNE:** Yes, Parker 1.  Yeah, Your Honor, we'll

23 offer Parker 1.

24         **THE COURT:** Okay, Mr. Haedicke, any objection to

25 Parker 1?

OFFICIAL TRANSCRIPT

1    **MR. HAEDICKE:** No objection, Judge.

2    **THE COURT:** All right, admitted.  Thank you.

3    Did you finish your direct?

4    **MR. PAYNE:** I did.  That was it.

5    **THE COURT:** Okay.

6    **MR. PAYNE:** And I think we ended off on that sealed

7    matter; so I think we want to continue with cross.

8    **THE COURT:** All right, very good.  Thank you.

9    **CROSS-EXAMINATION**

10    **BY MR. HAEDICKE:**

11    Q.   Agent Heimbach, you mentioned a crash, a car wreck in

12    December of 2021.  And essentially, what I understood is that

13    the reason you believe that it was a staged car wreck rather

14    than just an actual car wreck is that the vehicle was salvaged?

15    A.   Yes, among other factors.

16    Q.   Tell me what those other factors are.

17    A.   It is in the same general area where previous staged

18    accidents had occurred.

19    If I'm remembering correctly, that's the accident where it

20    was a head-on collision as well which is similar to previous

21    accidents that have been staged by Mr. Parker.

22    And then I believe Ms. Motta represented him in that

23    matter as well which we've determined is indicative of fraud.

24    Q.   Okay.  Anything else?

25    A.   Not that I recall.

OFFICIAL TRANSCRIPT

45

```
 1   Q.   Now you said head-on collision, that was an indication of
 2   fraud to you because allegedly Mr. Parker had been involved in
 3   other collisions that were head-on.  What other collisions?
 4   What are you talking about?
 5   A.   The 2017 accident where there was a head-on collision.
 6   Mr. Parker was in a vehicle.  The other vehicle was occupied by
 7   Jovanna Gardner.  I believe Vernika Blunt was there as well.
 8   And then Mr. Harris was on scene for an unknown reason.
 9   Q.   Okay.  Now have you ever spoken to the other driver in
10   this December 2021 collision?
11   A.   No.
12   Q.   Now the November or the recent November 2024 car wreck
13   that Mr. Parker was in, you also suggested that -- I'm not
14   putting words in your mouth, but I think you believe or you
15   suggested that was also fraudulent?
16   A.   Yes.
17   Q.   What reasons do you have for that?
18   A.   That accident was on Eastbound I-10, an area throughout
19   this investigation frequently used for staged accidents.
20   Again, another salvage title.  Those are two of the factors in
21   the initial report that we deem suspicious and likely a
22   fraudulent accident.
23   Q.   Anything else?  The location and the salvage title, is
24   that the extent of your evidence regarding that?
25   A.   And Mr. Leon Parker's involvement, yeah.
```

OFFICIAL TRANSCRIPT

1  Q.    Have you spoken to the other driver in the other car?

2  A.    No.

3  Q.    Have you gathered a police report regarding --

4  A.    We made attempts to find the police report.  It's not

5  clear at this time if one was even made.

6  Q.    Now you said that there was an insurance claim filed

7  regarding that November 2024 --

8  A.    Yes.

9  Q.    -- accident?  Do you know the status of that claim?

10 A.    I don't know.  All I know is that a claim has been filed.

11 We requested those records.

12 Q.    Now you mentioned that a search warrant was performed on

13 Mr. Parker's home in December, just a few days ago.

14      What evidence was recovered during that?

15 A.    Again, approximately five and a half kilos of marijuana,

16 cell phones, various documents, scales, digital scales.

17 Q.    I understand that it's only a few days ago that this

18 search warrant occurred.  But do you believe that you recovered

19 any evidence connected to staged car wrecks or the murder of

20 Mr. Garrison?

21 A.    The first part of your question, yes, staged accidents.

22 There's various insurance documents, business cards from

23 Ms. Motta.  So yes.

24 Q.    How about the murder, anything that you believe is

25 connected to that?

