UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

*****************************************************************

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION NO. 24-105 |
| VERSUS | SECTION "D"(1) DECEMBER 16, 2024 |
| LEON M. PARKER | |

*****************************************************************

TRANSCRIPT OF DETENTION HEARING
HEARD BEFORE THE HONORABLE JANIS VAN MEERVELD
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

FOR PLAINTIFF:
Matthew R. Payne, Esq.
Brian M. Klebba, Esq.
Mary Katherine Kaufman, Esq.
Jeffrey Ryan McLaren, Esq.
U.S. ATTORNEY'S OFFICE
650 Poydras Street
Suite 1600
New Orleans, LA 70130

FOR DEFENDANT:
Stephen J. Haedicke, Esq.
LAW OFFICE OF STEPHEN J. HAEDICKE
1040 St. Ferdinand Street
New Orleans, LA 70117

TRANSCRIBED BY:
Alexis A. Vice, RPR, CRR
500 Poydras Street, HB-275
New Orleans, LA 70130
(504) 589-7777
*Alexis_Vice@laed.uscourts.gov*

*Proceedings recorded by electronic sound recording. Transcript produced by transcriptionist.*

OFFICIAL TRANSCRIPT

GOVERNMENT EXHIBIT
P

**P-R-O-C-E-E-D-I-N-G-S**

**(DECEMBER 16, 2024)**

**(DETENTION HEARING)**

**DEPUTY CLERK:** Criminal Action 24-105, *United States of America versus Leon Parker* for a detention hearing on a superseding indictment.

**MR. PAYNE:** Your Honor, good afternoon, Matthew Payne, Brian Klebba, Ryan McLaren, and Mary Katherine Kaufman on behalf of the United States.

**THE COURT:** Thank you.

**MR. HAEDICKE:** Stephen Haedicke on behalf of Leon Parker.

**THE COURT:** Thank you.

Mr. Parker, if you could just speak into a microphone, may I have your full name, please, sir?

**THE DEFENDANT:** Leon Mack Parker, ma'am.

**THE COURT:** All right, thank you, Mr. Parker. You are here this afternoon for a detention hearing, and it is my understanding we are going to have a hearing. So if you would like, you could sit at counsel table again while the lawyers do what they're going to do.

Before we get started, let me remind you of your right to remain silent. You do not have to make any statement.

Should you choose to make a statement, it can be used against you. If you start to make a statement, you can stop at any time.

Do you understand your right to remain silent?

**THE DEFENDANT:** Yes, ma'am.

**THE COURT:** All right, thank you. Then go ahead and have a seat again.

All right, Mr. Payne, what is the basis of your motion for detention? Please be specific.

**MR. PAYNE:** Yes, Your Honor. The Government moves based on the risk of flight and also risk of obstruction, Your Honor. As we set forth -- we did submit a filing, Your Honor, that specifically laid out the Government's grounds. So obviously, we'll be referring to that, Your Honor.

We do not believe they will comply with conditions -- excuse me, Mr. Parker will comply with conditions of his bond, specifically, again, obstructive conduct and witness tampering and risk of flight.

**THE COURT:** Okay. And Mr. Haedicke, I am correct we have no stipulation; correct?

**MR. HAEDICKE:** No stipulation, Judge. We just note that this is not a presumption case; so it is the Government's burden.

**THE COURT:** Okay, and the Government will go first.

Do you intend to call any witnesses, Mr. Payne?

**MR. PAYNE:** Yes, Your Honor. The Government calls Special Agent Michael Heimbach from the United States FBI.

**THE COURT:** All right, thank you.

**MR. HAEDICKE:** I did intend to call my client's wife who is present in the courtroom. I don't know if she needs to step out.

**MR. PAYNE:** We'll invoke the rule, Your Honor, of sequestration.

**THE COURT:** Okay, everybody can stay until such time as they need to leave.

But Mr. Haedicke, are you suggesting she needs to go first for some reason?

**MR. HAEDICKE:** No, no. If it would be an issue for her to be present in the courtroom during this testimony and that would cause an issue with her testifying afterwards, then that is -- I do intend to call her as a witness.

**THE COURT:** Okay, all right, that's fine. Thank you.

**MR. PAYNE:** I appreciate it, thank you.

**MR. HAEDICKE:** So if she needs to step out?

**THE COURT:** She can stay in for now; right, Mr. Payne?

**MR. PAYNE:** No, the Government invokes the rule of sequestration.

**THE COURT:** Oh, I misunderstood. Thank you.

**MICHAEL HEIMBACH,**

after having been duly sworn, did testify as follows:

**DEPUTY CLERK:** Please have a seat. State your name, and spell it for the record.

**THE WITNESS:** Special Agent Michael Heimbach, M-I-C-H-A-E-L, H-E-I-M-B-A-C-H.

**MR. PAYNE:** Your Honor, the Government's going to be presenting some documents here by slide. We have a copy for Your Honor and also one that we submitted for record purposes.

I think in an abundance of caution, we ask that this also be filed under seal.

**THE COURT:** Any objection, Mr. Haedicke?

**MR. HAEDICKE:** No objection.

**MR. PAYNE:** It has some sealed information in one part of it, Your Honor.

**THE COURT:** Okay. We'll seal this exhibit.

**DIRECT EXAMINATION**

**BY MR. PAYNE:**

Q. Good afternoon, Special Agent.
A. Good afternoon.
Q. What's your assignment, sir?
A. I'm currently a special agent assigned to the New Orleans Gang Task Force, FBI New Orleans Division.
Q. How long have you been an FBI agent?
A. I've been an FBI agent for six and a half years.
Q. What's some of your experience previous to that?
A. I was an officer in the United States Marine Corps prior

to joining the FBI. When I joined the FBI, I worked domestic terrorism matters, mass shootings, death of a federal officer before transferring here to New Orleans.

Q. Have you been involved in the investigation concerning Operation Sideswipe?

A. Yes.

Q. Can you explain that very briefly for the Court and your role in it?

A. My role primarily has been involving the death of Cornelius Garrison who was a witness in that matter. That case involved hundreds of accidents involving individuals staging automobile accidents with 18-wheelers on the interstate. Those accidents or fraudulent accidents resulted in lawsuits which subsequently had large settlements.

But my primary focus has been the homicide of Cornelius Garrison in September of 2020.

Q. While there's suspicion of many of these, we have actually confirmed that some of these accidents were actually fraudulent?

A. That is correct.

Q. I'd like to turn our attention to Mr. Parker.

In the course of this investigation, has it been determined that Mr. Parker was involved in fraudulently staged collisions?