OFFICIAL TRANSCRIPT

1  A.    There's cell phones that could contain evidence of the
2  homicide of Mr. Garrison.
3  Q.    Are you performing searches on those cell phones?
4  A.    We will be seeking a search warrant for those cell phones.
5  Q.    Now regarding these communications between Mr. Harris and
6  Mr. Parker regarding the firearm, the 9-millimeter firearm, do
7  you recall that?
8  A.    Yes.
9  Q.    Mr. Harris was actually attempting to purchase a firearm
10 from a gun shop?
11 A.    Yes.
12 Q.    Now I understand that he was later declined, or they
13 wouldn't allow him to purchase that firearm.  Do you know why?
14 A.    Yes.  Because of a previous firearms-related conviction,
15 he was denied.
16 Q.    Now you mentioned that Mr. Parker had given a deposition
17 at some point.  That was in relation to one of the car wrecks;
18 is that right?
19 A.    Yes, that was a deposition related to the January 2016
20 accident.
21 Q.    January of 2016?
22 A.    Yes, that's when the accident occurred.  The deposition, I
23 believe, was roughly a year later.
24 Q.    Now regarding this 71-minute call that was occurring
25 during the time frame of the murder, do you know who that call

OFFICIAL TRANSCRIPT

1  was made to?

2  A.   We have databases that have suggested who the subscriber

3  might be, but we have not talked to that person or identified

4  him at this time.

5  Q.   Now you mentioned Mr. Parker taking out money from his

6  bank account September 21st, 2020.  Have you done any

7  investigation to determine if that money was later used for any

8  other purpose or deposited back into a bank?

9  A.   Yes.

10  Q.   What did you learn?

11  A.   We were unable to determine where that money went after it

12  was withdrawn.

13  Q.   Now Mr. Garrison recorded conversations with

14  Mr. Alfortish.  I want to make this a broader topic.

15      Mr. Garrison never provided the Government with any

16  information regarding Mr. Parker; is that correct?

17  A.   He made statements more broadly that he assisted the

18  Harris family, but he never specifically identified Mr. Parker

19  as far as I know.

20  Q.   Okay.  So I take it there were no conversations recorded

21  by Mr. Garrison regarding him and Mr. Parker?

22  A.   Correct.

23  Q.   Now regarding these searches that the Government believes

24  Mr. Parker made regarding Mr. Alfortish and various news

25  reports, I mean your investigation into these car wrecks have

1  been going on for years before September of 2020; is that
2  correct?
3  A.    Yes.
4  Q.    And Mr. Alfortish and Vanessa Motta had been in the news a
5  number of times in relation to that investigation?
6  A.    Yes.
7  Q.    So if somebody were just curious about the state of this
8  investigation, they could kind of go into an Internet wormhole
9  regarding Mr. Alfortish and search a lot of different things.
10 You would agree with me?
11 A.    It's possible, yes, sir.
12 Q.    There's lots of different information out there about
13 Mr. Alfortish and his legal troubles in the past and his
14 alleged involvement in this scheme.  Would you agree with me?
15 A.    Yes.
16 Q.    Now you mentioned Mr. Parker or the Government presented
17 information on Mr. Parker, or at least, his phone.  You tracked
18 his phone making a trip to Kenner on the night of
19 September 22nd, 2020.  Do you remember that?
20 A.    Yes.
21 Q.    And the implication, again, without any direct evidence,
22 but the implication that the Government is obviously making is
23 that Mr. Alfortish met with Mr. Parker out in Kenner.  Is that
24 what you believe?
25 A.    Yes.

OFFICIAL TRANSCRIPT

1  Q.    Do you have any evidence to substantiate that belief?

2  A.    The meetings with Cornelius that we discussed had a

3  particular -- I guess, Sean Alfortish met him in specific areas

4  along Veterans.  So this travel by Leon Parker was consistent

5  with those previous meetings we saw between Sean and Garrison.

6  Q.    Anything else?

7  A.    No.

8  Q.    I mean I assume that you've probably gotten data, cell

9  phone data, etcetera, from Mr. Alfortish's phones during this

10 investigation?

11 A.    We have received various phone data from Mr. Alfortish's

12 phones, correct.