A. Yes.

Q. To specifically go over some of those, was there a January 2016 collision?
A. Yes.
Q. Could you explain that one?
A. In January of 2016, Mr. Parker, as well as others, were in a suspicious accident involving an 18-wheeler which we deemed to be fraudulent. Essentially, in insurance filings, Mr. Parker claimed that he was hit by an 18-wheeler. We have since determined that was not true, and the result of that particular accident resulted in an $800,000 settlement.
Q. And then a January 2017 collision; is that right?
A. Yes.
Q. Okay. So I know as this investigation progressed, there's been a lot of focus on collisions between vehicles and 18-wheelers; correct?
A. Yes.
Q. Have we determined that's the limit of the scope of these fraudulent accidents?
A. No.
Q. So there's some other -- there's another kind of version?
A. Yes.
Q. Can you explain that, please, for the Court?
A. Of course. We've determined that these accidents also included two regular vehicles colliding with one another. Oftentimes that collision was conducted by individuals we knew

to stage accidents with 18-wheelers. Now they are crashing vehicles into one another in isolated areas of New Orleans, and again, filing fraudulent lawsuits after those collisions.
Q. So to turn the Court's attention to the January 2017 collision, was that another one that Mr. Parker was involved in?
A. Yes.
Q. And who was involved in that one?
A. Leon Parker, Jovanna Gardner, I believe Vernika Blunt. And then on body camera, you can see Ryan Harris present for that accident as well.
Q. Was Ryan Harris involved in setting up these accidents?
A. Yes.
Q. The location here is Morrison and Gannon. Where is that located?
A. In the New Orleans East area of New Orleans.
Q. Is that a populated area?
A. Moderately isolated area of New Orleans.
Q. I understand that involved a salvage vehicle?
A. Yes, that's correct.
Q. Can you explain that?
A. We found that many of these accidents, both with the 18-wheelers and the vehicle-on-vehicle accidents, they involved salvage titles. Vehicles that often can be purchased for low cost that already have damage. Often do not have any repairs

done to them, and if they do, very minimal. So that during a subsequent accident, they can then claim those damages were part of the accident versus previous damage prior to salvage.
Q. Turning to December 2021, can you explain that one?
A. Yes. In 2021, Mr. Parker, again, was in an accident. This time in the I-10 Service Road area of New Orleans East. This particular accident involved a salvage title and was subsequently handled by Motta Law following the accident.
Q. The location on I-10 Service Road, again, is that a commonalty with the January 2017 one?
A. Correct. It's very close to the Morrison/Gannon area of New Orleans East.
Q. Did it involve a salvage vehicle?
A. Yes.
Q. And as far as the information provided by the opposing -- for the opposing driver to the insurance company, can you tell us about that?
A. Yes. The insurance company received very minimal information about the other driver in this alleged head-on collision which we deemed suspicious.
Q. So again, does this have the same kind of hallmarks of a fraudulently staged accident?
A. Yes.
Q. There's also a recent collision that Mr. Parker was in; is that right?

A. Yes.
Q. When did that happen?
A. It was November 23rd, 2024.
Q. And what did you learn about this rather recent collision, less than a month ago?
A. This accident involved Leon Parker and his wife Teshana Jones. We have minimal information, but we do know it took place on Eastbound I-10, also involving a salvage title which again is all the hallmarks of a fraudulent accident.
Q. And when we refer here to NICB, do you know what that stands for?
A. Yes, the National Insurance Crime Bureau.
Q. And roughly describing it, that's a private organization, but collects the information from insurance companies?
A. Correct.
Q. Obviously, to potentially investigate fraud?
A. Yes.
Q. So they're kind of a clearinghouse and provide some quick information; is that right?
A. Yes.
Q. And just to be clear, this is a matter that's still being investigated?
A. That's correct.
Q. But to explain all the other details about it, what else -- what are some other hallmarks of fraud that you found

here?
A. Again, it involved salvage titles. There was very minimal information provided that we have access to at this time. Again, indicative of fraud.
Q. Similar to the other accidents that are staged, was an insurance claim filed?
A. Yes.
Q. And I believe we covered it, but the location, is that a similar hallmark?
A. Yes.
Q. Okay. Did Mr. Parker have an arrest in November 2024?
A. Yes.
Q. Can you please take us through that?
A. Yes. On November 26th, 2024, Leon Parker was arrested for drug distribution in Jefferson Parish. That arrest happened following surveillance of Mr. Parker distributing or suspected of distributing marijuana throughout New Orleans and Jefferson Parish on that date.
Q. Now subsequent to that arrest, was there a search warrant done on Mr. Parker's home?
A. Yes.
Q. And that's actually a federal search warrant; is that right?
A. Yes.
Q. So was that on Monday, December the 9th?

A. That's correct.
Q. During the search of Mr. Parker's home roughly two weeks after this arrest, what did they even find?
A. We found ledgers indicative of drug dealing, so ledgers with prices for drugs as well as people who owe Mr. Parker money. We also found five and a half kilos of marijuana, scales, and packaging indicative of drug sales.
Q. Was there any impression from the ledgers as to how long Mr. Parker has been distributing?
A. Yes. Some of the ledgers go back as far as last year. So it appears he's been doing this for several years now.
Q. Did agents also inquire about his bond paperwork?
A. Yes.
Q. Now to be clear, the search warrant, where did that occur?
A. In Slidell.
Q. That was a residence in Slidell?
A. Yes, sir.
Q. And was Mr. Parker found at that residence when it was executed?
A. Yes.
Q. As far as the bond paperwork for Mr. Parker's bond in that Jefferson Parish arrest that happened in November, late November 2024, what's the address that was provided there?
A. 2713 Dawson Ave in Kenner.
**MR. PAYNE:** Your Honor, I provided a copy previously

to Defense Counsel. We're going to mark this as Parker 1 for the record, and we'll offer this as well. It was not actually submitted. It's a late addition to the Government's brief.

**THE COURT:** Any objection, Mr. Haedicke?

**MR. HAEDICKE:** No objection.

**THE COURT:** Admitted.

**BY MR. PAYNE:**

Q. As far as Mr. Parker's address here, what's the address that Mr. Parker gave on his bond paperwork for that pending Jefferson Parish charge?

A. Again, 2713 Dawson Ave in Kenner.

Q. And that's different from the Slidell address; is that right?

A. Yes.

Q. Now, when you did execute that warrant in Slidell in December, this month, did you speak to Mr. Parker's wife?

A. Yes.

Q. And did she inform you anything about how long they had been living there?

A. Yes.

Q. What did she say?

A. She said they'd been living there for several years.

Q. Now, moreover, Mr. Parker, as far as Mr. Parker's address, do you know what his address is on his driver's license?

A. Yes. Mr. Parker's current driver's license also lists

this address in Kenner.
Q. And when did Mr. Parker last renew that driver's license?
A. In April 2024.
Q. In April of 2024, was that Kenner address his correct address?
A. No, that was not his correct address.
Q. Now, Special Agent, I'd like to now turn your attention back to the Sideswipe investigation here because I'd like to discuss what's some of the evidence that's provided by Mr. Garrison.
Mr. Garrison who, again, you investigated his homicide. Prior to his homicide, was he a cooperating witness for the FBI?
A. Yes.
Q. And in that, his cooperation, did he provide information relating to obstruction and witness tampering?
A. Yes.
Q. Specifically, during his cooperation, obstruction and witness tampering by whom?
A. Sean Alfortish and Vanessa Motta.
Q. For instance, I'd like to turn your attention to a January 9th, 2020 report from Mr. Garrison.
On this date, did he report to agents that Mr. Alfortish offered to move Mr. Garrison to the Bahamas?
A. That's correct.

Q. And why did Mr. Alfortish offer to move Mr. Garrison to the Bahamas?
A. To keep Mr. Garrison from testifying in pending civil matters as well as criminal investigations.
Q. And did Mr. Alfortish -- we have it here on this slide, a report regarding this information from Mr. Garrison who is referred to as CHS; is that right?
A. Yes.
Q. What does CHS stand for?
A. Confidential Human Source.
Q. Did Mr. Garrison also report that Mr. Alfortish offered to compensate him if Mr. Garrison took the fall for the staged accidents?
A. That's correct.
Q. And how much did Mr. Alfortish offer?
A. He offered $500,000 with $100,000 of it upfront.
Q. Regarding this report, were agents able to corroborate whether or not, indeed, Mr. Alfortish and Ms. Motta actually recently went to the Bahamas?
A. Yes.
Q. According to records from the Customs and Border Patrol, and again, referring back to this January 9th, 2020 trip, when did Mr. Alfortish and Ms. Motta travel to the Bahamas?
A. It would have been January 2020, around that time frame.
Q. And according to these records, it shows that they

traveled to the Bahamas December 28th, 2019 and returned January 3rd, 2020?
A. Correct.
Q. Now we're hitting some of the points on Mr. Garrison's cooperation; right?
A. Yes.
Q. Are we hitting every single point about your investigation here today?
A. No.
Q. In fact, we're not going to go over every single report by Mr. Garrison; right?
A. That's correct.
Q. So, again, just so it's clear, we're hitting some of the highlights here relevant to Mr. Parker, and what we're going to explain is relevant grounds for his detention later on?
A. Yes.
Q. So let's move on to reports by Mr. Garrison of their suspicion of his cooperation.
On February 3rd, 2020, was there a report by Mr. Garrison about suspicion of Mr. Garrison's cooperation?
A. Yes.
Q. And suspicion by who?
A. Sean Alfortish.
Q. February 4th, 2020, what did Mr. Garrison report about Mr. Alfortish and his, Mr. Garrison's, status as a cooperator?