13 Q.    Am I correct in saying, based on your answer, that none of

14 that data would corroborate your belief that Mr. Alfortish met

15 with Mr. Parker out in Kenner on this night?

16 A.    There was no location data available with Mr. Alfortish's

17 devices.  So I couldn't say either way based on that.

18          **MR. HAEDICKE:** No further questions, Judge.

19          **THE COURT:** Thank you.

20          Any redirect, Mr. Payne?

21                  **REDIRECT EXAMINATION**

22 **BY MR. PAYNE:**

23 Q.    So to discuss Mr. Garrison's involvement with Mr. Parker,

24 the January 2016 accident, who did that involve?

25 A.    That involved Leon Parker, Selita Harris, Darnell Harris.


                        OFFICIAL TRANSCRIPT

1  Mr. Parker was in communication with a phone number associated
2  with Cornelius Garrison before and after that accident.
3  Q.    In Mr. Garrison's role as a slammer, does that suggest to
4  you that Mr. Garrison set up that accident?
5  A.    Yes.
6  Q.    And did Mr. Parker profit from that accident?
7  A.    Yes.
8  Q.    And was this a settlement amount?
9  A.    Yes.
10 Q.    How much for?
11 A.    It was a settlement of over $800,000.  Mr. Parker
12 received, I believe, $100,000 worth, a check for $100,000 out
13 of that settlement.
14 Q.    Regarding the other collisions that were set up other than
15 18-wheelers, have you investigated other collisions that were
16 set up by Mr. Harris?
17 A.    Yes.
18 Q.    Because I know we spoke about these are basically set up
19 between two smaller vehicles; correct?
20 A.    Yes.
21 Q.    Have you been able to identify other accidents of this
22 nature set up by Mr. Harris?
23 A.    Yes.
24 Q.    And do they have the same kind of hallmarks that we're
25 talking about?

OFFICIAL TRANSCRIPT

1  A.    Yes.

2  Q.    Regarding the firearm, I know that we talked about --

3  Mr. Haedicke asked you questions about that firearm and whether

4  or not it had been purchased by Mr. Harris.

5        Again, he was denied; correct?

6  A.    Yes.

7  Q.    In those text messages, though, I believe that did --

8  there were text messages, excuse me, from Mr. Parker.  When he

9  saw that, what did he respond about the Scorpion?

10  A.    "Oh, nothing.  Nice.  Almost look like mines."

11  Q.    Potentially in reference to another Scorpion firearm?

12  A.    Correct.

13  Q.    Withdrawal, we asked you about that withdrawal of funds

14  the day before the homicide, September 21, 2020.

15        Just to be clear, based on your training, experience, and

16  what you've seen in this case, what does that signify to you?

17  A.    It's indicative of individuals or Mr. Parker draining his

18  bank account prior to committing a crime possibly to evade law

19  enforcement when they begin their investigation.

20  Q.    Finally, Mr. Haedicke asked you some questions about the

21  Google searches for Mr. Alfortish afterwards, okay.

22        And regarding those Google searches, concerning, you said,

23  going down Internet wormholes, you viewed Mr. Parker's search

24  data history.  Does Mr. Parker go down Internet wormholes that

25  much?

OFFICIAL TRANSCRIPT

1  A.    I hadn't seen any wormhole -- like he'd never performed

2  searches like this before regarding Mr. Alfortish.

3  Q.    And those searches about Mr. Garrison, I think just to

4  make it clear on this point, those searches about Mr. Garrison,

5  were those conducted before or after Mr. Garrison's indictment?

6  A.    Before.

7  Q.    So there was not a news story about Mr. Garrison's

8  indictment at this point?

9  A.    Correct.

10         **MR. PAYNE:** Thank you very much.  I think we'll submit

11  on that, Your Honor.

12         And again, just for the record, we did provide a copy

13  of the PowerPoint which we ask to be put under seal.  Thank

14  you.

15         **THE COURT:** Thank you.  And we will seal that

16  document.

17         **MR. PAYNE:** Thank you.

18         **THE COURT:** Does the Government have any other

19  witnesses?

20         **MR. PAYNE:** No, Your Honor, the Government submits.