A. Mr. Garrison reported that he believed Sean Alfortish was telling people that he was cooperating with the Government.
Q. Just to give a little bit of context for the Court, around this time, January to early February, what did Ms. Motta and Mr. Alfortish do for Mr. Garrison or attempt to do?
A. Around this time frame, they were attempting to provide him a large amount of money and then also move him to the Bahamas.
Q. Did Mr. Garrison get a subpoena for a deposition?
A. Yes.
Q. In response to that, what did Mr. Alfortish and Ms. Motta do?
A. They arranged for Garrison to have an attorney.
Q. While that attorney did agree briefly to represent Mr. Garrison, subsequently, it became known that Mr. Garrison had already been appointed a lawyer; is that right?
A. Yes.
Q. And appointed a lawyer through an appointment process here in the federal court; correct?
A. Yes.
Q. And that person was who?
A. That was Claude Kelly with the Federal Public Defender's Office.
Q. And it actually was Mr. Kelly himself?
A. Yes.

Q. Represented him personally.

Okay, and so at this point, Mr. Kelly's representation had become known; is that right?

A. Yes.

Q. Around this time, all right. So that's February 3rd and February 4th.

February 10th, again, did Mr. Garrison make a report about Mr. Alfortish?

A. Yes.

Q. And Mr. Alfortish contacting Mr. Garrison?

A. Yes.

Q. At the very end of that on February 10th, what was the impression by Mr. Garrison of Mr. Alfortish?

A. He stated Sean Alfortish seemed concerned.

Q. And this, again, related to a meeting with this attorney, the new attorney Mr. Kelly?

A. Correct.

Q. By February 16th, 2020, did, again, Mr. Alfortish reach out to Mr. Garrison?

A. Yes.

Q. Did they discuss the deposition coming up for Mr. Garrison?

A. Yes.

Q. Mr. Kelly was going to be at that deposition; is that right?

A. Yes.
Q. And what did Mr. Garrison say that he felt like Mr. Alfortish was doing?
A. He felt like something was -- he felt like Alfortish was up to something regarding the deposition.
Q. And then February 17th, did Mr. Garrison make another report about Mr. Alfortish?
A. Yes.
Q. In fact, in this case, Mr. Alfortish and then also Ms. Motta together talked to him; is that right?
A. Yes.
Q. Then Mr. Garrison here who is now represented by Mr. Claude Kelly?
A. Yes.
Q. During this contact, did Ms. Motta provide some advice to Mr. Garrison about his deposition?
A. Yes. Cornelius reported that he should think about what he said before he said it and that defense counsel would stop harassing the CHS, Mr. Garrison.
Q. And then February 21, 2020, this is after the deposition where Garrison is represented by Claude Kelly. What did Mr. Garrison report about contact with Mr. Alfortish?
A. Cornelius reported that Sean was not happy with how things went at the deposition and told him that it did not go well.
Q. I'd now like to turn to Mr. Garrison's murder.

Specifically, though, Claude Kelly, the Federal Public Defender, was interviewed by federal agents on September 24th, 2020; is that right?
A. Yes.
Q. And that is two days after the murder?
A. Correct.
Q. Mr. Garrison's murder was certainly known by that point by Mr. Kelly?
A. Yes.
Q. And agents?
A. Yes.
Q. What did Mr. Kelly report regarding Mr. Garrison?
A. Mr. Kelly reported that Garrison had expressed concerns about his safety around that time period or prior to his death.
Q. At this point, was Mr. Garrison speaking with Motta and Alfortish, at least, according to Mr. Garrison?
Well, let me be clear. Mr. Kelly stated that he doubted Mr. Garrison was speaking with Motta or Alfortish at the time?
A. The time leading up to, correct, yes.
Q. So going to some facts on this murder, just to give the Court some background here, we have a photograph here.
What's that a photograph of?
A. That's the front of Cornelius Garrison's residence at 1533 Foy Street.
Q. We're just showing one photograph here. This is -- what's

this photograph of the crime scene?
A. Yes, that's a picture of Cornelius Garrison's body at the crime scene the night he was killed.
Q. What we want to do is just to provide some very basic background because I know this has been explained in other settings.
However, in order to track down who the suspected murderers were, when Mr. Garrison's body was found initially by NOPD, was there a phone found with him?
A. Yes.
Q. What did officers and soon after special agents start doing to further this investigation?
A. Investigators reviewed the contents of Mr. Garrison's phone and determined he had received text messages from a person who identified themselves as "Kim." That person had arranged to meet him at roughly 8:30 the night of his death.
Q. The person "Kim," in fact, instructed, told Garrison, "I'll be at your house at 8:30"?
A. Correct.
Q. So did investigators research that phone, the "Kim" phone?
A. Yes. Investigators determined which phone had been communicating with Cornelius. That phone had been purchased the day before the murder at a Family Dollar off the I-10 Service Road in New Orleans East.
Q. And in your parlance, what do investigators call such

phones?
A. A burner phone.
Q. So I know this has been labeled previously as Burner Phone 1 for the purpose of this investigation; is that right?
A. Yes.
Q. Now, did investigators try to then find out which phone numbers Burner Phone 1 had been in contact with other than Mr. Garrison?
A. Yes.
Q. How many phone numbers?
A. One.
Q. Well, did you investigate that other phone number?
A. Yes.
Q. And did you figure out when that phone had been purchased?
A. Yes.
Q. When did that phone get purchased?
A. It was purchased on August 26, 2020 at the same Family Dollar on the I-10 Service Road in New Orleans East.
Q. And in your investigation, did you then label that phone Burner Phone 2?
A. Yes.
Q. Did you investigate the location of these phones at the time of the murder?
A. Yes.
Q. Where was Burner Phone 1 located?

A. In the New Orleans East area of New Orleans.
Q. Not near 1533 Foy?
A. Correct.
Q. Now Burner Phone 2, however, the one that's in contact with Burner Phone 1, where was that one located at the time of Mr. Garrison's murder?
A. Burner Phone 2 utilized a cell site 500 feet from Cornelius Garrison's residence, approximately 500 feet.
Q. And while the communications between Garrison and Burner Phone 1 are occurring, can you describe whether or not there were communications with Burner Phone 2?
A. Yes. Burner Phone 1 was communicating with Cornelius Garrison and then also with Burner Phone 2 the night of the murder.
Q. And based on your training and experience and what you've learned on this case, what did it look like was happening?
A. It looked like Burner Phone 1 was coordinating and assisting with the homicide. Burner Phone 2 appeared to be at the location of the homicide the night of the murder.
Q. Did you obtain photographs of the person who purchased both Burner Phone 1 and 2?
A. Yes.
Q. And who did that resemble?
A. Ryan Harris.
Q. Ryan Harris is what -- does he have any involvement in the

Sideswipe investigation?
A. Yes. Ryan Harris is a suspect in numerous staged accidents throughout the Sideswipe investigation.
Q. Does Mr. Harris have any connection to Mr. Alfortish?
A. Yes.
Q. What's that?
A. Mr. Harris also received payments from Mr. Alfortish for staging accidents.
Q. Now, again, that's an overview of some of the evidence here regarding Mr. Harris and the homicide; correct?
A. Yes.
Q. I'd like to just turn now to Mr. Parker.
What is Mr. Parker's relationship, if any, with Ryan Harris?
A. Mr. Parker described himself in a deposition as Ryan Harris's stepdad. Essentially, Leon dated Ryan Harris's mother for some time.
Q. Have you investigated Mr. Parker's potential role in this homicide?
A. Yes.
Q. In furtherance of that, was a search warrant executed on Mr. Parker's Google account?
A. Yes.
Q. On September 6, 2020, did Mr. Parker conduct searches on his Google account?