21         **THE COURT:** All right, thank you.

22         Would any of the staff or lawyers involved like a

23  five-minute comfort break before we continue?  We've been at it

24  for about two hours.  It's up to you.

25         **MR. HAEDICKE:** May I have just a moment to talk to

OFFICIAL TRANSCRIPT

1  Mr. Parker's wife?  Yes, five minutes.

2          **THE COURT:** All right.  We'll meet back here at

3  4:00 o'clock sharp.  Thank you.

4          **DEPUTY CLERK:** All rise.

5                  (A short recess was taken.)

6          **DEPUTY CLERK:** All rise.

7          **THE COURT:** Thank you.  Be seated, and we can

8  continue.

9          All right, Mr. Haedicke, I think Mr. Payne has

10  submitted, and we're over to you.

11          **MR. HAEDICKE:** No witnesses, Judge.

12          **THE COURT:** Oh, okay, all right.  Then let's have

13  brief concluding arguments, and then I will rule.

14          **MR. PAYNE:** Certainly, Your Honor.

15          In sum, Your Honor, the information we've presented

16  here concerns both Mr. Parker's involvement in the long-term

17  fraud, but more importantly, his involvement in obstructing a

18  witness and very likely assisting in and aiding in a homicide.

19          We've presented evidence that he was involved, made

20  searches for Mr. Cornelius Garrison weeks beforehand, just a

21  couple of weeks beforehand.  Met with Mr. Harris several times

22  before.  Mr. Harris, a person that he was very close to.

23  Again, Mr. Parker was dating Mr. Harris's mother.

24          The subsequent actions also connect him very directly

25  to Mr. Alfortish who we've established did have a motive in

OFFICIAL TRANSCRIPT

1   order to silence Mr. Garrison.  And we know specifically

2   Mr. Garrison -- excuse me, Mr. Parker had an involvement with

3   Mr. Garrison in this scheme.  Mr. Garrison was a slammer

4   involved regarding a settlement where Mr. Parker settled for

5   over $800,000.

6          Moving beyond that, Your Honor, we also have a recent

7   arrest in November 2024.  In that arrest, Mr. Parker provided

8   on his bond paperwork an address of 2713 Dawson Avenue, Kenner,

9   Louisiana which is nowhere near where he lives.  Now by all

10  means, I don't know if that's an address related to possibly

11  another person that he knows.  But my understanding is when a

12  court such as the judge in Jefferson Parish asks for bond

13  paperwork and you're supposed to put down your address, that's

14  not supposed to be an address for your daughter, for your

15  friend.  That is your address where you are expected to be

16  found.

17         According to Mr. Parker's own spouse on the day of

18  the search warrant on December 9th, she explained they had

19  been living in Slidell for a couple of years.  So already we

20  have recently, very recently Mr. Parker has provided false

21  information to a court relating to bond.  Respectfully, that

22  should also be disqualifying as to whether or not he should

23  receive bond here today.

24         Based on this information, the Government submits --

25  one moment.


OFFICIAL TRANSCRIPT

1          We do want to emphasize also, Your Honor, that there
2     was a search done at Mr. Parker's house; and at that search,
3     there was five and a half kilograms of marijuana.  I know that,
4     I believe, probation has recommended that she be a third-party
5     custodian.  I believe that's inappropriate here.  Again, she
6     has been residing at this residence where, according to the
7     ledger, also Mr. Parker has been distributing drugs over at
8     least a year.  Either she's then complicit or had knowledge or
9     was ignorant of it.  Regardless, that makes her inappropriate
10    as a third-party custodian.

11          We ask that bond be denied and he be held pending
12    trial.

13          **THE COURT:** Thank you.

14          **MR. HAEDICKE:** Judge, the fact remains, I mean,
15    despite this presentation that's been made, there has been no
16    indictment of my client for involvement with this homicide of
17    Mr. Garrison.  If they believe that they can do that and they
18    believe it's appropriate, then they should do it.  But I submit
19    that they -- this evidence and each one of these things,
20    there's a lot of circumstances, a lot of smoke that they can
21    point to.  But where is the direct evidence of involvement?