A. Yes.
Q. What were they for?
A. For the name Cornelius -- or "Corlinus Garrett," "CORNELIUS GARRETT," and "Cornelius Garrett."
Q. Roughly different spellings or permutations of Cornelius Garrison?
A. Yes.
Q. Not exact, but it's a possibility?
A. Correct.
Q. And just to be clear, were these sequential searches?
A. Yes.
Q. For the record, when you go into a lot of these records, these Google records, it's labeled as UTC; is that right?
A. Yes.
Q. And that's universal -- go ahead, why not ask you?
A. Universal Central Time.
Q. Coordinated time?
A. Yeah, coordinated time.
Q. In the military, Zulu time?
A. Correct.
Q. All right, let's go with that.
Anyway, roughly speaking, though, what does that translate to time in New Orleans?
A. During this period, it would have been five hours behind UTC.

Q. It depends whether or not it's Daylight Savings?
A. Correct.
Q. We may refer to this as UTC later on just because we'll be referring to some records.
Okay, six days before the homicide, what happens then?
A. We see communication between Mr. Harris and Mr. Parker regarding Harris's attempts to purchase a firearm, specifically, a Scorpion firearm. There, you can see a picture of the firearm sent from Mr. Harris to Mr. Parker.
Q. Correct me if I'm wrong, I'm not sure if the records exactly show whether or not a photo was sent.
But at this time, that photo was taken by Mr. Harris?
A. Correct.
Q. And the photo here on the slide, do you recognize that photo -- or excuse me. Do you recognize what that gun is?
A. Yes.
Q. What is it?
A. A Scorpion.
Q. So that's actually a name of a gun?
A. Correct.
Q. All right. So after Mr. Harris says, "Scorpion," what does that -- what does Mr. Parker reply with?
A. "Man, that thing nice. Almost look like mines. How much?"
Q. What did Mr. Harris respond with?

A. $1,000.
Q. Continuing on in that conversation, September 16, 2020, six days before the homicide, what does Mr. Harris say?
A. "They going call me in the morning to let me know when to come pick it up. My background never came back N they was closing."
Q. To which Mr. Parker responded with what?
A. "Let me know when you get your hands on that thing. I may can get something real nice for it."
Q. And Harris replied with what?
A. "They just called. Told me to come pick it up on the 22nd."
Q. Now, did you agents contact Jefferson Gun Outlet?
A. Yes.
Q. Was Mr. Harris actually able to purchase this weapon?
A. No.
Q. He was denied?
A. Correct.
Q. However, this weapon was -- was this a 9-millimeter?
A. Yes.
Q. And what kind of weapon was used to murder Cornelius Garrison?
A. A 9-millimeter.
Q. Now let's go to September 21, 2020, the day before the homicide. What did Mr. Parker do with his bank account?

A. Mr. Parker withdrew $39,050 from his bank account.
Q. In fact, that was one of his bank accounts. In total -- he made another withdrawal; is that right?
A. Yes.
Q. The total from his two withdrawals from his Regions Bank account, what did that total?
A. $47,287.
Q. And how much did that leave in his account?
A. $2,617.63.
Q. Okay, excuse me, that's both his accounts at Regions Bank; correct?
A. Yes.
Q. Now, again, one day before the homicide, because, going back again, the depletion of the bank account is September 21st, 2020. So let's talk about meetings.
Did Mr. Parker meet with Mr. Harris the day before the homicide?
A. Yes.
Q. At 1:36 p.m., what did Mr. Parker text to Mr. Harris?
A. "I'm here."
Q. And what did Mr. Harris reply with?
A. "Pulling up."
Q. Where did they meet? Where did they meet, Special Agent?
A. I believe the meeting took place roughly in the area of I-10 Service Road and Crowder Boulevard near the Planet

Fitness.
Q. This location, right off the I-10?
A. Yes.
Q. And in a parking lot?
A. Correct.
Q. After this occurs, what happens next?
A. The purchase of Burner Phone 1.
Q. So, and we're showing here, what's this a photograph of?
A. This is a photograph of surveillance video from Family Dollar on I-10 Service Road from September 21st, 2020 at 3:04 p.m. It depicts an individual we believe is Ryan Harris.
Q. And only to highlight one detail here, he's wearing a sweatshirt --
A. Yes.
Q. -- with a logo on it. Have agents found that sweatshirt?
A. Yes, we believe so.
Q. Where was a similar sweatshirt found?
A. It was on Ryan Harris's person during an arrest in 2020.
Q. So after this phone was purchased, what did Mr. Harris, based again on phone data, what happened with that phone?
A. Burner Phone 1, when it's first activated, we see cell site data consistent with moving to the Chalmette area of -- well, to Chalmette.
Q. And Chalmette is where who lives?
A. Jovanna Gardner.

Q. And based on Ms. Gardner, she's previously been charged in this matter; correct?
A. Yes.
Q. In her factual basis, what did she confirm about the burner phone and Mr. Harris?
A. She confirmed that Mr. Harris gave her the burner phone the day before the murder.
Q. So next, after that burner phone is delivered, what does Mr. Harris do next?
A. Begins texting Mr. Parker again.
Q. What did Mr. Harris text with Mr. Parker at 6:38 p.m.?
A. "I'mma be there around 7:30."
Parker responds, "Same spot?"
Harris says, "Yeah."
Q. Okay. So we have a meeting between Mr. Parker and Mr. Harris before the purchase of Burner Phone 1?
A. Yes.
Q. Burner Phone 1 is purchased, and then what happens right afterwards?
A. Mr. Harris travels to Gardner's residence and provides her the phone.
Q. And then after that, what does Mr. Harris do?
A. Meets with Mr. Parker.
Q. For the second time?
A. Correct.

Q. Now at this point, Burner Phone 1, which Ms. Gardner has said is with her; correct?
A. Yes.
Q. Begins contacting Mr. Garrison; right?
A. Yes.
Q. But specifically, it starts that contact -- when does it start contacting Mr. Garrison?
A. At approximately 7:34 p.m. on the 21st.
Q. At that point, is Mr. Harris and Mr. Parker together?
A. Yes.
Q. Can you again describe roughly what's the interplay between Burner Phone 2 with Mr. Harris, Burner Phone 1 with Ms. Gardner, and Mr. Garrison's phone?
A. There'd be communications between Burner Phone 1 and Burner Phone 2. Then a communication between Burner Phone 1 and Cornelius Garrison. Seemingly, Burner Phone 2 was coordinating communication with Cornelius Garrison and Burner Phone 1.
Q. So, again, Burner Phone 1 which the one Ms. Gardner has admitted she's in possession of --
A. Yes.
Q. -- contacts Mr. Garrison and then Burner Phone 2?
A. Correct.
Q. And again, during this period, where are Mr. Harris and Mr. Parker's phones?