22          You know, the Internet searches, this case has been
23    in the news for years.  And so is it unusual for Mr. Parker to
24    have made searches about some of the people he's reading about
25    in the news?  No, it's not unusual at all.

OFFICIAL TRANSCRIPT

1          The text regarding the gun with Mr. Harris,
2    Mr. Harris is attempting to buy a gun at a gun shop legally.
3    There's no reason why my client can't have a conversation with
4    somebody that he's reportedly very close with about something
5    that this person is doing.  There's no allegation that that gun
6    was actually used in a homicide.

7          And this is a good example.  They say, well, this is
8    a 9-millimeter gun that they're texting about, and then
9    Mr. Garrison is killed with a 9-millimeter gun later on.  These
10   are just kind of, whatever, indications that ultimately mean
11   nothing.  They're sound and fury that ultimately means nothing.

12         You know, these conversations, communications,
13   meetings between Mr. Harris and Mr. Parker that allegedly
14   happened, they admit.  They say Mr. Parker is close with
15   Mr. Harris.  None of these things show any kind of indication
16   of guilt.  It's just more circumstances that they can point to
17   that say, well, maybe that happened, maybe that happened.  But
18   again, there's been no indictment of my client regarding this
19   homicide.  And I submit that if they could do that and they
20   believe that confidently they could obtain a conviction on
21   that, then they would do that.  But they have not done that.

22         And other than that, if you take that out of the
23   equation, then you have my client Mr. Parker having allegedly
24   participated in car wrecks that happened back, you know, some
25   of them, nine years ago at this point or almost nine years ago.

OFFICIAL TRANSCRIPT

1          So my client lives on disability.  He lives at home

2    with his wife.  Now I understand that these allegations of drug

3    dealing are present.  Quite frankly, this was news to me; so I

4    understand the Court's concern with that.  But I do believe

5    that it would be possible to fashion some form of supervision

6    that would assure the Court of my client's -- both my client's

7    return to court when he's required to do so and the safety of

8    the community.  Some house arrest, home detention, whatever

9    condition that the Court would be comfortable with, then

10   Mr. Parker would agree to comply with.

11          **THE COURT:** Thank you, Mr. Haedicke.

12          All right, I am prepared to rule.  In determining

13   whether defendant should be detained in this case, the Court is

14   guided by several general principles.  First, at all times, the

15   defendant is entitled to the presumption of innocence.  Nothing

16   that occurred in this hearing or that I set forth in my

17   findings is intended or should be construed to affect that

18   presumption.  Rather, the purpose of this hearing is to

19   determine whether, notwithstanding the presumption of

20   innocence, the defendant should be detained pending trial.

21          Second, under the Bail Reform Act, a defendant must

22   be released prior to trial unless the Court finds that no

23   condition or combination of conditions exist that will

24   reasonably assure the appearance of the defendant if the

25   Government seeks detention based on risk of flight or

OFFICIAL TRANSCRIPT

1    reasonably assure the safety of any other person in the

2    community if the Government seeks detention based on the

3    defendant being a danger to the community.

4           In this case, the Government moved both on risk of

5    flight and danger styled as obstruction.  The act requires that

6    the least restrictive conditions be imposed that are necessary

7    to provide those reasonable assurances.  If I cannot find any

8    conditions that will reasonably assure the appearance of the

9    defendant as required or the safety of the persons in the

10   community, then I am required by the act to order the defendant

11   held in custody.

12          In this case, I'll turn my attention first to the

13   risk of flight or risk of non-reappearance.  The Court does not

14   hold a real concern about that.  Usually, conditions can be

15   fashioned that will ensure reappearance through monitoring or

16   home confinement.  Although I have not heard about any suitable

17   place to house Mr. Parker in particular since it appears that

18   the house was the site of significant drugs, and I did not see

19   a condition or combination of conditions that would reassure me

20   on that.  But I could have worked with that if I was also

21   satisfied that Mr. Parker does not present a danger to the

22   community.