A. They have activity consistent with being at the same area next to the Planet Fitness off of Crowder and I-10 Service Road.
Q. Same location?
A. Correct.
Q. And just to be clear for the record, let's talk just a brief minute when we're talking about where Mr. Harris is and where Mr. Parker is.
Mr. Harris, this information, is this based on cell site data?
A. Correct.
Q. Cell site data can be accurate, or what have you, but we're often talking about the same vicinity; right?
A. Yes.
Q. A vicinity sometimes, not a specific location?
A. Right.
Q. And also, we'll be a little more particular coming forward here on some data, but sometimes we'll talk about Harris's true phone.
When you use the term "true phone," what does that mean?
A. The phone with his name and the subscriber data that he used on a daily basis for months prior to and after this incident.
Q. And this, of course, is compared to a burner phone?
A. Correct.

Q. When you talk about Mr. Parker, just to be clear, we're talking about the location of Mr. Parker's phone, but that's based on Google data?
A. Correct.
Q. Can you explain that just briefly, what location data you get from Google?
A. Yes. So Google retains data primarily through Wi-Fi GPS cell site data. For advertisement purposes, this is data enabled by the user. It can be disabled by anyone who has a Google account, but it's retained by Google for a number of years and can be requested by law enforcement.
Q. So whenever we're talking about Mr. Parker's location and discussing Google data, we're talking about the location of his phone; is that right?
A. Yes.
Q. Now, of course, you can access his Google account from his home too; right?
A. Yes.
Q. Presumably. But why is it that you believe that this is being used by his cell phone?
A. The location data was along routes of travel. So you would see GPS coordinates on roads at movements that are indicative of a car moving along a road, ultimately stopping at locations around the time period Ryan would text him, "I'm here." So therefore, we believe it was with a physical device

such as a phone.
Q. Understood, okay.
All right, so now we just concluded here the second time they meet together, and this is the second meeting the day before the homicide.
Let's go to the day of the homicide. Did Mr. Harris and Mr. Parker meet the day of the homicide?
A. Yes.
Q. On the day of the homicide -- one important point here is what neighborhood did Mr. Parker live in?
A. At this time, he's living in the Hollygrove area of New Orleans?
Q. At this time, where did Mr. Harris live?
A. Off I-10 Service Road in New Orleans East.
Q. So right here, was there data that Mr. Harris spoke to Mr. Parker?
A. Correct.
Q. Okay. Now then Mr. Parker's phone travels to New Orleans East; is that right?
A. Yes.
Q. At approximately 7:55 p.m. -- excuse me.
It traveled to New Orleans East and then departs New Orleans East around 7:42; is that right?
A. Yes.
Q. Now the murder of Mr. Garrison is at 8:30?

A. Yes, roughly.
Q. When Mr. Parker's phone leaves New Orleans East and heads -- and leaves the area, it goes back to Hollygrove; is that right?
A. Correct.
Q. And what does it do in Hollygrove?
A. Mr. Parker's phone has a 71-minute phone call at 7:55 p.m.
Q. Now have you reviewed Mr. Parker's phone records for the duration of his calls?
A. Yes.
Q. Would you characterize this as a relatively long call?
A. Yes.
Q. Now Harris's phone, around 10:30 p.m., where did Harris's true phone go after the homicide?
A. That New Orleans East area -- or excuse me. At 10:30, it travels to the area around Parker's residence.
Q. I should point out, though, before that, was there data showing Mr. Harris's true phone elsewhere before it goes to Hollygrove?
A. Yes.
Q. Where did it go?
A. The New Orleans East area.
Q. Okay. And then after that, where does Mr. Harris's true phone go at 10:30?
A. To the general area of Mr. Parker's residence in

Hollygrove.

Q. And there are two outgoing calls here to Parker's phone at 10:31 and 10:32; correct?

A. Yes.

Q. And then what does Harris's true phone do in New Orleans East? Sorry.

Where does it go at approximately 11:07 p.m.?

A. New Orleans East area.

Q. Okay, so. Now, again, Mr. Parker's phone does show that it goes back to his residence, the area of his residence in Hollygrove during the time of the murder; correct?

A. Yes.

Q. However, what do you make of that 71-minute call?

A. It looked to me like an alibi call. It's just pretty lengthy compared to other calls made by Mr. Parker throughout his toll records.

Q. And I think we're going to touch on that a little bit more later on.

However, this is not the end of Mr. Parker's activity on September 22nd, 2020, the day of the homicide; is that right?

A. Correct.

Q. In fact, according to the Google data, does Mr. Parker make a late night trip to Kenner?

A. Yes.

Q. And at about what time is that?

A. Approximately 11:20 p.m., Mr. Parker's phone departs the Hollygrove area. At approximately 11:35, Parker's phone arrives in the vicinity of the Home Depot on Veterans Boulevard in Kenner.
Q. And specifically, was it behind the Home Depot?
A. Yes.
Q. Again, just as far as the rough location, things like Google data, is there a rough range of distance that this is accurate to?
A. Yes. With each data point, they'll provide a radius where the phone could be at that time.
Q. So did it look like he was inside the Home Depot or Wal-Mart?
A. Most of the data was in the general area behind, closer to a baseball field and a small school.
Q. Now how long did his phone remain there?
A. Ten minutes.
Q. And just to show -- go ahead.
A. Just roughly ten minutes.
Q. And as far as the rough location, there's a map up here, and there's a red dot. Again, this area is approximate because the phone is just around that area; right?
A. Correct.
Q. So this is really just for a demonstrative, but it's that 26th Street area behind both the Home Depot and Wal-Mart;

right?
A. Yes.
Q. And this is off of Veterans Boulevard?
A. Yes.
Q. In Kenner?
A. Yes.
Q. Where does Mr. Alfortish reside?
A. During this time period, the Kenner area.
Q. And also, had there been previous recorded meetings between Mr. Garrison and Mr. Alfortish?
A. Yes.
Q. Mr. Garrison had recorded these because he was an FBI confidential informant?
A. Yes.
Q. Where did those meetings occur?
A. Various locations off of Veterans Highway or Boulevard.
Q. Now Mr. Parker, that's not the end of the data we have regarding Google; correct?
A. Correct.
Q. Did Mr. Parker use his phone to conduct searches?
A. Yes.
Q. In fact, he did some searches, again, potentially related to Cornelius Garrison about two weeks or so before the homicide?
A. Can you repeat the question?

Q. About two weeks or so before the homicide, he had searched for Cornelius Garrison?
A. Yes.
Q. Seven days after the homicide, what did he do?
A. Mr. Parker conducted Google searches for articles related to Sean Alfortish.
Q. And what are we posting here? Where is this data from here on the screen?
A. This is from Leon Parker's Google search history.
Q. And this is -- first of all, as a general characterization, did you look at Mr. Parker's Google history generally?
A. Yes.
Q. There's some news articles here. Are there lots of news articles in that news history, I mean, that search history?
A. Occasionally, but not often.
Q. So we have here, again, sequential searches; is that right?
A. Yes.
Q. And another three right here; correct?
A. Yes.

**MR. PAYNE:** The first one -- we're going to submit this as Government's Exhibit V as in Victor, and this is not under seal, Your Honor.

I'll provide a copy to the Special Agent as well.