23          But I find that Mr. Parker does present a danger to

24   the community in particular relating to the obstruction

25   allegations that the Government has just laid out here in great

OFFICIAL TRANSCRIPT

1  detail.  I am concerned about the fact that 16 days before the

2  murder, he was searching for Mr. Garrison's name on Google.

3  That seems like quite a coincidence given how far they go back

4  together to the slamming days of 2016, '17, and that time

5  frame.

6        I am concerned that six days before the murder, he

7  was texting with Mr. Harris about the Scorpion 9-millimeter

8  gun, confirming had one, and then, indeed, it was a

9  9-millimeter gun that was used in Mr. Garrison's murder.

10       I am concerned that one day before the murder, he

11  withdrew $47,000 which was substantially all of his money from

12  his accounts.  This certainly suggests that he was concerned

13  about something.

14       I am concerned that one day before the murder, he met

15  with Harris who then went to buy a burner phone, Burner Phone

16  No. 1, less than two hours later which was delivered to Jovanna

17  Gardner that same day.

18       Obviously, the killing of Mr. Garrison is an act of

19  obstruction in a significant federal investigation, and there

20  is enough evidence here to be concerned that Mr. Parker had

21  some role in that.  Whether he knew that the meeting between

22  Mr. Harris and Mr. Garrison was to kill Mr. Garrison or whether

23  it was to pay him off as Jovanna Gardner alleges she believed,

24  either way, it is an act of obstruction.

25       Those negotiations began with an offer to pay

OFFICIAL TRANSCRIPT

1   Mr. Garrison apparently by Alfortish and Motta and move him to
2   the Bahamas and to appoint him a lawyer.  And so there's just a
3   lot of evidence that Mr. Garrison was, indeed, hushed up.
4        In addition, I am concerned about the evidence that
5   Mr. Harris and Mr. Parker were apparently together on the day
6   of the murder as evidenced by the Google location data.  Also,
7   on the day of the murder, they met again and that Mr. Parker
8   apparently went to New Orleans East.
9        I find sufficient reason to disbelieve the 71-minute
10  call was legit and that, in fact, it may have been an alibi
11  call and that Mr. Parker may have been on site with Mr. Harris
12  at the time of the murder.  I am concerned about the additional
13  calls later on the day of the murder from Mr. Harris to
14  Mr. Parker at 10:31 and 10:32 following which Mr. Parker made a
15  trip to Kenner which may have only lasted ten minutes, but
16  there is reason to be concerned about that location.
17       I am concerned about the implications that were
18  presented as to Mr. Harris's visit by a witness with
19  significant personal information and supporting that the
20  71-minute call was an alibi call.
21       I am concerned about evidence of other crimes in
22  Mr. Parker's recent and far past, including, four possibly
23  fraudulent car accidents, including, one that just happened
24  last month.  I am concerned about five and a half kilos of
25  marijuana and evidence of dealing, including, the possession of

OFFICIAL TRANSCRIPT

1  scales and baggies.

2          I am concerned about his acts of evasion, including,

3  the wrong address given on an appearance bond just last month.

4  That is, indeed, a pretty grievous error, if it is one on his

5  part, that suggests that maybe he didn't want to be found.

6          And again, I just don't see any condition or

7  combination of conditions that can overcome all of that.  So

8  for all of these reasons, I find that Mr. Parker must be

9  remanded to the custody of the marshal and detained pending his

10  trial.  Thank you.

11          **MR. HAEDICKE:** Thank you, Your Honor.

12          **MR. PAYNE:** Thank you, Your Honor.

13          **DEPUTY CLERK:** This concludes the docket.

14          (Whereupon this concludes the proceedings.)

15

16                    **<u>CERTIFICATE</u>**

17      I, Alexis A. Vice, RPR, CRR, Official Court Reporter for

18  the United States District Court, Eastern District of

19  Louisiana, do hereby certify that the foregoing is a true and

20  correct transcript, to the best of my ability and

21  understanding, from the record of the proceedings in the

22  above-entitled and numbered matter.

23

24                    */s/Alexis A. Vice, RPR, CRR*
                        Alexis A. Vice, RPR, CRR
25                      Official Court Reporter


                    OFFICIAL TRANSCRIPT