**BY MR. PAYNE:**
Q. So Special Agent, first of all, there is -- this is the first search in Mr. Parker's search history; is that right?
A. In that time period we showed, yes, that's correct.
Q. Okay. So there's a link here, and we copied it right here on the slide, the slide deck. The first link in the search history appears to no longer be operable; is that right?
A. Yes.
Q. Did we inquire with the Louisiana Attorney Disciplinary Board regarding this Doc ID 8068?
A. Yes.
Q. And what did they respond with?
A. They responded with the Doc ID being valid; however, the link had expired and provided the document we have here today.
Q. So this one doc, is that document Exhibit V?
A. Yes.
Q. So this search, to be clear, is to the Louisiana Attorney Disciplinary Board?
A. Correct.
Q. Their website?
A. Yes.
Q. For a document that is for Internet purposes on their website is labeled as Doc 8068. And what does this document concern?
A. It concerns Sean Alfortish's disbarment with the State of

Louisiana Board or Bar Association.
Q. The document speaks for itself, but it says there Recommendation of the Louisiana Attorney Disciplinary Board for Sean Alfortish?
A. Correct.
Q. All right, that's Mr. Parker's first search on September 29th, 2020.
Let's go to the next search. What did he search for next?
A. The next search was, again, about Alfortish, May 2019, Louisiana Record article, and it discusses the staged accident scheme at that time.
**MR. PAYNE:** Again, this document speaks for itself, and we've attached it as an exhibit to our motion, Your Honor.
**BY MR. PAYNE:**
Q. Again, on this one, was this document about, for example, Ms. Motta?
A. No.
Q. Who was this about?
A. Sean Alfortish.
Q. Let's go to the next article that Mr. Parker searches for in his Google history on September 29th, 2020. What's this next document about?
A. This article is about Sean Alfortish's sentencing to 46 months in prison related to his previous conviction involving the Horsemen's Benevolent and Protective Association.

Q. This conviction, again, nothing with Ms. Motta; correct?
A. Correct.
Q. Okay. But this article, however, was from what year?
A. February 2012.
Q. So about eight years earlier?
A. Yes.
Q. Then another article, Special Agent, here, this one is again in sequential order. What's this article that Mr. Parker searched for?
A. November 2019 article regarding Sean Alfortish and Vanessa Motta's role in the staged accident scheme.
Q. And then -- so this is the search for, as you said, November 2019 WWL article. This one obviously concerns Ms. Motta as well; correct?
A. Yes.
Q. And then one more article. Again, this is in sequential order; correct?
A. Yes.
Q. Where is this article from?
A. *NOLA.com*.
Q. What's the date of that article?
A. January 2018.
Q. This article though, specifically, is this about Operation Sideswipe or crashes?
A. No.

Q. What's this article about?
A. It's about Alfortish's lawsuit to own thoroughbreds after his conviction in 2012.

**MR. PAYNE:** Your Honor, we have some witness information to share under seal.

**THE COURT:** All right, then we need to clear the courtroom. Isabella, you can stay. All others must leave if you have no official role here.

(Proceedings held under seal.)

**THE COURT:** We have a couple of exhibits that have been mentioned and not yet admitted too while we're refilling the room. We had Government Exhibit V which is the LADB report.

Any objection, Mr. Haedicke?

**MR. HAEDICKE:** No, Judge.

**THE COURT:** All right, so that's admitted.

And there was another that was attached to your motion or your filing, I believe, but I didn't catch the letter on it.

What was it, Angelle?

**DEPUTY CLERK:** Parker 1.

**MR. PAYNE:** Yes, Parker 1. Yeah, Your Honor, we'll offer Parker 1.

**THE COURT:** Okay, Mr. Haedicke, any objection to Parker 1?

**MR. HAEDICKE:** No objection, Judge.

**THE COURT:** All right, admitted. Thank you.

Did you finish your direct?

**MR. PAYNE:** I did. That was it.

**THE COURT:** Okay.

**MR. PAYNE:** And I think we ended off on that sealed matter; so I think we want to continue with cross.

**THE COURT:** All right, very good. Thank you.

**CROSS-EXAMINATION**

**BY MR. HAEDICKE:**

Q. Agent Heimbach, you mentioned a crash, a car wreck in December of 2021. And essentially, what I understood is that the reason you believe that it was a staged car wreck rather than just an actual car wreck is that the vehicle was salvaged?

A. Yes, among other factors.

Q. Tell me what those other factors are.

A. It is in the same general area where previous staged accidents had occurred.

If I'm remembering correctly, that's the accident where it was a head-on collision as well which is similar to previous accidents that have been staged by Mr. Parker.

And then I believe Ms. Motta represented him in that matter as well which we've determined is indicative of fraud.

Q. Okay. Anything else?

A. Not that I recall.

Q. Now you said head-on collision, that was an indication of fraud to you because allegedly Mr. Parker had been involved in other collisions that were head-on. What other collisions? What are you talking about?
A. The 2017 accident where there was a head-on collision. Mr. Parker was in a vehicle. The other vehicle was occupied by Jovanna Gardner. I believe Vernika Blunt was there as well. And then Mr. Harris was on scene for an unknown reason.
Q. Okay. Now have you ever spoken to the other driver in this December 2021 collision?
A. No.
Q. Now the November or the recent November 2024 car wreck that Mr. Parker was in, you also suggested that -- I'm not putting words in your mouth, but I think you believe or you suggested that was also fraudulent?
A. Yes.
Q. What reasons do you have for that?
A. That accident was on Eastbound I-10, an area throughout this investigation frequently used for staged accidents. Again, another salvage title. Those are two of the factors in the initial report that we deem suspicious and likely a fraudulent accident.
Q. Anything else? The location and the salvage title, is that the extent of your evidence regarding that?
A. And Mr. Leon Parker's involvement, yeah.

Q. Have you spoken to the other driver in the other car?
A. No.
Q. Have you gathered a police report regarding --
A. We made attempts to find the police report. It's not clear at this time if one was even made.
Q. Now you said that there was an insurance claim filed regarding that November 2024 --
A. Yes.
Q. -- accident? Do you know the status of that claim?
A. I don't know. All I know is that a claim has been filed. We requested those records.
Q. Now you mentioned that a search warrant was performed on Mr. Parker's home in December, just a few days ago.
What evidence was recovered during that?
A. Again, approximately five and a half kilos of marijuana, cell phones, various documents, scales, digital scales.
Q. I understand that it's only a few days ago that this search warrant occurred. But do you believe that you recovered any evidence connected to staged car wrecks or the murder of Mr. Garrison?
A. The first part of your question, yes, staged accidents. There's various insurance documents, business cards from Ms. Motta. So yes.
Q. How about the murder, anything that you believe is connected to that?

A. There's cell phones that could contain evidence of the homicide of Mr. Garrison.
Q. Are you performing searches on those cell phones?
A. We will be seeking a search warrant for those cell phones.
Q. Now regarding these communications between Mr. Harris and Mr. Parker regarding the firearm, the 9-millimeter firearm, do you recall that?
A. Yes.
Q. Mr. Harris was actually attempting to purchase a firearm from a gun shop?
A. Yes.
Q. Now I understand that he was later declined, or they wouldn't allow him to purchase that firearm. Do you know why?
A. Yes. Because of a previous firearms-related conviction, he was denied.
Q. Now you mentioned that Mr. Parker had given a deposition at some point. That was in relation to one of the car wrecks; is that right?
A. Yes, that was a deposition related to the January 2016 accident.
Q. January of 2016?
A. Yes, that's when the accident occurred. The deposition, I believe, was roughly a year later.
Q. Now regarding this 71-minute call that was occurring during the time frame of the murder, do you know who that call

was made to?
A. We have databases that have suggested who the subscriber might be, but we have not talked to that person or identified him at this time.
Q. Now you mentioned Mr. Parker taking out money from his bank account September 21st, 2020. Have you done any investigation to determine if that money was later used for any other purpose or deposited back into a bank?
A. Yes.
Q. What did you learn?
A. We were unable to determine where that money went after it was withdrawn.
Q. Now Mr. Garrison recorded conversations with Mr. Alfortish. I want to make this a broader topic.
Mr. Garrison never provided the Government with any information regarding Mr. Parker; is that correct?
A. He made statements more broadly that he assisted the Harris family, but he never specifically identified Mr. Parker as far as I know.
Q. Okay. So I take it there were no conversations recorded by Mr. Garrison regarding him and Mr. Parker?
A. Correct.
Q. Now regarding these searches that the Government believes Mr. Parker made regarding Mr. Alfortish and various news reports, I mean your investigation into these car wrecks have

been going on for years before September of 2020; is that correct?
A. Yes.
Q. And Mr. Alfortish and Vanessa Motta had been in the news a number of times in relation to that investigation?
A. Yes.
Q. So if somebody were just curious about the state of this investigation, they could kind of go into an Internet wormhole regarding Mr. Alfortish and search a lot of different things. You would agree with me?
A. It's possible, yes, sir.
Q. There's lots of different information out there about Mr. Alfortish and his legal troubles in the past and his alleged involvement in this scheme. Would you agree with me?
A. Yes.
Q. Now you mentioned Mr. Parker or the Government presented information on Mr. Parker, or at least, his phone. You tracked his phone making a trip to Kenner on the night of September 22nd, 2020. Do you remember that?
A. Yes.
Q. And the implication, again, without any direct evidence, but the implication that the Government is obviously making is that Mr. Alfortish met with Mr. Parker out in Kenner. Is that what you believe?
A. Yes.

Q. Do you have any evidence to substantiate that belief?
A. The meetings with Cornelius that we discussed had a particular -- I guess, Sean Alfortish met him in specific areas along Veterans. So this travel by Leon Parker was consistent with those previous meetings we saw between Sean and Garrison.
Q. Anything else?
A. No.
Q. I mean I assume that you've probably gotten data, cell phone data, etcetera, from Mr. Alfortish's phones during this investigation?
A. We have received various phone data from Mr. Alfortish's phones, correct.
Q. Am I correct in saying, based on your answer, that none of that data would corroborate your belief that Mr. Alfortish met with Mr. Parker out in Kenner on this night?
A. There was no location data available with Mr. Alfortish's devices. So I couldn't say either way based on that.
**MR. HAEDICKE:** No further questions, Judge.
**THE COURT:** Thank you.
Any redirect, Mr. Payne?

**REDIRECT EXAMINATION**

**BY MR. PAYNE:**
Q. So to discuss Mr. Garrison's involvement with Mr. Parker, the January 2016 accident, who did that involve?
A. That involved Leon Parker, Selita Harris, Darnell Harris.

Mr. Parker was in communication with a phone number associated with Cornelius Garrison before and after that accident.

Q. In Mr. Garrison's role as a slammer, does that suggest to you that Mr. Garrison set up that accident?

A. Yes.

Q. And did Mr. Parker profit from that accident?

A. Yes.

Q. And was this a settlement amount?

A. Yes.

Q. How much for?

A. It was a settlement of over $800,000. Mr. Parker received, I believe, $100,000 worth, a check for $100,000 out of that settlement.

Q. Regarding the other collisions that were set up other than 18-wheelers, have you investigated other collisions that were set up by Mr. Harris?

A. Yes.

Q. Because I know we spoke about these are basically set up between two smaller vehicles; correct?

A. Yes.

Q. Have you been able to identify other accidents of this nature set up by Mr. Harris?

A. Yes.

Q. And do they have the same kind of hallmarks that we're talking about?

A. Yes.
Q. Regarding the firearm, I know that we talked about -- Mr. Haedicke asked you questions about that firearm and whether or not it had been purchased by Mr. Harris.
Again, he was denied; correct?
A. Yes.
Q. In those text messages, though, I believe that did -- there were text messages, excuse me, from Mr. Parker. When he saw that, what did he respond about the Scorpion?
A. "Oh, nothing. Nice. Almost look like mines."
Q. Potentially in reference to another Scorpion firearm?
A. Correct.
Q. Withdrawal, we asked you about that withdrawal of funds the day before the homicide, September 21, 2020.
Just to be clear, based on your training, experience, and what you've seen in this case, what does that signify to you?
A. It's indicative of individuals or Mr. Parker draining his bank account prior to committing a crime possibly to evade law enforcement when they begin their investigation.
Q. Finally, Mr. Haedicke asked you some questions about the Google searches for Mr. Alfortish afterwards, okay.
And regarding those Google searches, concerning, you said, going down Internet wormholes, you viewed Mr. Parker's search data history. Does Mr. Parker go down Internet wormholes that much?

A. I hadn't seen any wormhole -- like he'd never performed searches like this before regarding Mr. Alfortish.
Q. And those searches about Mr. Garrison, I think just to make it clear on this point, those searches about Mr. Garrison, were those conducted before or after Mr. Garrison's indictment?
A. Before.
Q. So there was not a news story about Mr. Garrison's indictment at this point?
A. Correct.
**MR. PAYNE:** Thank you very much. I think we'll submit on that, Your Honor.
And again, just for the record, we did provide a copy of the PowerPoint which we ask to be put under seal. Thank you.
**THE COURT:** Thank you. And we will seal that document.
**MR. PAYNE:** Thank you.
**THE COURT:** Does the Government have any other witnesses?
**MR. PAYNE:** No, Your Honor, the Government submits.
**THE COURT:** All right, thank you.
Would any of the staff or lawyers involved like a five-minute comfort break before we continue? We've been at it for about two hours. It's up to you.
**MR. HAEDICKE:** May I have just a moment to talk to

Mr. Parker's wife? Yes, five minutes.

**THE COURT:** All right. We'll meet back here at 4:00 o'clock sharp. Thank you.

**DEPUTY CLERK:** All rise.

(A short recess was taken.)

**DEPUTY CLERK:** All rise.

**THE COURT:** Thank you. Be seated, and we can continue.

All right, Mr. Haedicke, I think Mr. Payne has submitted, and we're over to you.

**MR. HAEDICKE:** No witnesses, Judge.

**THE COURT:** Oh, okay, all right. Then let's have brief concluding arguments, and then I will rule.

**MR. PAYNE:** Certainly, Your Honor.

In sum, Your Honor, the information we've presented here concerns both Mr. Parker's involvement in the long-term fraud, but more importantly, his involvement in obstructing a witness and very likely assisting in and aiding in a homicide.

We've presented evidence that he was involved, made searches for Mr. Cornelius Garrison weeks beforehand, just a couple of weeks beforehand. Met with Mr. Harris several times before. Mr. Harris, a person that he was very close to. Again, Mr. Parker was dating Mr. Harris's mother.

The subsequent actions also connect him very directly to Mr. Alfortish who we've established did have a motive in

order to silence Mr. Garrison. And we know specifically Mr. Garrison -- excuse me, Mr. Parker had an involvement with Mr. Garrison in this scheme. Mr. Garrison was a slammer involved regarding a settlement where Mr. Parker settled for over $800,000.

Moving beyond that, Your Honor, we also have a recent arrest in November 2024. In that arrest, Mr. Parker provided on his bond paperwork an address of 2713 Dawson Avenue, Kenner, Louisiana which is nowhere near where he lives. Now by all means, I don't know if that's an address related to possibly another person that he knows. But my understanding is when a court such as the judge in Jefferson Parish asks for bond paperwork and you're supposed to put down your address, that's not supposed to be an address for your daughter, for your friend. That is your address where you are expected to be found.

According to Mr. Parker's own spouse on the day of the search warrant on December 9th, she explained they had been living in Slidell for a couple of years. So already we have recently, very recently Mr. Parker has provided false information to a court relating to bond. Respectfully, that should also be disqualifying as to whether or not he should receive bond here today.

Based on this information, the Government submits -- one moment.

We do want to emphasize also, Your Honor, that there was a search done at Mr. Parker's house; and at that search, there was five and a half kilograms of marijuana. I know that, I believe, probation has recommended that she be a third-party custodian. I believe that's inappropriate here. Again, she has been residing at this residence where, according to the ledger, also Mr. Parker has been distributing drugs over at least a year. Either she's then complicit or had knowledge or was ignorant of it. Regardless, that makes her inappropriate as a third-party custodian.

We ask that bond be denied and he be held pending trial.

**THE COURT:** Thank you.

**MR. HAEDICKE:** Judge, the fact remains, I mean, despite this presentation that's been made, there has been no indictment of my client for involvement with this homicide of Mr. Garrison. If they believe that they can do that and they believe it's appropriate, then they should do it. But I submit that they -- this evidence and each one of these things, there's a lot of circumstances, a lot of smoke that they can point to. But where is the direct evidence of involvement?

You know, the Internet searches, this case has been in the news for years. And so is it unusual for Mr. Parker to have made searches about some of the people he's reading about in the news? No, it's not unusual at all.

The text regarding the gun with Mr. Harris, Mr. Harris is attempting to buy a gun at a gun shop legally. There's no reason why my client can't have a conversation with somebody that he's reportedly very close with about something that this person is doing. There's no allegation that that gun was actually used in a homicide.

And this is a good example. They say, well, this is a 9-millimeter gun that they're texting about, and then Mr. Garrison is killed with a 9-millimeter gun later on. These are just kind of, whatever, indications that ultimately mean nothing. They're sound and fury that ultimately means nothing.

You know, these conversations, communications, meetings between Mr. Harris and Mr. Parker that allegedly happened, they admit. They say Mr. Parker is close with Mr. Harris. None of these things show any kind of indication of guilt. It's just more circumstances that they can point to that say, well, maybe that happened, maybe that happened. But again, there's been no indictment of my client regarding this homicide. And I submit that if they could do that and they believe that confidently they could obtain a conviction on that, then they would do that. But they have not done that.

And other than that, if you take that out of the equation, then you have my client Mr. Parker having allegedly participated in car wrecks that happened back, you know, some of them, nine years ago at this point or almost nine years ago.

So my client lives on disability. He lives at home with his wife. Now I understand that these allegations of drug dealing are present. Quite frankly, this was news to me; so I understand the Court's concern with that. But I do believe that it would be possible to fashion some form of supervision that would assure the Court of my client's -- both my client's return to court when he's required to do so and the safety of the community. Some house arrest, home detention, whatever condition that the Court would be comfortable with, then Mr. Parker would agree to comply with.

**THE COURT:** Thank you, Mr. Haedicke.

All right, I am prepared to rule. In determining whether defendant should be detained in this case, the Court is guided by several general principles. First, at all times, the defendant is entitled to the presumption of innocence. Nothing that occurred in this hearing or that I set forth in my findings is intended or should be construed to affect that presumption. Rather, the purpose of this hearing is to determine whether, notwithstanding the presumption of innocence, the defendant should be detained pending trial.

Second, under the Bail Reform Act, a defendant must be released prior to trial unless the Court finds that no condition or combination of conditions exist that will reasonably assure the appearance of the defendant if the Government seeks detention based on risk of flight or

reasonably assure the safety of any other person in the community if the Government seeks detention based on the defendant being a danger to the community.

In this case, the Government moved both on risk of flight and danger styled as obstruction. The act requires that the least restrictive conditions be imposed that are necessary to provide those reasonable assurances. If I cannot find any conditions that will reasonably assure the appearance of the defendant as required or the safety of the persons in the community, then I am required by the act to order the defendant held in custody.

In this case, I'll turn my attention first to the risk of flight or risk of non-reappearance. The Court does not hold a real concern about that. Usually, conditions can be fashioned that will ensure reappearance through monitoring or home confinement. Although I have not heard about any suitable place to house Mr. Parker in particular since it appears that the house was the site of significant drugs, and I did not see a condition or combination of conditions that would reassure me on that. But I could have worked with that if I was also satisfied that Mr. Parker does not present a danger to the community.

But I find that Mr. Parker does present a danger to the community in particular relating to the obstruction allegations that the Government has just laid out here in great

detail. I am concerned about the fact that 16 days before the murder, he was searching for Mr. Garrison's name on Google. That seems like quite a coincidence given how far they go back together to the slamming days of 2016, '17, and that time frame.

I am concerned that six days before the murder, he was texting with Mr. Harris about the Scorpion 9-millimeter gun, confirming had one, and then, indeed, it was a 9-millimeter gun that was used in Mr. Garrison's murder.

I am concerned that one day before the murder, he withdrew $47,000 which was substantially all of his money from his accounts. This certainly suggests that he was concerned about something.

I am concerned that one day before the murder, he met with Harris who then went to buy a burner phone, Burner Phone No. 1, less than two hours later which was delivered to Jovanna Gardner that same day.

Obviously, the killing of Mr. Garrison is an act of obstruction in a significant federal investigation, and there is enough evidence here to be concerned that Mr. Parker had some role in that. Whether he knew that the meeting between Mr. Harris and Mr. Garrison was to kill Mr. Garrison or whether it was to pay him off as Jovanna Gardner alleges she believed, either way, it is an act of obstruction.

Those negotiations began with an offer to pay

Mr. Garrison apparently by Alfortish and Motta and move him to the Bahamas and to appoint him a lawyer. And so there's just a lot of evidence that Mr. Garrison was, indeed, hushed up.

In addition, I am concerned about the evidence that Mr. Harris and Mr. Parker were apparently together on the day of the murder as evidenced by the Google location data. Also, on the day of the murder, they met again and that Mr. Parker apparently went to New Orleans East.

I find sufficient reason to disbelieve the 71-minute call was legit and that, in fact, it may have been an alibi call and that Mr. Parker may have been on site with Mr. Harris at the time of the murder. I am concerned about the additional calls later on the day of the murder from Mr. Harris to Mr. Parker at 10:31 and 10:32 following which Mr. Parker made a trip to Kenner which may have only lasted ten minutes, but there is reason to be concerned about that location.

I am concerned about the implications that were presented as to Mr. Harris's visit by a witness with significant personal information and supporting that the 71-minute call was an alibi call.

I am concerned about evidence of other crimes in Mr. Parker's recent and far past, including, four possibly fraudulent car accidents, including, one that just happened last month. I am concerned about five and a half kilos of marijuana and evidence of dealing, including, the possession of

scales and baggies.

I am concerned about his acts of evasion, including, the wrong address given on an appearance bond just last month. That is, indeed, a pretty grievous error, if it is one on his part, that suggests that maybe he didn't want to be found.

And again, I just don't see any condition or combination of conditions that can overcome all of that. So for all of these reasons, I find that Mr. Parker must be remanded to the custody of the marshal and detained pending his trial. Thank you.

**MR. HAEDICKE:** Thank you, Your Honor.

**MR. PAYNE:** Thank you, Your Honor.

**DEPUTY CLERK:** This concludes the docket.

(Whereupon this concludes the proceedings.)

**CERTIFICATE**

I, Alexis A. Vice, RPR, CRR, Official Court Reporter for the United States District Court, Eastern District of Louisiana, do hereby certify that the foregoing is a true and correct transcript, to the best of my ability and understanding, from the record of the proceedings in the above-entitled and numbered matter.

*/s/Alexis A. Vice, RPR, CRR*
Alexis A. Vice, RPR, CRR
Official Court Reporter